**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN NOAKES<br>c/o Engel & Martin, LLC<br>4660 Duke Drive, Suite 101<br>Mason, Ohio  45040,<br><br>Plaintiff,<br><br>v.<br><br>SYRACUSE UNIVERSITY<br>900 South Crouse Ave.<br>Syracuse, NY 13244,<br><br>Defendant | Case No.   5:18-cv-43 (DNH/DEP)<br><br>Judge:<br><br><br>COMPLAINT<br><br>AND<br><br>JURY DEMAND |

**INTRODUCTION**

1.  Plaintiff John Noakes brings this action for breach of contract, violation of Title IX, and other related claims.

2.  This case arises out of the decision of Syracuse University ("Syracuse") to impose disciplinary sanctions against John Noakes in violation of the Plaintiff's contractual rights.

3.  The allegations in this case are substantially similar in numerous respects to allegations brought by another Syracuse student in this Court in *Doe v. Syracuse University, No.* 5:17-CV-0787.

**PARTIES**

4.  Plaintiff John Noakes is a former student at Syracuse.

    a.  John Noakes is a Florida resident with a residence at [OMITTED].

    b.  John Noakes has completed six semesters of coursework at Syracuse, including a summer term.  He needs approximately 26 additional credits to obtain his undergraduate degree, and approximately another 30 additional credits after that to complete the "CPA Track." Noakes was also planning to take courses for graduate credit at Syracuse.

1

    c.  John Noakes has paid a significant amount of money to Syracuse in the expectation of receiving an education and, if he successfully completes his classwork, a degree.

    d.  The disclosure of John Noakes' identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99.

5. Defendant Syracuse is a private university.

    a.  Syracuse was founded in 1870 as a nonsectarian private school, although it maintains a relationship with The United Methodist Church. Syracuse has a current enrollment of over 21,000 students, including approximately 15,000 undergraduates.

    b.  Syracuse has a principal place of business at 900 South Crouse Ave., Syracuse, NY 13244

    c.  Syracuse voluntarily participates in federal spending programs.

## JURISDICTION AND VENUE

6. This case arises, in part, under the laws of the United States, specifically Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq* and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 200d *et seq.*. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

7. This case is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332.

8. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all other claims in this case, as the claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

9.  This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391.  The
defendant is a resident of the State in which this district is located and a substantial part of the
events or omissions giving rise to the claim occurred in this district.

**FACTS**

**SYRACUSE'S RESPONSE TO THE ISSUE OF SEXUAL MISCONDUCT ON
CAMPUSES**

10. After years of criticism for being too lax on campus sexual assault, colleges and universities are
relying on Title IX to crackdown on alleged perpetrators.  Unfortunately, this crackdown has gone
too far.  Problems include: accused students effectively are presumed guilty; instead of requiring
accusers to prove they were assaulted, the accused students have to prove they had consent; and
schools apply the very lowest standard of proof — preponderance of the evidence.  In many
instances schools undertake incomplete and biased investigations and hearings.

11. On April 11, 2011, the U.S. Education Department's Office of Civil Rights ("OCR") sent a  "Dear
Colleague" to colleges and universities.

   a.  The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and
Universities must have transparent, prompt procedures to investigate and resolve
complaints of sexual misconduct.

   b.  Most notably, the Dear Colleague Letter required schools to adopt a relatively low burden
of proof—"more likely than not"—in cases involving sexual misconduct, including assault.
Several colleges had been using "clear and convincing," and some, like Stanford, had
applied the criminal standard, "beyond a reasonable doubt."

   c.  The Dear Colleague Letter states that schools should "minimize the burden on the
complainant," transferring alleged perpetrators, if necessary, away from shared courses or
housing.

    d.  The Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

    e.  After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures.

12. The Obama administration, through OCR, pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

    a.  The "Dear Colleague" letter was a step in the increased enforcement of Title IX on colleges and universities. NPR described the Dear Colleague Letter as the government's "first warning shot."  Source:  *How Campus Sexual Assaults Came to Command New Attention*, NPR, August 12, 2014.

    b.  In February 2014, Catherine E. Lhamon, the assistant secretary of education who heads the department's Office for Civil Rights, told college officials attending a conference at the University of Virginia that schools need to make "radical" change.  According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington."  Source:  *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education, February 11, 2014.

    c.  Lhamon was quoted in the LA Times stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward."  David G. Savage and Timothy M. Phelps, *How a little-known education office has forced far-reaching changes to campus sex assault investigations,* LA Times August 17, 2015.

13. Colleges and Universities, including Syracuse, were scared of being investigated or sanctioned by the Department of Education and/or of potential Title lawsuits by the Department of Justice ("DOJ").

a.  The Federal government has created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." Source: *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

b.  Lhamon told a national conference at Dartmouth in the summer of 2014, "I will go to enforcement, and I am prepared to withhold federal funds." Source: *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014. In that same article, Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead.

c.  Other news reports have suggested that the threat to withdraw federal funding from schools is credible. MSNBC reports:

>   Speaking at a conference on campus sexual assault held at Dartmouth College, Assistant Secretary for Civil Rights at the Department of Education Catherine Lhamon said that despite the fact it has never been done before, she is prepared to cut off federal funding to schools that violate Title IX, the 1972 gender equity law.

5

> Calling that one enforcement mechanism part of a set of "very, very effective tools," Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."
>
> In her 10-month tenure at the Department of Education, Lhamon has threatened to withdraw federal funding from four schools. "It's not surprising to me that we haven't gone to the last step," she said. "It means that so far the process has been working."

Meredith Clark,  *Official to colleges: Fix sexual assault or lose funding*, July 15, 2014

(available at: http://www.msnbc.com/msnbc/campus-sexual-assault-conference-dartmouth-college#51832)

d. The White House issued a report entitled "Not Alone" in April 2014, which includes a warning that if the OCR finds that a Title IX violation, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools, if a voluntary resolution cannot be reached, the DOJ may initiate litigation.

e. In June 2014, Lhamon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ."  She further told the Committee:

> If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments.

f. Robert Dana, dean of students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and

universities are getting very jittery about it." Source: *Some Accused Of Sexual Assault On Campus Say System Works Against Them*, NPR, September 3, 2014.

    g.   In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. Source: *Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault*, Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

14. On September 22, 2017, the Department of Education withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment." Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017).[1]

    a.   In withdrawing the Dear Colleague Letter, OCR observed that prior actions "may have been well-intentioned, but . . . led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints." *Id.* at 1-2.

    b.   OCR further said:  "Legal commentators have criticized the 2011 Letter . . . for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." As a result, many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." *Quoting Open Letter From Members Of The Penn Law School Faculty:  Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

---

[1]Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

15. The change in administrations is unlikely to change the pressure felt by colleges and universities.

   a. One college President was quoted in the Chronicle of Higher Ed. suggesting that the crack-down would continue regardless of actions by the Trump Administration. Diane Harrison, president of California State University, Northridge, said, "There are rumors that they're going to lessen what we have to do. So we are potentially going to need to be far more assertive and far more vocal." Chronicle of Higher Ed., *Do Not Step Away*, January 16, 2017 (Available at: https://www.insidehighered.com/news/2017/01/26/college-leaders-discuss-future-title-ix-sexual-assault-prevention-efforts). The same article noted, "College presidents . . . were in agreement that they would continue to use the preponderance of evidence standard, even if the 2011 guidance were to be reversed. The majority of colleges were already using the standard prior to the Dear Colleague letter." *Id.*

   b. A separate article in the Chronicle of Higher Ed. noted, "even though colleges are likely to face much less pressure from the federal government, that doesn't mean they'll stop following the letter or the spirit of Title IX." Chronicle of Higher Ed., *Trump Administration May Back Away From Title IX, but Campuses Won't*, Nov. 11, 2016 (available at: http://www.chronicle.com/article/Trump-Administration-May-Back-238382). The article continues: "Even though the particular manner of enforcement may change, Title IX will still be law, and regulations written to carry it out will still be obligatory. . . . It hasn't been just the federal government but campus activists and advocacy groups, as well, that have pushed colleges to pay more attention and devote more resources to stopping sexual assault."

16. In response to pressure from OCR, DOJ, and the White House, educational institutions, like Syracuse, limited procedural protections afforded to male students, like John Noakes, in sexual

8

misconduct cases.  This is not political speculation.  The Association of Title IX Administrators published "2014 Whitepaper" entitled *Equity is Such a Lonely Word*, includes training materials presented to college Title IX departments and states: "victims have historically been accorded 3/5 of the rights of an accused individual (or less), and ***victims are typically women***, equity may require institutions to recalibrate the pendulum to right the historical imbalance." (emphasis added).

17. In recent years, and during the period preceding the disciplinary actions against John Noakes, there was substantial criticism of Syracuse, both in the student body and in the public media, accusing Syracuse of not taking seriously complaints of female students alleging sexual assault by male students.

    a.  This criticism included criticism of the manner in which Syracuse handled Title IX investigations.

    b.  In September 2014, students, faculty and staff gathered on the steps of Hendricks Chapel at Syracuse to protest the university's changes to sexual assault policies. News reports:

> The protest concluded with about 50 advocates storming the chancellor's office and slapping him with the petition. Initially, staffers told the protesters that the chancellor was not available to speak to students that day, but he eventually emerged from his office after a lot of persuasion from the crowd and told them that he appreciated their efforts and would read the petition.

Source:  USA Today College, *'Rally For Consent' protest aims to alter sexual assault resources at Syracuse*, September 19, 2014 (available at: http://college.usatoday.com/2014/09/19/rally-for-consent-protest-aims-to-alter-sexual-assault-resources-at-syracuse/).

    i.  Approximately 75 people showed up for The "Rally for Consent" on Wednesday, September 17, 2014.

ii.  In response to these protests, the Chancellor promised changes.  He said, "I've heard very much that people wanted to be consulted about major decisions at the university before they're announced.  As chancellor, I'm committed to that, and I've learned from this experience."  Source:  WRVO, *SU students protest closure of sexual assault advocacy center,* Sept. 18, 2014 (available at: http://wrvo.org/post/su-students-protest-closure-sexual-assault-advocacy-center).

c.  In November 2014, students have organized to raise awareness to issues facing "marginalized groups" at Syracuse and to protest a decision last summer to close the Advocacy Center, which provided sexual assault prevention education and counseling to survivors.   Source:   Inside Higher Ed Nov. 4, 2015 (available at: https://www.insidehighered.com/news/2014/11/05/syracuse-students-sit-demand-changes).   An organization called "THE General Body," a collective of student organizations, spent close to three weeks occupying the Syracuse administration building. Source:   Syracuse   New   Times,   Nov.   24,   2014   (available   at: https://www.syracusenewtimes.com/solidarity-continues-syracuse-university/)

i.  The General Body claimed growing support from faculty and alumni, including letters from faculty members.

ii.  Among the demands from THE General Body were an increase in attention to the issue of sexual assault. The group protested the closure of the Advocacy Center, formerly the Rape Center, described as "a resource for survivors of sexual assault and a community of individuals fighting domestic and sexual violence."  The group also complained about:  "The lack of a Yes Means Yes policy [and] that the [Syracuse] Title IX Coordinator has not gone through extensive enough sexual

assault advocacy training."   Source:   https://thegeneralbody.org/grievances-needs/

    iii.   A document outlining communications between The General Body and the administration demonstrates a significant focus on the issue of sexual assault on the campus, demonstrating that the Syracuse administration was cognizant of, and sensitive to, these criticisms.  These communications contain specific personal criticism of the Syracuse Title IX Coordinator for her role in prior matters in which the University was seen as not taking seriously the complaints of female students. Source:

https://thegeneralbodydotorg.files.wordpress.com/2014/11/compiled_grievances_needs_responses_11_12.pdf

18. In December 2014, Syracuse received a report from the Chancellor's Workgroup on Sexual Violence Prevention, Education, and Advocacy.  (Available at:  http://inclusion.syr.edu/wp-content/uploads/2016/12/Workgroup-Final-Report-Dec-2014.pdf).   The purpose of the Workgroup was to identify critical gaps in services and support for victims and survivors of sexual and relationship violence on campus, and to propose a set of recommendations for improving campus and community culture relating to these matters.

    a.   The report observed that much of the focus of preventing sexual assault at Syracuse is the prevention of acts by males.  The report says, "The discourse on campus about sexual assault and relationship violence typically focuses on male-on-female violence involving students who are fulltime undergraduates, White, and heterosexual."  (Report at 5.)

    b.   The report suggested that Syracuse had "insufficient staff and resources to effectively investigate incidents of sexual assault and relationship violence, and to educate members of the Syracuse University community."  (Report at 5.)

      c.   The Chancellor in particular was subjected to criticism for his role in the closure of the Advocacy Center: "We planned to ask the Chancellor to issue an apology and appreciate that one was given during the fall semester, although we realize that it was not fully satisfactory to everyone." (Report at 6.)

      d.   The report urged Syracuse to adopt policies that were more victim-centered: "Examine the interpretation of federal and state regulations about sexual assault and relationship violence in the wake of changing policy landscapes . . . This process should include external legal counsel with expertise and understanding of the needs of victims and survivors." (Report at 8.)

19.  In July 2015, New York Gov. Andrew Cuomo signed into law the "Enough is Enough" legislation to combat sexual assault on college campuses.

      a.   Syracuse Chancellor Kent Syverud adopted the "Enough is Enough" legislation in summer 2015, making him the first private college chancellor or president to do so. Under "Enough is Enough," Syracuse is obligated to notate on the student's transcript if the student is found responsible for committing sexual assault.

      b.   Kevin Quinn, senior vice president for public affairs, told the Daily Orange, "We are very pleased that it was passed by the Legislature and will become law. Although we believe that many of the university's polices actually exceed the 'Enough is Enough' standards . . ." Source: http://dailyorange.com/2015/08/enough-is-enough-affects-sus-sexual-assault-policy-changes-definition-of-consent/

      c.   In 2017, Chancellor Syverud stated that he is "proud that Syracuse University was the first private university in New York State to endorse 'Enough is Enough,' and that he is pleased with the progress the community has made in recent years." Source:

https://news.syr.edu/2017/07/syracuse-university-continues-commitment-to-gov-andrew-cuomos-enough-is-enough-legislation/

20. Syracuse received national attention as a result of a September 2015 CNBC report titled, "One of the most dangerous places for women in America." Source: http://www.cnbc.com/2015/09/22/college-rape-crisis-in-america-under-fire.html

    a. The report described a sexual assault against a Syracuse student that occurred in 2012. The alleged sexual assault never led to criminal charges.

    b. The CNBC articles states that students are pressuring Syracuse and other schools. The article states, "courageous students—both male and female—are continuing to speak out, refusing to be silenced until the crisis stops."

21. In April 2016, Syracuse responded to some of the criticism that it was not taking the problem of sexual assaults on campus seriously.

    a. Syracuse put out a press release noting that the Title IX coordinator had received 143 reports "from students impacted by sexual assault, relationship violence, stalking and harassment" in 2014-2015. Source: https://news.syr.edu/2016/04/its-on-us-addressing-sexual-assault-and-relationship-violence-44234/ The Press release noted that Syracuse had "hired a new equal opportunity and Title IX investigator, Bernie Jacobson, to support the investigation process."

    b. One Syracuse Dean responded to allegations that Syracuse was not taking the issue seriously by stating, "the university has expelled and suspended students and put students on probation for sexual misconduct." Source: Daily Orange, *How sexual assault on college campuses is reported differently at Syracuse University versus public institutions*, April 27, 2016 (available at: http://dailyorange.com/2016/04/how-sexual-assault-on-college-campuses-is-reported-differently-at-syracuse-university-versus-public-institutions/). Syracuse also

13

intended to publish statistics on the number of formal complaints, the outcome and the disciplinary action that was taken.

22. In October 2016, Syracuse students dragged mattresses covered with messages in red tape to protest rape culture on campus.  According to news reports, "Students took turns standing or sitting with mattresses on the quad. The mattresses were marked up with red tape that read 'rapists go here,' 'survivor,' and 'I can hear your silence.'"  Source:  Post-Standard, *SU students protest handling of sexual assault cases with mattresses, red tape*, October 4, 2016 (available at: http://www.syracuse.com/su-news/index.ssf/2016/10/su_students_protest_handling_o.html).

   a.  The protest was based on a similar protest at Columbia University.  About 50 faculty members signed a letter to support the protest.

   b.  The protesters described Syracuse as an "institution that lets perpetrators walk free while survivors, activists, and our families must bear the injustice silently."  Source: Daily Orange,  *Students hold red tape demonstration against sexual assault*, October 4, 2016 (available at:  http://dailyorange.com/2016/10/students-hold-red-tape-demonstration-sexual-assault/).

23. On information and belief, Syracuse was aware of OCR investigations of other schools and took actions to either avid OCR scrutiny or to make sure that it had a record of aggressive enforcement to show OCR.

24. Chancellor Syverud has admitted that Syracuse has engaged in "aggressive efforts to crack down on campus sexual assaults."  In a 2017 email to the campus community following the revocation of the 2011 Dear Colleague Letter, Syverud "re-emphasized" the university's commitment to fighting sexual assault and said that school has been committed to "exceeding" legal and regulatory requirements that have been the subject of national debate . . ."  Source: http://www.syracuse.com/su-

14

news/index.ssf/2017/10/chancellor_su_wont_back_down_on_campus_sexual_assaults_despite
_federal_changes.html

25. Syracuse has been the subject of at least two investigations by OCR.

   a. On June 22, 2016, OCR notified Syracuse that OCR was investigating an allegation that
   Syracuse failed to respond "promptly and equitably" to a "report of sexual assault."  OCR
   Docket # 02-16-2168. OCR requested a significant amount of data and information from
   Syracuse

   b. On January 17, 2017, OCR notified Syracuse that OCR was investigating a second
   allegation that Syracuse failed to respond "promptly and equitably" to a "report of sexual
   assault."  OCR Docket # 02-16-2323.

      i. Although the letter is dated January 17, 2016, Plaintiff believes that the actual date
      of the OCR letter was in 2017 based on the August 2016 date of the complaint
      referenced in the letter and contemporaneous media reporting.

      ii. On information and belief, in February 2017, the graduate student at the center of
      the second OCR investigation withdrew the complaint and the OCR closed the
      second investigation.

26. Officials from OCR were scheduled to visit Syracuse on January 24, 2017.  Post-Standard, *Feds to
visit Syracuse University as part of sexual assault procedures investigation*, January 13, 2017. According to
the news report in response to this visit, Syracuse administration officials sought to emphasize
their actions in this area to appease OCR.  The article previously cited says, "Campus officials said
they have taken 'significant' steps in recent years to prevent sexual and relationship violence."

27. Federal officials hosted two community meetings for students, faculty and staff during their
January 2017 visit.  OCR attorneys asked students and faculty during the visit general questions
about their opinions on Syracuse's response to sexual assault and discrimination allegations.

Source Daily Orange, *Office for Civil Rights attorneys hold first of 2 meetings on Title IX investigation at* SU, Jan. 24, 2017 (available at: http://dailyorange.com/2017/01/office-for-civil-rights-attorneys-hold-first-of-two-meetings-on-title-ix-investigation-at-su/).

28. On information and belief, Syracuse provided information about the investigation and adjudication of claims of sexual misconduct by John Noakes to OCR in response to inquiries.

29. The relationship between John Noakes and Syracuse is governed by the Student Conduct System Handbook .

   a. The Student Conduct System Handbook  constitutes a contract between students and the school and, in particular, between John Noakes and Syracuse.

   b. A copy of the Student Conduct System Handbook  is provided to or available to each student.

30. The Student Conduct System Handbook  includes the "Student Conduct System Handbook."  A copy of the 2015-2016 Student Conduct System Handbook is attached as Exhibit A.

31. The Student Conduct System Handbook also contains a section entitled "Syracuse University Policy On Sexual Assault, Sexual Harassment, Stalking Or Relationship Violence (the "Sexual Misconduct Policy.")  (*See generally* Exhibit A at 7.)

   a. The Sexual Misconduct Policy prohibits, *inter alia* harassment, sexual assault, and relationship violence.

   b. Students who violate the Sexual Misconduct Policy will be disciplined under the University's Code of Conduct whether or not a criminal prosecution occurs.

   c. Violations of the Sexual Misconduct Policy may result in counseling, educational sanctions, disciplinary probation, suspension, expulsion, and referral to the proper law enforcement authorities for prosecution.

32. The Sexual Misconduct Policy contains a section referred to as the "Bill of Rights." (*See generally* Exhibit A at 8-9.) Under this section, Syracuse students have the following rights:

    a. The right to "participate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard."

    b. The right to an appeal.

    c. The right to "be accompanied by an advisor of choice who may assist and advise a reporting individual, accused or respondent throughout the judicial or conduct process including during all meetings and hearings related to such process."

        i. Syracuse policy states that it specifically prohibits students facing allegations of misconduct from being represented by an attorney unless there are also criminal of civil proceedings. The web page, http://studentconduct.syr.edu/processes--sanctions/conduct-process/formal-process.html, states, "No attorney who is not also a full-time member of the Syracuse University or SUNY ESF faculty, staff, or student body will be permitted to participate in the conduct process on behalf of the complainant or the accused student, except where criminal or civil proceedings are also pending." Further:

## Role of Attorneys

No attorney who is not also a full-time member of the Syracuse University or SUNY ESF faculty, staff, or student body will be permitted to participate in the conduct process on behalf of the complainant or the accused student, except where criminal or civil proceedings are also pending.

When criminal or civil proceedings are pending, both the complainant and the accused student may be advised by an attorney, but the individual parties remain primarily responsible for conducting their own presentations.

Attorneys for the complainant and the accused student, when permitted to participate, are limited to the role of the procedural advisor described in the current Student Conduct System Handbook.

Any attorney who fails to conform his or her behavior to these requirements will be removed from the proceedings and barred from acting as a procedural advisor in future Student Conduct System proceedings. In such circumstances the hearing board will determine whether to proceed with the hearing without the presence of the procedural advisor or to forward the case to the Director of the Office of Student Rights and Responsibilities for resolution before a hearing officer.

    ii.  This aspect of the Syracuse Policy appears to be in conflict with the Clery Act, which permits a student accused of sexual misconduct to be represent by an advisor of their choice, including an attorney.

  d.  Other aspects of the Bill of Rights suggests that Syracuse has adopted a biased, "victim centered" approach aimed at always believing and supporting the victim without regard to the results of any investigation or adjudicatory process. This includes rights that apply only to the complainant:

    i.  The right to "be treated with dignity and to receive from the institution courteous, fair and respectful health care and counseling services where available."

    ii.  The right to be "free from any suggestion that the reporting individual is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations."

    iii.  The right to "describe the incident to as few institutional representatives as practicable and not be required to unnecessarily repeat a description of the incident.

    iv.  The right to be "protected from retaliation by the institution, any student, the accused or the respondent and/or their friends, family and acquaintances within the jurisdiction of the institution."

33. In practice, the adoption of victim centered approaches by schools such as Syracuse has led to erroneous and unfair outcomes in the investigation and adjudication of claims of sexual misconduct.

34. The Syracuse web page has a section specifically for "students" in regards to Title IX matters. http://inclusion.syr.edu/facultystaff/students/   This web page describes "rights" of students. The rights do not mention any rights for accused students:



A similar section of the web page, titled "rights and responsibilities," http://inclusion.syr.edu/facultystaff/speak-up/, does not mention any rights of accused students:

<div style="border:1px solid">

## *Your Rights & Responsibilities*

***SU Cares, Understands, and is a place of Connection:*** *this is about our Syracuse University community and our culture here at the University.*

*Syracuse University's Core Principles: The University's Code of Ethical Conduct guides the activities of all faculty, staff, and students. It provides, in part:* ***We respect the rights and dignity of all persons and recognize that discrimination or harassment in any form undermines the fundamental principles of the University.***

*We support a respectful environment through our own actions, encourage respectful behavior in others, and* ***speak out against hatred and bias.*** *We strive to respect the rights of others and while we respect everyone's right to freedom of speech, with those rights comes a responsibility to do so in ways that are appropriate and sensitive to others. We will investigate allegations of bias against any and all members of our community.*

</div>

35. The Sexual Misconduct Policy provides for the provision of "accommodations" for those who he Student Conduct System Handbook contains specific, unique, policies for the resolution of claims that a student violated the Sexual Misconduct Policy.

   a. Complaints alleging violations of the Sexual Misconduct Policy are made to the Syracuse Title IX Coordinator. The alleged victim is referred to as the "complainant." The student against whom the complaint is filed is the "respondent." The Title IX Coordinator may also file a complaint without the cooperation of the victim(s) in a specific incident.

   b. Syracuse will not delay its investigation pending the completion of a criminal investigation unless requested to do so by the appropriate legal authorities.

   c. Syracuse may grant "interim relief" such as no-contact orders, moving the respondent, changes in living and/or working and/or academic situations, protective escort services, and referrals to counseling prior to the completion of ay investigation. When a complaint is filed, Syracuse will place a hold on the respondent's academic records until a final resolution of the complaint.

d. Upon the receipt of a complaint, the Title IX Coordinator will designate an investigator who may conduct an investigation.

    i. The investigator should meet with both the complainant, respondent, and witnesses to the alleged incident to gather information regarding the facts and circumstances of the incident.

    ii. The investigative report should describe the relevant facts and circumstances learned during the course of the investigation and will contain all of the interviews conducted by the investigator. The report should not include any conclusions regarding responsibility for violations of the Code of Student Conduct.

e. The complainant, respondent and witnesses involved in the case may be advised by an advisor of their choice, including an attorney. Advisors, including attorneys "have no standing in the University investigation or in the University Student Conduct System proceedings" and may only "provide advice to their respective parties in a quiet non-disruptive manner." Advisors and may not represent or speak for their respective parties.

f. Once the investigation report is complete, both the respondent and the complainant will be given the opportunity to review the report and provide a written response. However, personal information is redacted from files and complainants and respondents are not permitted to create copies of the files.

36. Allegations of sexual misconduct are adjudicated by a University Conduct Board comprised of trained faculty and staff members, as appointed by the Director of the Office of Student Rights and Responsibilities. (*See generally* Exhibit A at 25.)

a. Prior to any hearing, the Board reviews the written report.

b. The University Conduct Board is comprised of three (3) members who are full-time faculty or staff from Syracuse. Members of the University Conduct Board are appointed by the

Senior Vice President and Dean of Student Affairs from a pool of at least ten (10) members recommended by the University community. The University Conduct Board is advised by the Director of Student Rights and Responsibilities, by the Associate Director of Student Rights and Responsibilities or an attorney appointed by the Director of Student Rights and Responsibilities.

c.  Syracuse rules do not require a hearing.  (*See* Exhibit A at 25.) Instead:

At its sole discretion, the University Conduct Board may rely upon the investigator's report for its understanding of the relevant facts, or it may conduct additional witness interviews and/or gather other additional information. The University Conduct Board may also interview the investigator. The complainant and respondent will be invited to speak to the University Conduct Board to present any additional information that they believe is relevant to the case.

i.  The Board determines whether it is more likely than not that the respondent violated the Code of Student Conduct using the preponderance of the evidence standard.

ii.  Rules of evidence and "criminal standards of proof" do not apply.

iii.  Once a finding of responsibility is the University Conduct Board may impose sanctions up to and including expulsion from the University.

d.  Decisions of the University Conduct Board are confirmed by the Director of Student Rights and Responsibilities or a designee.

37. Syracuse aspires to conclude the process of investigation and the Board's decision within 60 days of the original complaint.

38. Appeals of decision of the hearing are considered by the University Appeals Board.  (*See generally* Exhibit A at 34-35.)

39. Grounds for appeals are limited to: (i)  new information not reasonably available at the time of the original hearing, the absence of which can be shown to have had a detrimental impact on the outcome of the hearing; (ii) procedural error that can be shown to have had a detrimental impact

22

on the outcome of the hearing; and (iii) errors in the interpretation of University policy so substantial as to deny either party a fair hearing; and (iv) grossly inappropriate sanction having no reasonable relationship to the charges.

    a. The University Appeals Board is comprised of three members who are full-time faculty or staff from Syracuse. Members of the University Appeals Board are appointed by the Senior Vice President and Dean of Student Affairs.

    b. The Board may uphold the decision, change lower board decisions, alter sanctions up or down, or return cases to the respective lower board for further process.

    c. Decisions of the University Appeals Board, will be final when reviewed and confirmed by the Senior Vice President and Dean of Student Affairs or a designee.

        i. The Senior Vice President and Dean of Student Affairs, or a designee, as appropriate, may interview any participant in an earlier proceeding, change the decision, alter the sanction up or down, or return the case to the University Appeals Board or another hearing board for further process.

        ii. Decisions of the Senior Vice President and Dean of Student Affairs or a designee, are final.

40. The Student Conduct System Handbook guarantees "Fundamental Fairness" to students. The provision provides:

> **β. FUNDAMENTAL FAIRNESS**
>
> Students have the right to written notice and the opportunity for a hearing before any change in status is incurred for disciplinary reasons unless a significant threat to persons or property exists. Students have the right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct--as provided in the published procedures of the University's Student Conduct System or other official University publications.

41. Syracuse has a duty under the accreditation standards to provide a disciplinary process that consistent with the liberal values of fairness and due process.

23

a. Accreditation standards applied to colleges and universities generally require that truthfulness, clarity, and fairness characterize the institution's relations with students and that an institution's educational policies and procedures are equitably applied to all its students.

b. Syracuse is accredited by the Middle States Commission on Higher Education. The accreditation standards applied to the school require that Syracuse's "policies and procedures are fair and impartial, and assure that grievances are addressed promptly, appropriately, and equitably." See *Standards for Accreditation and Requirements of Affiliation*, Thirteenth Edition.

**THE DISCIPLINARY PROCEEDINGS AGAINST JOHN NOAKES**

42. John Noakes was suspended from Syracuse for events that allegedly occurred in the evening of October 24, 2015/early morning of October 25, 2015 (the "Incident").

43. John Noakes denies committing a sexual assault against Jane Roe.

a. John Noakes is 100% innocent of the allegations brought by Jane Roe.

b. John Noakes was incorrectly identified as the person who sexually assaulted Jane Roe.

44. Prior to the Incident, John Noakes and Jane Roe did not know each other.

45. On the evening of the Incident, Jane Roe had been drinking at the "Orange Crate Bar" on Crouse Avenue in Syracuse, NY.

46. Jane Roe observed a black male at the bar who she alleged was staring at her.  She left the bar about 1:00 in the morning.  She alleges that this black male pulled her into an alley, grabbed her, and tried to kiss her.  She further alleges that this black male put his hands down her pants and penetrated her vagina with his finger.  A passing female grabbed Jane Roe by the arm and pulled her away.

24

47. Jane Roe reported the Incident to the police.  According to the police report, Jane Roe provided

the following description:

> [Jane Roe] described the suspect a dark skinned black male, approximately 5'09", heavy
> set with black dreadlock style hair.  [Jane Roe] stated that his dread locks were worn
> down and "hung to about his shoulder."  [Jane Roe] advised . . . that when he spoke,
> he had a very deep voice.  [Jane Roe] state that the suspect was wearing a black tee
> shirt and dark pants but she could not remember any further details regarding his
> description.

48. The police took a report and Jane Roe agreed to a SANE examination.  A copy of the police report

is set forth here:

## CNYLEADS Narrative Supplement 1

| AGENCY | | | | | | DR # |
|---|---|---|---|---|---|---|
| Syracuse Police Department | | | | | | 15-516989 |

| Person Type | Last Name | First | Middle | Suffix | Business Name |
|---|---|---|---|---|---|
| | | | | | |

On Sunday, 25OCT15 at 1940hrs, while assigned to Unit 663, I responded to Crouse Hospital located at 736 Irving Av., regarding a sexual assault investigation.

Upon arrival I spoke with the victim, ████████ who stated that around 1300hrs, on 24OCT15, she went to the Orange Crate Bar located in the 700blk of S. Crouse Av ████ stated that while still inside of the bar, around 2345hrs, she observed a black male who appeared to be staring at her frequently from across the bar. ████ stated she decided to leave the bar around 0100hrs and walk to a bus stop located by the Shine Building on the Syracuse University Campus ████ stated that while walking South on S. Crouse Av., she was approached from behind and pulled into the alleyway, located next the Brueggers Bagels in the 700blk of S. Crouse Av., by the male who was staring at her in the bar. ████ stated that the male grabbed her and "was trying to kiss her" but she was "pulling away from him and turning her head so he couldn't". ████ stated that the male then "put his hands down her pants" and "penetrated her vagina with his finger" ████ stated that the male did speak to her, she was not certain of everything that he said to her but she stated that he made reference to taking her back to his apartment. ████ stated that she told him that she was not going anywhere with him and that he continued to try to kiss her and put his hand down her pants. ████ stated that he never unbuttoned her pants but began to take off his belt and unbutton his pants. ████ stated that is when a female passing by grabbed ████ by the arm and pulled her away from him.

████ stated that she did not see where the male went after that but that she continued to walk South on S. Crouse Av. and then went and met up with friends at Jimmy John's, located in the 100blk of Marshall St. ████ stated she did not know who the girl was who pulled her out of the alleyway but stated she was a white female with brown hair who was wearing a white tee shirt and black leggings.

████ stated that while she was in Jimmy John's with her friend she observed the black male walk past the window of Jimmy John's and glance in at her. ████ stated he continued walking East on Marshall St., and that she did not see him again after that. ████ stated that she then got into a cab with several of her friends and returned to her residence.

████ described the suspect as a dark skinned black male, approximately 5'09", heavy set with black dreadlock style hair ████ stated that his dread locks were worn down and "hung to about his shoulder" ████ advised me that when the suspect spoke, he had a very deep voice ████ stated that the suspect was wearing a black tee shirt and dark pants but she could not remember any further details regarding his description.

Crouse Hospital SANE Nurse, Anne Galloway, conducted an examination on ████ Galloway stated she would advise the Syracuse Police Department when the sample would be available for collection by an Evidence Technician.

Syracuse University Student Councilor, Kizzie Walker, responded to Crouse Hospital.
Syracuse Department of Public Safety, Officer Gabriell, responded to Crouse Hospital.
Vera House Victim Advocates responded to Crouse Hospital.

A canvass was conducted in the 700blk of S. Crouse Av. as well as the 100blk of Marshall St. There were several surveillance cameras in the area however, I was unable to contact anyone with access to the footage.

C.I.D. sheet notified.
C.I.D., Det. Morris, notified.
Unit 613C, Sgt. Yarema, notified.
Case open, T.O.T. Abused Persons Unit.

| PRINT NAME | ID# | SIGNATURE | SUPERVISOR NAME (PRINT) | ID# | APPROVED DATE | APPROVED BY SIGNATURE | Page |
|---|---|---|---|---|---|---|---|
| Gregory DiPuccio | 0037 | Electronically Signed | Sgt Ric Williams | 0319 | 10/25/2015 | Approved Electronically | 5 of 5 |

49. The black male who allegedly assaulted Jane Roe was not located by the police.

50. On December 11, 2015 Jane Roe was shown a photo array by a Syracuse Police detective.  She did not identify her assailant.  John Noakes was not included in the photo array.

51. On January 24, 2016, Jane Roe contacted the Syracuse Police to state that she had observed "an unknown black male" in a bar who "looked like the suspect that [sic] forcibly touched her in an Alleyway near the bar back in October."

    a.  Two men who were with the person observed by Jane Roe identified the person as John Noakes.  The two men were football players and said that John Noakes was a graduate assistant with the football team.

    b.  A     copy     of     the     supplemental     police     report     is     set     forth     here:

**CNYLEADS Narrative Supplement 1**

| Agency Name | | | | DR# |
|---|---|---|---|---|
| Syracuse Police Department | | | | 15-516989 |

| Incident Type | Person Type | Victim Type | | | |
|---|---|---|---|---|---|
| SXOF | VI | Individual | | | |

| Last Name | First | Middle | Suffix | DOB | Business Name |
|---|---|---|---|---|---|
| ████ | ████ | | | ████ | |

On 24January2016 at 0150 hours while assigned to Unit 672A, I was dispatched to the 700 block of S. Crouse Ave. in regards to a follow up investigation for a Sexual Assault that occurred on 25October2015.

Upon arrival I spoke with the complainant, ████████ stated that while she was at the bar on S. Crouse Ave. she noticed an unknown black male in the bar that looked like the suspect that forcibly touched her in an Alleyway near by the bar back in October.   She stated that she went to approach him, however when he noticed her walking over he quickly left the bar and headed towards Marshall St.   She asked the two males, that were standing with him, who the male was and they stated that his first name is ████ and that he's a Graduate assistant for the football team at Syracuse University. ████ stated that the two males, who were both football players, would not give her any further information in regards to his identity. ████ then stated that she went outside to try and locate the male, however he was no longer in the area when she went outside. ████ stated that she was advised to notify the police if she were to see the suspect again and that's why she called.   She then stated that they never actually spoke with each other tonight, she was just alarmed to see him at the bar.

For further information in regards to this incident, please see other reports under the same DR#.

52. Shortly after the January 24, 2016 report, Jane Roe was shown another photo array by the Syracuse Police.

   a.   This photo array included John Noakes.  Jane Roe identified John Noakes as her assailant.

   b.   On information and belief, the photo array process used by the Syracuse police was unduly suggestive and conducive to mistaken identification.

      i.   Jane Roe, having recently viewed John Noakes on the street, unsurprisingly picked his face out of a photo array.

      ii.   John Noakes only vaguely meets the physical description Jane Roe gave to the police on the day of the Incident.  He is approximately 5'8", and weighs about 250 pounds.

53. Jane Roe told the Syracuse police that she had elected to not have John Noakes criminally charged; she indicated that she preferred to have the matter handled through Syracuse and the Title IX Office.

54. On or about March 7, 2016, the police referred the matter to Syracuse Office of Student Rights and Responsibilities and the Syracuse Athletic Department.

55. On or about March 10, 2016, Jane Roe "formally" reported the matter to Syracuse.  The Syracuse investigative report indicates:  "Date Investigation Opened: Reported Formally March 10, 2016."  Syracuse has never disclosed to John Noakes exactly when it became aware of the alleged sexual assault on Jane Roe or when John Noakes was identified as a suspect.

56. On March 4, 2016 – *three days before the matter was referred to Syracuse by the police and six days before Jane Roe formally reported the matter to Syracuse* – John Noakes received a letter from the Assistant Dean of Student Affairs/Director of the Office of Student Rights and Responsibilities.

28

a.  The letter did not provide any details about the alleged misconduct by John Noakes, including, even, the identity of the alleged victim.  The only notice of the nature of the allegations against John Noakes is this statement:

> This office has received information from the Office of Equal Opportunity, Inclusion and Resolution Services, alleging that on or about October 25, 215 you sexually assaulted another Syracuse University student.

The relevant portion of the letter is set forth here:

**SYRACUSE UNIVERSITY**
**OFFICE OF STUDENT RIGHTS**
**AND RESPONSIBILITIES**



March 4, 2016

**VIA HAND DELIVERY**

███████████████

Regarding Case Number: 2015109501

Dear ███████████████

This office has received information from the Office of Equal Opportunity, Inclusion and Resolution Services, alleging that on or about October 25, 2015 you sexually assaulted another Syracuse University student.

Given the nature of these allegations, even though no decision has been reached regarding your culpability in this case, Syracuse University is obligated to take reasonable measures to promote the safety and well-being of the victim, as well as the campus community generally. Accordingly, effective immediately, you are hereby suspended on an interim basis from Syracuse University. This means that you are prohibited from any presence on Syracuse University owned, operated, or controlled property and from enrollment in any course or program offered by Syracuse University while this matter remains pending. The physical barrier includes University Village Apartments, Drumlins Country Club, Park Point Apartments, Campus West and the Syracuse University Sheraton. Should you need access to campus property or programs for any reason, you must obtain prior approval from this office. Failure to obtain prior approval before accessing University property will result in your immediate arrest for trespass and new charges will be filed where Expulsion is a possibility.

You should anticipate that this interim suspension status will continue at least until this matter is resolved in full through the Syracuse University Student Conduct System. If you wish to challenge this decision, you have the right to the following process:

> You may request a hearing before the University Appeals Board to review the Interim suspension. A hearing will be held within three University business days of our receipt of your written request for appeal. The deadline to submit your appeal April 15, 2016 at 5:00 pm – thirty University business days from today. Please note that this hearing is for the sole purpose of reviewing the administrative decision reached in your case and is not for the purpose of reviewing the case on its merits.

29

b.  The letter does not indicate that Office of Student Rights and Responsibilities had conducted any investigation.  Nonetheless, apparently based solely on an "allegation," John Noakes was immediately suspended and prohibited from entering the campus.

c.  Although John Noakes was given the right to appeal, the letter indicated that such an appeal would likely be futile.  The letter stated, "You should anticipate that this interim suspension will continue at least until this matter is resolved in full through the University Student Conduct System."

57. On March 7, 2016, John Noakes was informed that a hearing of the University Appeals Board on his interim suspension would be held on March 9, 2016.

58. On March 8, 2016, the Associate Director of the Syracuse Office of Student Rights and Responsibilities issued a "No Contact Order" prohibit John Noakes from having "direct or indirect contact" with Jane Roe.

59. The No Contact Order hampered John Noakes in his ability to investigate this matter, as it also prohibited John Noakes from contacting Jane Roe's "friends or family members."

60. On March 9, 2016, the University Appeals Board held a hearing on John Noakes' appeal of his interim suspension.

61. Jane Roe did not appear before the March 9, 2016 hearing of the University Appeals Board. Instead, a "University Representative" presented evidence to the Board.

62. The University Appeals Board provided a written opinion.

a.  In an opinion, the Board made the following "Finding of Fact"

1.  [John Noakes] is alleged to have sexually assaulted a Syracuse University student
2.  [John Noakes] was at the same bar as [Jane Roe] and in its vicinity on October 25, 2015 and January 24, 2016
3.  [Jane Roe] identified [John Noakes] as the alleged perpetrator in a photo array provided by Syracuse City Police on January 24, 2016
4.  [John Noakes] was "black out drunk" on night in question.

30

b.  In its opinion, the Board found that the University representative "was extremely credible" but that John Noakes was "not completely credible" in part because "he did not provide any statement of fact regarding the alleged incident."   This is completely false and demonstrates extreme bias.  John Noakes denied being the person who assaulted Jane Roe. John Noakes had presented documentary evidence in the form of screen shots and phone records indicating that he was texting or talking with friends when Jane Roe was assaulted.

c.  In its opinion, the Board indicated that it did not consider the screen shots of texts provided by John Noakes because they were "not an official phone record" and because they "did not support or refute whether the alleged incident occurred."  This is nonsense, as John Noakes did not dispute that the Incident occurred; he challenged identification. This also demonstrates extreme bias, as Syracuse does not conduct hearings pursuant to rules of evidence and otherwise permitted hearsay to be considered.

63. On March 10, 2016 – days after John Noakes had already been suspended – Syracuse initiated an investigation of the claim by Jane Roe against John Noakes.

64. On March 11, 2016, John Noakes received a letter from the Associate Vice Present of Student Affairs.  This letter indicated that the University Appeals Board had affirmed the interim suspension.

65. On April 22, 2016, the investigation was completed.

66. The investigator interviewed Jane Roe.

a.  Jane Roe acknowledged that she had been drinking heavily and was intoxicated when she left the bar alone about 1:00 am.

b.  Jane Roe stated that she was sexually assaulted in an alley.  She did not know her assailant.

c. Jane Roe states that she saw John Noakes outside the bar on January 24, 2016.  She was able to learn John Noakes' name from some football players at the bar.  Jane Roe subsequent identified John Noakes' picture in a photo array.  A copy of the phot array was not included in the investigative packet.

67. The investigator interviewed eight potential witnesses.

a. "Student 1" is a friend of Jane Roe.

   i. Student 1 observed Jane Roe and her assailant in the alley.

   ii. Student 1 described the assailant as "heavyset with long dreads.  He was wearing jeans and a t-shirt."

   iii. The investigator noted, "Student 1 identified a photo from [John Noakes]s Facebook profile. . . as the guy she saw that night."

b. "Student 2" is a student who knows John Noakes and Jane Roe.

   i. Student 2 stated that he "did not remember speaking to [Jane Roe] outside" the bar in January 2016.

   ii. Student 2 stated that he "may have talked" to John Noakes outside the bar.

c. "Student 3" is a friend of John Noakes.

   i. Student 3 was with John Noakes at the bar along with "Student 4" and "Student 5."

   ii. Student 3 told investigators he received a text from Student 4 about 1:00 am stating that student 4 and John Noakes were at a pizza restaurant, Acropolis.  He then called Student 4 a few minutes later.

d. "Student 4" is a friend of John Noakes.

   i. Student 4 stated that he went to the bar along with John Noakes and Student 3.

    ii.  Student 4 stated that he and John Noakes left the bar about 12:50 am to get pizza at Acropolis.  He said that John Noakes ran back into the bar to get something, and that he texted and called John Noakes about 1:04 am.

    iii.  Student 4 stated that John Noakes and Student 3 arrived together at Acropolis a few minutes later.

e.  Student 5 is a friend of John Noakes.

    i.  Student 5 saw John Noakes at the bar.

    ii.  Student 5 stated that he observed John Noakes kiss a woman at the bar.  He added, "this occurred inside the bar and lasted about 5 seconds . . . the kiss appear completely consensual."  This woman was not identified as Jane Roe.

    iii.  Student 5 said that he never saw John Noakes outside of the bar.

f.  Student 6 is a friend of John Noakes.

    i.  John Noakes and others were drinking at Student 6's room before going to the bar.

    ii.  Student 6 saw John Noakes at the bar, but was with his girlfriend and does not know where John Noakes was for much of the evening.

g.  Student 7 does not know John Noakes but identified him from a photograph.

    i.  Student 7 saw John Noakes at the bar.

    ii.  Student 7 does not know where John Noakes was for much of the evening. Student 7 did not observe John Noakes assaulting Jane Roe.

h.  Student 8 knows John Noakes.

    i.  Student 8 saw John Noakes at the bar.

    ii.  Student 8 has worked at the bar.  He indicated that although there is often a line to get in about 1:00, people had had previously been in the bar are permitted to

reenter.  He explained that if John Noakes and a friend had left the bar then wanted

to come back in, he would have been able to do so "without trouble."

    iii.   Student 7 does not know where John Noakes was for much of the evening.

Student 8 did not observe John Noakes assaulting Jane Roe.

68.  The investigator interviewed John Noakes

    a.   John Noakes denied that he was the person who had assaulted Jane Roe.

    b.   John Noakes stated that he was at the bar with Student 3, Student 4, and others.

    c.   John Noakes and Student 4 exchanged text messages at abut 1:03 about meeting at

Acropolis.  Copies of these text messages were provided to the investigator and were

included in the packet reviewed by the hearing panels..

    d.   John Noakes called Student 4 at about 1:04 am.  Copies of John Noakes' cell phone

records were provided to the investigator and were included in the packet reviewed by the

hearing panels.

    e.   John Noakes returned to the bar with Student 3.  He took two selfies at the bar at 1:42 am

and 1:49 am.  Copies of these photographs were provided to the investigator and were

included in the packet reviewed by the hearing panels.

    f.   John Noakes acknowledged that, because he had been drinking heavily, his memory of the

exact events of the evening is hazy.

69.  The investigator discouraged John Noakes from obtaining the advise of an advisor associated with

Syracuse. On April 13, 2016 the investigator emailed John Noakes seeking an interview.  The

investigator told John Noakes: "Please understand that this is a confidential matter, so we ask that

you refrain from discussing this with any other faculty, staff or students."

70. In addition to the bias noted *supra,* the investigation by Syracuse was deficient or biased in a

number of significant respects:

a.   The investigator made excuses for inconsistencies in the statements provided by Jane Roe.

    i.   The investigation noted that "Jane Roe's statement during the SANE [examination] differ from what she told the investigator. [sic]"  The report, rather than suggesting the Jane Roe lacked credibility, simply chooses to believe one version, noting, "Where a witness gives two conflicting statements the statement nearer in time to the incident tends to be more accurate."

    ii.   The Report suggests that statements by the police, when they contradict later statements by Jane Roe, are inaccurate.  For example, the report indicated that that the police "Investigation Report . . . contains an inaccurate summary of events written by the office."  Instead, the report suggests that "the event is accurately described" in a subsequent statement by Jane Roe.

b.   The investigator notes that Jane Roe was "heavily intoxicated during the encounter with respondent."  Yet, the investigator does not take into account that this intoxication may have made any subsequent identification unreliable.

c.   The investigator's summary of Jane Roe's description of the assault assumed that John Noakes was the assailant:

> She had no idea who [John Noakes] was but he looked like he might be a student.  She thought he might've been a football player so she checked the roster and didn't see him anywhere so she figured he must not be an athlete. Syracuse Police Department later (December 11, 2015) asked her to look at a photo lineup to see if she could identify [John Noakes]  [Jane Roe] said that [John Noakes] was not included in the first lineup Syracuse Police showed her.

This statement indicates that the investigator had already, before conducting any investigative work, concluded that John Noakes was the person who assaulted Jane Roe.

d.   The investigator never conducted any follow-up interviews or attempted to resolve differences in the accounts provided by the witnesses.   Indeed, referring to the

conversations with Jane Roe and witnesses as "interviews" is generous. The investigator did not conduct an interview as that term is understood by law enforcement; instead the investigator merely took down what Jane Roe or the witnesses said.

 e. The investigator never conducted adequate investigation to determine the reliability of the identifications.

  i. The investigator never obtained the photo array used by the Syracuse Police for the identification by Jane Roe. On March 17, 2016, the investigator asked the Syracuse Police Detective by email if the lineup shown to Jane Roe "include[d] men with a similar appearance." The detective responded that the photo array "contained 6 pictures of people bearing similar appearance." The investigator accepted the representation of the detective and never sought to actually review the photo array independently. The investigator never questioned whether the phot array was done in accordance with accepted best practices.

  ii. The investigator never provided a photo array or other non-suggestive technique to obtain an identification from Student 2.

 f. The investigator failed to determine what, if any, accommodations or benefits Jane Roe had obtained as a result of her claim to be a victim of sexual assault. This information would have been valuable to the trier of fact in evaluating Jane Roe's credibility.

71. On April 25, 2016, John Noakes was informed by an Office Coordinator that he had the opportunity to review the report of the investigation. He was not permitted to obtain a copy of the report at that time.

72. On May 17, 2016, John Noakes was informed that his hearing before the University Conduct Board had been scheduled for May 25, 2016.

a. John Noakes was informed that he was alleged to have violated certain provisions of the Code of Student Conduct.  He was informed only "the complaint arises from an incident occurring on or about October 25, 2016 at approximately 1:00 a.m. when it is alleged that you sexually assaulted a Syracuse University Student."

b. The notice did not provide the location of the alleged sexual assault.

c. The notice, in relevant part, is set forth here:



**SYRACUSE UNIVERSITY**

OFFICE OF STUDENT RIGHTS AND RESPONSIBILITIES
*Division of Student Affairs*

May 17, 2016

**VIA EMAIL DELIVERY**



PERSONAL AND CONFIDENTIAL

Dear ▮▮▮▮▮▮

This is to inform you that the University Conduct Board will hear the complaint filed against you by ▮▮▮▮▮▮ ▮▮ The hearing has been scheduled for **Wednesday, May 25, 2016 at 9:00 a.m. in 302 Steele Hall**.

The complaint alleges violations of the following section(s) of the Code of Student Conduct:

1) Physical harm or threat of physical harm to any person or persons, including, but not limited to: assault, sexual abuse, or other forms of physical abuse.

3) Conduct— whether physical, verbal or electronic, oral, written or video— which threatens the mental health, physical health, or safety of any person or persons including, but not limited to hazing, drug or alcohol abuse, bullying or other forms of destructive behavior.

15) Violation of University policies, rules or regulations that are published in the Student Handbook, or other official University publications or agreements.
   - Syracuse University Policy on Sexual Assault, Sexual Harassment, Stalking or Relationship Violence.

More specifically, the complaint arises from an incident occurring on or about October 25, 2015 at approximately 1:00 a.m., when it is alleged that you sexually assaulted a Syracuse University student.

37

73. On May 25, 2016 the Student Conduct Board held a hearing.

    a.   Jane Roe did not testify before the Student Conduct Board.  As a result:

        i.  The Student Conduct Board had no ability to assess the credibility of Jane Roe or ask questions about here ability to make an adequate identification.

        ii.  John Noakes had no opportunity to ask Jane Roe any questions or in any manner confront his accuser.

    b.   The Syracuse Police detective who obtained the identification of John Noakes from a photo array did not testify.  As a result:

        i.  The Student Conduct Board had no ability to assess the reliability of the identification or whether the identification was made in accordance with current best practices.

        ii.  John Noakes had no opportunity to ask the detective any questions or in any manner attempt to question the identification methods.

    c.   Student 1 testified at the hearing.

        i.  Student 1 testified that she did not get a good look at Jane Roe's assailant in October.  She testified:

> [A] I only saw him out of the corner of my eye, initially walking towards the – and as we were leaving I saw him again and she kind of pointed him out to me and I didn't really think anything of it.

        ii.  Student 1 could not provide a detailed description of Jane Roe's assailant.  She said only that he was "Average height.   African American, larger build, long dreadlocks." She was unable to describe the clothing that Jane Roe's assailant was wearing beyond "darker wash jeans."

        iii.  Student 1 testified that she picked out John Noakes from a Facebook photo shown to her by the Title IX office, not in a photo array.  She said:

[Q] How did you get access to that photo?  Were you shown photos of different people?  Did you pull up his Facebook?  Was it something [Jane Roe] showed you?

[A] No.  I was interviewed by one of the Title IX coordinators or something like that.  And in his office he had [John Noakes'] page pulled up and he asked me to confirm whether or not that was him and I said yes.

* * *

[Q] Okay.  But you didn't compare it to other men of similar build and hairstyle and things like that but you were certain it was him.

[A] Yes. . . .  I mean, I'm pretty certain.  There is always a possibility that its not but I mean I'm pretty confident that was the person . . .

. .

    iv.   Student 1 questioned the ability of Jane Roe to make a good identification because she had been drinking.  She testified:

> [Q] How intoxicated do you think that [Jane Roe] was that night?  I mean do you think that – did she – she could clearly identify somebody?  Do you think there's a chance she could have seen somebody that looked similar and pointed that person out?
>
> [A] That's definitely a possibility.  I mean it was one of the first weekends of – well, not one of the first weekends of the year.  It was in October.  But it was near the beginning of the year so we were having a good time.  We were enjoying ourselves.  There is definitely a chance she could have pointed out a different person from the person that she was in the alleyway with.

d.   John Noakes testified that the Student Conduct Board hearing.

    i.   John Noakes explained that he was "always with somebody" on the night that Jane Roe was assaulted.

    ii.   John Noakes testified that he never saw Jane Roe, even in the face of obviously hostile questioning:

> [Q] Did you encounter [Jane Roe] at all?
> [A] No.  Not at all.  I've never seen this girl in person.  . . .
> [Q] Do you remember seeing her I the bar when you were in the bar?
> [A] Not at all.
> [Q] Never saw her outside of the bar in the alleyway, walking to Acropolis, down the street?
> [A] I was never in the alleyway.  Ever.  I have no reason to be there.

    iii.   John Noakes testified that his memory of the night Jane Roe was assaulted was not great because he had been drinking.  He added, "I don't remember the entire night because it was so long ago."

    iv.   John Noakes noted that text messages and photos corroborated his version of the events.  John Noakes also noted that he had been wearing khaki pants, not the jeans worn by Jane Roe's assailant.

    v.   John Noakes concluded:

> [A] . . . I've never been in trouble and I compete – all my grades are like straight As and stuff and – not straight As but good grades.  This is just out of the blue when this started.  It's been rough to deal with something like this.

74. On May 27, 2016 John Noakes was informed that the Student Conduct Board had issued a decision.  The decision was contained in a letter from the Assistant Dean of Student Affairs.

    a.   John Noakes was placed on Indefinite Suspension.  John Noakes was permitted to apply for readmission for the Spring 2017 term.

    b.   The relevant portion of the letter is set forth here:



## SYRACUSE UNIVERSITY

### OFFICE OF STUDENT RIGHTS AND RESPONSIBILITIES
*Division of Student Affairs*

May 27, 2016

**VIA EMAIL DELIVERY**



Dear ▮

This letter is to confirm the outcome reached by the University Conduct Board at the hearing held on May 25, 2016.  The University Conduct Board found you are **RESPONSIBLE** for violating the Code of Student Conduct, section(s):

1) Physical harm or threat of physical harm to any person or persons, including, but not limited to: assault, sexual abuse, or other forms of physical abuse.

3) Conduct— whether physical, verbal or electronic, oral, written or video— which threatens the mental health, physical health, or safety of any person or persons including, but not limited to hazing, drug or alcohol abuse, bullying or other forms of destructive behavior.

15) Violation of University policies, rules or regulations that are published in the Student Handbook, or other official University publications or agreements.

   - Syracuse University Policy on Sexual Assault, Sexual Harassment, Stalking or Relationship Violence.

More specifically, the Board found that on or about October 25, 2015, you sexually assaulted a Syracuse University student.

As a result of your misconduct, the Board has applied the following sanctions:

1. **You are hereby placed on a status of indefinite suspension from Syracuse University.  You are to remain on indefinite suspension until the spring 2017 academic term.** This means that you are prohibited from any presence on Syracuse University owned, operated, or controlled property and from enrollment in any course of program offered by Syracuse University.  This includes the University Sheraton, Park Point, Campus West, University Village, and Drumlins Country Club.  Should you need access to campus property or programs for any reason, you must obtain prior approval from this office.  Failure to adhere to this directive will result in new Code of Student Conduct charges being filed where Expulsion is a possibility and you will be arrested for trespassing.  Furthermore, violating this sanction may be grounds to deny your petition to return to the University, especially if you were suspended for threats/violence-related behavior, damage to property, or drug sales.

2. You may petition to **return to Syracuse University as early as the spring 2017 academic term**. To be considered for readmission for a future academic term, you are required to submit a petition demonstrating your good citizenship during your time away from Syracuse University.

75. The University Conduct Board issued a written decision.

   a.  The Board made the following Finds of Fact

      1. Both [Jane Roe] and [John Noakes] were both at Lucy's the morning of October 25, 2015 [sic].
      2. [Jane Roe] and [John Noakes] were not together at Lucy's

41

3.  Both [Jane Roe] and [John Noakes] were intoxicated.

4.  [Jane Roe] left Lucy's and was sexually assaulted in the alleyway . . . by someone she did not previously know.

5.  [Jane Roe] was assailant again in January 2016 at Lucy's and identified him as [John Noakes] from the October 25, 2015 incident. [sic]

6.  Student 1 also identified a photo of [John Noakes] as being the person that assaulted [Jane Roe] on October 25, 2015.

7.  The Board believes that more likely than not [John Noakes] sexually assaulted [Jane Roe] on October 25, 2015.

b.  The Board found that Jane Roe was "mostly credible."

   i.  The Board in particular credited the identification made by  another  Student as consistent with Jane Roe's testimony.

   ii.  The Board made this determination that Jane Roe was credible *even though the Board never heard testimony from Jane Roe!*

c.  The Board found that John Noakes "lacked credibility" because, in part, his story was inconsistent in some respect with the statements from Student 3 and Student 4.

76. Syracuse found John Noakes responsible and imposed discipline, based on a flawed identification by Jane Roe.  As a result of numerous errors, the identification was not the result of a fair, objective, and nonsuggestive process.

a.  The photo array identification process used by the Syracuse police was flawed and unreliable because it occurred *after* Jane Roe had identified John Noakes as a suspect on the street.

   i.  Preferred police practice is to avoid multiple identification procedures featuring any one suspect with the same witness.  Yet that is what occurred n this case; Jane Roe merely picked out the person she had viewed on the street from the photo array.

   ii.  Courts have observed the unreliability of identifications after a witness has viewed the suspect.  For example, in *United States v. Emanuele*, 51 F.3d 1123 (3d Cir. 1995),

42

the Third Circuit held that when a witness sitting outside the courtroom saw the defendant walk past her in shackles and with a U.S. Marshal at each side, the witness's later in-court identification should not have been admitted.

b. Recent scientific research has called into question the reliability of eyewitness identifications in general.  Innocence Project statistics show that mistaken identifications accounted for approximately seventy-two percent wrongful convictions in the United States that were overturned by DNA evidence.  An Examination of Why Innocent People Are Locked Up, INNOCENCE PROJECT, http://www.innocenceproject.org/news-events-exonerations/an-examination-of-why-innocent-people-are-locked-up.

c. The identification of John Noakes is unreliable for an additional reason:  The Cross-Race Effect.  The Cross-Race Effect is based on scientific research finding the same-race faces are recognized more accurately than cross-race faces.   This is a well-replicated psychological phenomenon which has been found to result in eyewitness misidentification.  Studies since the advent of DNA testing have been revealed that scores of people have been wrongly imprisoned for crimes that they did not commit, and cross-race eyewitness misidentifications are a determining factor in a large percentage of these convictions.

d. The Board believe Jane Roe was credible even though they never heard any testimony from Jane Roe.

77. John Noakes appealed the decision of the Conduct Board.

a. Jane Roe never responded to John Noake's appeal.

b. John Noakes said that his defense was an improper identification:

> I have stated since the first time I met with the Syracuse Police Detective . . . that I do not know who this girl is and I have never met her.  When [the detective] showed me a picture of her that was the first time I had ever seen [Jane Roe] in my life.  I was never in the alleyway with this girl that night.

    c.   John Noakes further said that he had submitted documentary evidence that he could not have committed the assault.  For example:

> The text messages provided show that I am in communication and texting with my roommate . . . throughout the timetable that she alleges this happened.

    d.   John Noakes observed that Jane Roe could not provide a good identification because, as she admitted, she was intoxicated:

> [Jane Roe] admits to be heavily intoxicated that night as ell, so I believe it would be quite difficult to make a positive ID on the alleged person nearly 3 moths later in January at the bar where she was mots likely intoxicated again.

    e.   John Noakes concluded:

> The main problem that I have with the Conduct Board's decision in suspending me is that there is no actual evidence to that that I did what they are alleging.  Form my point of view all I see is [Jane Roe] pointing her fingers at me saying that I did this to her and I am being held responsible and suspended based off of her words.  And if that is the grounds on which I am being suspended that is completely unjust.

78. On June 15, 2016 the University Appeals Board held a hearing on John Noakes' appeal.

79. The University Appeals Board provided a written opinion.

    a.   In rejecting John Noakes' argument, the Board wrote:

> [John Noakes] perceives that the preponderance of the evidence standard was not met, but fails to recognize the empowered bystander as an eye witness who intervened on the behalf of the complainant and made a positive identification of [John Noakes] in a lineup of people with similar physical characteristics.

    b.   This statement is inaccurate.  The so-called "empowered bystander" never identified John Noakes from a photo array or other non suggestive identification procedure

80. On June 17, 2016, the Associate Vice President of Student Affairs sent a letter to John Noakes informing him of the decision reached by the university Appeals Board.

    a.   The University Appeals Bard sustained the decision reached by the University Conduct Board, but modified the sanction.

b. John Noakes was placed on Indefinite Suspension from Syracuse. John Noakes was permitted to petition fro readmission.

c. The relevant portion of the letter is set forth here:



## SYRACUSE UNIVERSITY

### OFFICE OF STUDENT RIGHTS AND RESPONSIBILITIES
*Division of Student Affairs*

June 17, 2016

**VIA EMAIL DELIVERY**



Dear

This letter confirms the outcome reached by the University Appeals Board at a hearing held on June 15, 2016. The University Appeals Board sustained the decision reached by the University Conduct Board on May 25, 2016 that found you **RESPONSIBLE** for violating the Code of Student Conduct, Section(s) 1, 3, and 15.

More specifically, the University Conduct Board found that on or about October 25, 2015, you sexually assaulted a Syracuse University student. However, the University Appeals Board has decided to modify your sanction.

As a result of your misconduct, the University Appeals Board has modified the University Conduct Board decision as follows:

1. **You are hereby placed on a status of indefinite suspension from Syracuse University. You are to remain on indefinite suspension until the spring 2017 academic term.** This means that you are prohibited from any presence on Syracuse University owned, operated, or controlled property and from enrollment in any course of program offered by Syracuse University. This includes the University Sheraton, Park Point, Campus West, University Village, and Drumlins Country Club. Should you need access to campus property or programs for any reason, you must obtain prior approval from this office. Failure to adhere to this directive will result in new Code of Student Conduct charges being filed where Expulsion is a possibility and you will be arrested for trespassing. Furthermore, violating this sanction may be grounds to deny your petition to return to the University, especially if you were suspended for threats/violence-related behavior, damage to property, or drug sales.

2. You may petition to **return to Syracuse University as early as the spring 2017 academic term**. To be considered for readmission for a future academic term, you are required to submit a petition demonstrating your good citizenship during your time away from Syracuse University.

81. Expulsion and/or Indefinite Suspension from Syracuse has caused John Noakes to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career.

a.  John Noakes had received valuable scholarship from Syracuse, including a Higher Education Opportunity Scholarship and, in his junior year, a scholarship through the athletic department.  He has lost these scholarships as a result of Syracuse's actions in this case.

b.  Expulsion from Syracuse has caused John Noakes significant economic damages in an amount difficult to quantify but reasonably believed to be well in excess of $75,000.00

## COUNT I
## (TITLE IX)

82. Plaintiffs repeat and incorporate all of the allegations of this Complaint, as if fully set forth herein.

83. Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Title IX provides in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

84. Syracuse is an education program or activity operated by recipients of Federal financial assistance.

85. Title IX bars the imposition of discipline against students where gender is a motivating factor in the decision to discipline.

86. The decisions of the hearing process and the appeal process for John Noakes were erroneous outcomes which were the direct result of a flawed and biased proceeding. In a fair and unbiased system, whether someone is a "victim" is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Syracuse has reversed this process and assumed that John Noakes was guilty because he was a male accused of sexual assault rather than evaluating the case on its own merits.

87. Syracuse committed impermissible gender bias against John Noakes in the investigation and adjudication of Jane Roe's accusations.

   a. There has been substantial criticism of Syracuse, both in the student body and in the public media (including the Internet), accusing schools of not taking seriously complaints of female students alleging sexual assault by male students. On information and belief, Syracuse's administration was cognizant of, and sensitive to, these criticisms. As a result, Syracuse's decision-makers and its investigators were motivated to favor the accusing

female over the accused male, so as to protect themselves and Syracuse from accusations that they had failed to protect female students from sexual assault.

b.  On information and belief, Syracuse was motivated in this instance to accept the female's accusation of sexual assault so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male student. The investigators, hearing panel, and administration adopted a biased stance in favor of the accusing female and against the defending male in order to avoid the criticism that Syracuse turned a blind eye to such assaults by men.

88. Syracuse has discriminated against John Noakes because of sex. This discrimination is intentional and is a substantial or motivating factor for Syracuse's actions in this case. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon John Noakes.  These circumstances include:

a.  Syracuse pursued discipline against John Noakes even though Jane Roe did not appear at the disciplinary hearing or respond to any of John Noakes' appeals.

b.  Syracuse, encouraged by federal officials, has instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women.

c.  Syracuse has applied flawed or incorrect legal standards, employed biased or negligent investigatory techniques.

d.  Syracuse officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. The imposition of discipline on John Noakes is the a result of a flawed and biased hearing process. This resulted in a deprivation of access to educational opportunities at Syracuse.

89. The circumstances of the Investigatory process, the hearing process, and the appeal process cast doubt on the accuracy of the outcome of the disciplinary proceeding.  The Department of

48

Education regulations and guidance state that Title IX requires a fair and equitable process for the adjudication of allegations of sexual misconduct.

90. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon John Noakes. These circumstances include:

   a. A general atmosphere at Syracuse where those who lodge a complaint of sexual assault are immediately treated as "survivors." This general atmosphere is a direct result of pressure on Syracuse from OCR, DOJ, student groups, and public opinion.

   b. The adjudication of the claims against John Noakes occurred at the time that Syracuse officials were touting New York's "Enough is Enough" law and their aggressive approach to issues of sexual assault on campus.

   c. The failure of Syracuse to conduct full and fair investigations.

   d. The failure of Syracuse to afford accused students counsel or the opportunity to present evidence in their defense and to effectively cross-examine their accusers under the auspices of "protecting" victims.

   e. The Sexual Misconduct Policy denies male students, like John Noakes, the basic guarantees of fundamental fairness in hearings. These rights include an impartial decision-maker, the assistance of counsel, the ability to confront adverse witnesses, the right to remain silent in the face of criminal accusations, and the presumption of innocence.

91. Syracuse assumed that Jane Roe, as an alleged female victim, was truthful and reliable. As a result of this gender bias, Syracuse failed to adequately investigate and question Jane Roe's credibility.

   a. Syracuse ignored evidence that the identification by Jane Roe was unreliable for the following reasons:

      i. Jane Roe was intoxicated during her assault and, as a result, could not make a reliable identification.

      ii.  The photo array conducted by the Syracuse Police was unreasonably suggestive.

     iii.  An eyewitness identification was not done in accordance with any accepted identification procedures.

     iv.  The identification procedure was susceptible to cross-race bias.

b.  Syracuse failed to determine what, if any, accommodations or benefits Jane Roe received that may have affected her credibility and reliability.

c.  Syracuse's practices and procedures appear to not necessarily be hostile to men, but can be seen as biased in favor of unfairly protecting "vulnerable" and "virtuous" females.

92. Syracuse has discriminated against John Noakes because of sex. This discrimination is intentional and is a substantial or motivating factor for Syracuse's actions in this case. Syracuse officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. On information and belief, throughout the disciplinary proceedings, Syracuse and its agents demonstrated and acted on pervasive gender bias.

93. John Noakes has been deprived of access to educational opportunities at Syracuse.

94. As a direct and proximate result of Syracuse's violations of John Noakes' rights under Title IX, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

95. Syracuse is liable to John Noakes for his damages.

96. Pursuant to 42 U.S.C. §1988, John Noakes is entitled to their attorney's fees incurred in bringing this action.

## COUNT II
## (TITLE VI)

97. Plaintiffs repeat and incorporate all of the allegations of this Complaint, as if fully set forth herein.

98. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

99. Syracuse is an education program or activity operated by recipients of Federal financial assistance.

100.    Title VI bars the imposition of discipline against students where race is a motivating factor in the decision to discipline.

101.    Plaintiff is an African-American student who is a member of a protected class.  Plaintiff was qualified to continue in pursuit of his education at Syracuse.  Plaintiff suffered an adverse disciplinary action under circumstances giving rise to an inference of discrimination.

102.    Syracuse engaged in intentional discrimination through discriminatory animus and deliberate indifference.  Syracuse assumed that Plaintiff, as a young African American male, sexually assaulted Jane Roe despite the lack of a reliable identification.  As a result, racial bias influenced the outcome of the disciplinary proceedings.

103.    Circumstances giving rise to a plausible inference of racially discriminatory intent include the following:

    a.  The investigator, as described *supra*, assumed that John Noakes was responsible before conducting any investigation.

    b.  The hearing panel determined that Jane Roe, a white woman, was credible while John Noakes, an African-American man, was not credible. Jane Roe never appeared before the hearing panel so that the panel could assess her credibility and the investigator made

excuses for inconsistencies in Jane Roe's statements.  In contrast, John Noakes was found to be not credible because of small inconsistencies in his testimony.

    c.    The investigator and hearing panel accepted an inherently unreliable identification and failed to take into account the bias inherent in cross-race identifications.

104.    On information and belief, Syracuse has disproportionately imposed discipline on minority students accused of sexual assault.

    a.    This information and belief is not based on any information specific to Syracuse, as Syracuse does not publicly disclose data on the racial composition of students accused of sexual misconduct.

    b.    This information and belief is based on anecdotal evidence that schools, in response to the Dear Colleague Letter, disproportionately imposed discipline on minority students. *See* Emily Yoffee, *The Question of Race in Campus Sexual-Assault Cases, Is the system biased against men of color?* Atlantic, September 11, 2017 (collecting cases).

105.    Syracuse has discriminated against John Noakes because of race. This discrimination is intentional and is a substantial or motivating factor for Syracuse's actions in this case. Syracuse officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. On information and belief, throughout the disciplinary proceedings, Syracuse and its agents demonstrated and acted on pervasive racial bias.

106.    John Noakes has been deprived of access to educational opportunities at Syracuse.

107.    As a direct and proximate result of Syracuse's violations of John Noakes' rights under Title VI, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional

anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

108.     Syracuse is liable to John Noakes for his damages.

109.     Pursuant to 42 U.S.C. §1988, John Noakes is entitled to their attorney's fees incurred in bringing this action.

## COUNT III
## (BREACH OF CONTRACT)

110.     Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

111.     By enrolling at Syracuse, and paying his tuition and fees, and attending the school, John Noakes and Syracuse had a relationship that may reasonably be construed as being contractual in nature.

112.     The terms of the contract between John Noakes and Syracuse are generally found in various Colleges policies and procedures, including those set forth in the Student Conduct System Handbook .

113.     The contract between John Noakes and Syracuse, as set forth in the Student Conduct System Handbook, contains the following guarantee of essential fairness:  "Students have the right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct."

114.     The contract between John Noakes and Syracuse prohibits discrimination on the basis of race or gender.

115.     The contract between John Noakes and Syracuse, as set forth in the Student Conduct System Handbook , contains the following guarantee of essential fairness:  "All Students have the right to

53

. . . Participate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard."

116.    The contract between John Noakes and Syracuse contains an implied covenant of good faith and fair dealing.  This implied covenant prohibits Syracuse from doing anything which will have the effect of destroying or injuring the right of John Noakes to receive the fruits of the contract. The contract between John Noakes and Syracuse, as a result, impliedly included the requirement that Syracuse provide John Noakes with an investigatory and adjudicatory process that was "essentially fair."

117.    John Noakes paid Syracuse tuition and fees.

118.    Syracuse repeatedly and materially breached the explicit guarantee of fundamental fairness and as well as the implied covenant of good faith and fair dealing and other contractual provisions. These breaches include, but are not limited to, the following:

a.    Syracuse breached the explicit and implied obligation to provide John Noakes with adequate notice of the nature of the charges against him.  The Student Conduct System Handbook provides: "Students have the right to written notice." The Bill of Rights within the Student Conduct System Handbook  further provides, "All students have the right to: . . . Participate in a process that is fair, impartial, and provides adequate notice . . ." Adequate notice was necessary to permit John Noakes to adequately defend himself through the entire disciplinary process, including the investigative stage.

i.    The information he was initially provided merely stated that a "complaint of relationship violence" had been filed against John Noakes.

ii.    The letter setting the hearing never provided John Noakes with the location of the alleged misconduct.

b. Syracuse breached the implied obligation to perform a threshold evaluation of the allegations before starting an investigation.

    i. This threshold evaluation is necessary to avoid imposing an undue burden upon the accused.

    ii. Had Syracuse performed a reasonable threshold inquiry, this matter would not have been investigated any further. This is because the allegations against John Noakes were brought months after the alleged incident, involved an incident where Jane Roe admitted they had engage in consensual sexual conduct, and were not supported by any physical evidence.

c. Syracuse breached the explicit and implied obligation to conduct a full and fair investigation of the claims against John Noakes. The Student Conduct System Handbook provides, "Upon the receipt of a complaint, the Title IX Coordinator will designate an investigator who may conduct an investigation."

    i. Syracuse's breach of its obligations to conduct the required investigation began when the Complainant filed.

    ii. On information and belief, the investigator had no real-world experience in, or training about, investigations into allegations sexual assault.

    iii. Syracuse's investigation was not an in investigation but, instead merely stenography. The investigator failed to conduct follow-up interviews or gather relevant physical evidence or information.

    iv. The investigator failed to determine what, if any, benefits or accommodations Jane Roe received as a result of her claim to be a victim of sexual assault. This information was relevant and essential to the assessment of Jane Roe's credibility.

     v. The failure to conduct a full and fair investigation was a breach of the guarantee of an investigation and the implied covenant of good faith and fair dealing.

d. Syracuse was required to conduct a full and fair hearing before an unbiased hearing panel. Syracuse breached its express and implied obligations to provide a fundamentally fair process when it failed to require Jane Roe to appear before the hearing panel

     i. Because Jane Roe never appeared before the hearing panel, the hearing panel was unable to adequately assess her credibility or ask questions aimed at determining the reliability of the identification.  In particular, the hearing panel had no ability to assess whether the identification process used by the police was unduly suggestive or whether Jane Roe was too intoxicated at the time of the assault to make an adequate identification.

     ii. Because Jane Roe never appeared at the hearing panel, John Noakes was denied any opportunity to confront an adverse witness.

     iii. The failure to provide John Noakes with a full and fair hearing was a breach of the guarantee of fundamental fairness and the implied covenant of good faith and fair dealing.

e. Syracuse breached its express and implied obligations when it found John Noakes Responsible without sufficient evidence.

     i. The Student Conduct System Handbook includes the express statement that a student be found "guilty" by the preponderance of the evidence.

     ii. There was no physical evidence or witness to support the allegations that John Noakes was guilty.

     iii. Jane Roe's identification of John Noakes was unreliable.

    iv.  The only live witness presented against John Noakes was Student 1, who was not a witness a reasonably prudent fact-finder would rely upon because her identification was unreliable.

    v.  Syracuse ignored substantial evidence that John Noakes had no opportunity to assault Jane Roe, including photographs, text messages and cell phone call records.

    vi.  The failure to require that John Noakes be found guilty only on the basis of sufficient evidence was a breach of the guarantees of fundamental fairness, conviction by a preponderance of the evidence, the presumption of innocence, and the implied covenant of good faith and fair dealing.

f.  Syracuse breached the explicit and implied obligation to conduct a investigation and adjudicatory process in compliance with Federal Law.  Syracuse breached its obligation under the Clery Act by prohibiting John Noakes from being represented by the attorney of his choice, and in particular when the investigator discouraged John Noakes from obtaining advice from another member of the Syracuse community.

119.  The conduct of entire process treated John Noakes as if he was guilty from the start, thereby tainting the investigative hearing process and violating the guarantees of fundamental fairness and fair and impartial hearing.

a.  Syracuse administrators acted from the beginning as someone who "believed" the Complainant without conducting any investigation.

b.  John Noakes was prohibited from confronting his accuser.

c.  The bias of the entire process was so pervasive throughout the pre-hearing and hearing processes that it destroyed any possibility of fairness and ensured that John would be found guilty.  The finding was plainly a product of the presumption of guilt, as well as the atmosphere of bias and hysteria that permeated the entire disciplinary process.

      d.   The failure to conduct an unbiased hearing was a breach of the guarantees of fundamental fairness, and the implied covenant of good faith and fair dealing.

120.    Syracuse breached the explicit and implied obligations to conduct a investigation and adjudicatory process free of racial and gender bias.

121.    As a direct and foreseeable result of Syracuse's failure to honor its express and implied contractual promises and representations, John Noakes has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT III
### (NEGLIGENCE)

122.    Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

123.    Having put in place a student disciplinary process, Syracuse owed a duty of care to John Noakes and others to conduct that process in a non-negligent manner and with due care. Syracuse officials who directed and implemented that process owed John Noakes the same duty of care. Syracuse is responsible for the conduct of those acting on its behalf under the theory of *respondeat superior*.

124.    The obligation of Syracuse included the obligation to conduct and in

125.    The obligation of Syracuse included to obligation to conduct an investigation and adjudicatory process in a non-negligent manner.

      a.   This duty is imposed by the contractual and/or quasi-contractual relationship between the parties.

      b.   This duty is imposed by Federal law, including Title IX and the Clery Act.

    c.  This duty is further imposed by the role of Syracuse in providing an education consistent with the liberal values of fairness and due process.

126.    The relevant standard is set by the accreditation standards applied to Syracuse

    a.  Accreditation standards applied to Syracuse and universities generally require that truthfulness, clarity, and fairness characterize the institution's relations with students and that an institution's educational policies and procedures are equitably applied to all its students.

    b.  Syracuse is accredited by the Middle States Commission on Higher Education. The accreditation standards applied to the school require that Syracuse' "policies and procedures are fair and impartial, and assure that grievances are addressed promptly, appropriately, and equitably." *See Standards for Accreditation and Requirements of Affiliation, Thirteenth Edition.*

127.    The conduct of Syracuse in conducting an investigation fell below the applicable standard of care for conducting investigations into, and adjudicating allegations of, sexual misconduct and amounted to breaches of the duty of due care.  This negligent conduct included, but was not limited to:

    a.  Syracuse failed to permit John Noakes the advisor of his choice, as required by the Clery Act.

    b.  The investigator failed to inquire about the accommodations received by Jane Roe even though these accommodations would have had a significant effect on her credibility.

    c.  The investigator relied upon a flawed and unduly suggestive identification process and ignored substantial evidence that supported John Noakes.

    d.  The investigator was biased and assumed from the start of the investigation of John Noakes was the person who has assaulted Jane Roe.

128.    The conduct of Syracuse in holding a hearing fell below the applicable standard of care and amounted to breaches of the duty of due care.  As described above, Syracuse used a biased process and hearing panel.

129.    As a direct and proximate result of Syracuse's negligence, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

**Wherefore**, Plaintiff seeks the following relief from the Court:

- Judgment in favor of John Noakes awarding damages in an amount to be determined at trial;
- An Injunction restoring John Noakes as a student, the removal of any negative notations on his transcripts, and prohibiting further disciplinary proceedings in a manner that violates Title IX or the contract between the parties.
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,


_____/s/ Catherine Josh_____
Catherine H. Josh, Esq. (5025036)
45 Exchange Boulevard, Suite 915
Rochester, NY 14614
585-423-1974
585-325-6075 (fax)
chjesq@gmail.com

Joshua Adam Engel (0075769)
*pro hac vice motion to be filed*
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

EXHIBIT A

# STUDENT CONDUCT SYSTEM HANDBOOK

# 2015 – 2016

SYRACUSE UNIVERSITY



# TABLE OF CONTENTS

SYRACUSE UNIVERSITY STATEMENT OF STUDENT RIGHTS AND RESPONSIBILITIES ........................3

   1.  SPEECH/EXPRESSION/PRESS ...........................................3

   2.  NON-DISCRIMINATION ........................................................3

   3.  ASSEMBLY/PROTEST ........................................................3

   4.  RELIGION/ASSOCIATION ...................................................3

   5.  PRIVACY/SEIZURE...............................................................3

   6.  ACADEMIC PURSUITS........................................................4

   7.  QUALITY ENVIRONMENT ...................................................4

   8.  GOVERNANCE/PARTICIPATION........................................4

   9.  FUNDAMENTAL FAIRNESS ................................................4

  10.  CONFIDENTIALITY .............................................................4

SYRACUSE UNIVERSITY CODE OF STUDENT CONDUCT ........................5

SYRACUSE UNIVERSITY POLICY ON SEXUAL ASSAULT, SEXUAL HARASSMENT, STALKING OR RELATIONSHIP VIOLENCE ........................7

  The Syracuse University Definition of Consent........................8

  Amnesty for Reporting Individuals ..........................................8

  Bill of Rights ...........................................................................8

SYRACUSE UNIVERSITY ANTI-HAZING POLICY ....................................10

SYRACUSE UNIVERSITY STUDENT CONDUCT SYSTEM PROCEDURES 2015 – 2016 ...........................12

  PART 1. ORGANIZATION AND PHILOSOPHY ........................12

  PART 2. JURISDICTION............................................................13

  PART 3. ROLES OF ADMINISTRATORS .................................13

  PART 4. INTERIM SUSPENSION, NO CONTACT ORDERS AND OTHER ADMINISTRATIVE ACTIONS ......................14

  PART 5. OVERVIEW OF THE CONDUCT PROCESS FOR CASES NOT INVOLVING SEXUAL ASSAULT, STALKING, GENDER-RELATED HARASSMENT AND DOMESTIC/RELATIONSHIP VIOLENCE..........................17

  PART 6. HEARING BOARDS FOR CASES THAT DO NOT INVOLVE SEXUAL ASSAULT, STALKING, GENDER-RELATED HARASSMENT AND DOMESTIC/RELATIONSHIP VIOLENCE ..........19

  PART 7. RIGHTS OF COMPLAINANTS AND RESPONDENTS FOR CASES THAT DO NOT INVOLVE SEXUAL ASSAULT, STALKING, GENDER-RELATED HARASSMENT AND DOMESTIC/RELATIONSHIP VIOLENCE..........20

  PART 8. RESPONSIBILITIES OF COMPLAINANTS AND RESPONDENTS FOR CASES THAT DO NOT INVOLVE SEXUAL ASSAULT, STALKING, GENDER-RELATED HARASSMENT AND DOMESTIC/RELATIONSHIP VIOLENCE..........21

  PART 9. HEARING PROCEDURES FOR CASES THAT DO NOT INVOLVE SEXUAL ASSAULT, STALKING, GENDER-RELATED HARASSMENT AND DOMESTIC/RELATIONSHIP VIOLENCE ..........22

PART 10. OVERVIEW OF THE CONDUCT PROCESS FOR CASES INVOLVING SEXUAL ASSAULT, STALKING, GENDER-RELATED HARASSMENT AND DOMESTIC/RELATIONSHIP VIOLENCE ........................................................................................................................ 23

PART 11. SANCTIONS FOR ALL CONDUCT CASES ............................................................ 26

PART 12. APPEALS ............................................................................................................... 34

PART 13. MODIFICATION OF PROCEDURES ...................................................................... 35

PART 14. DISCIPLINARY RECORDS AND TRANSCRIPT NOTATIONS.................................. 35

PART 15. STUDENT INITIATED WITHDRAWAL .................................................................... 37

PART 16. GOOD STANDING ................................................................................................. 37

PART 17. ENFORCED MEDICAL WITHDRAWAL................................................................... 38

PART 18. RIGHTS TO AMEND ............................................................................................. 38

# SYRACUSE UNIVERSITY STATEMENT OF STUDENT RIGHTS AND RESPONSIBILITIES

Syracuse University is an academic community and all persons—students, faculty, administrators and staff—share responsibilities for its growth and continued welfare. As members of the University community, students can reasonably expect that the following rights will be respected by all University offices, programs, employees and organizations.

Syracuse University further encourages all members of the University community to endorse, support and abide by the following statement of values, which this community has deemed fundamental to its mission and integral to its growth.

1.  **SPEECH/EXPRESSION/PRESS**

    Students have the right to express themselves freely on any subject provided they do so in a manner that does not violate the Code of Student Conduct. Students in turn have the responsibility to respect the right of all members of the University to exercise these freedoms.

2.  **NON-DISCRIMINATION**

    Students have the right not to be discriminated against by any agent or organization of Syracuse University for reasons of age, creed, ethnic or national origin, gender, disability, marital status, political or social affiliation, race, religion, sexual orientation, gender identity and gender expression, or any other protected class as described by law. In their individual roles as members of student organizations, students have the responsibility not to discriminate against others.

3.  **ASSEMBLY/PROTEST**

    Students have the right to assemble in an orderly manner and engage in peaceful protest, demonstration, and picketing which does not disrupt the functions of the University, threaten the health or safety of any person, or violate the Code of Student Conduct.

4.  **RELIGION/ASSOCIATION**

    Students have the right to exercise their religious convictions and associate with religious, political, or other organizations of their choice in University facilities provided they do so in a manner that respects the rights of other members of the community and complies with the Code of Student Conduct. Students have the responsibility to respect the rights of other members of their University community to free exercise of their religious convictions and to free association with organizations of their choice.

5.  **PRIVACY/SEIZURE**

    Students have the right of privacy and to be free from unreasonable searches or unlawful arrest on University property and within their campus residences. Students have the responsibility to respect the privacy of other members of the University community in their person and in their place of residence.

3

6.  **ACADEMIC PURSUITS**

Students have the right to accurate and plainly stated information relating to maintenance of acceptable academic standing, graduation requirements, and individual course objectives and requirements. Students can expect instruction from designated instructors at appointed class times and reasonable access to those instructors. Students have the responsibility to attend class and know their appropriate class requirements.

7.  **QUALITY ENVIRONMENT**

Students have the right to expect a reasonably safe environment supportive of the University's mission and their own educational goals. Students have the responsibility to protect and maintain that environment and to protect themselves from all hazards to the extent that reasonable behavior and precaution can avoid risk.

8.  **GOVERNANCE/PARTICIPATION**

Students have the right to establish representative governmental bodies and to participate in University governance in accordance with the rules and regulations of the University. Students who accept representative roles in the governance of the University have the obligation to participate responsibly.

9.  **FUNDAMENTAL FAIRNESS**

Students have the right to written notice and the opportunity for a hearing before any change in status is incurred for disciplinary reasons unless a significant threat to persons or property exists. Students have the right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct--as provided in the published procedures of the University's Student Conduct System or other official University publications.

10. **CONFIDENTIALITY**

Students have the right to access and control access to their educational records as provided in the federal Family Educational Rights and Privacy Act, also known as the Buckley Amendment. These include the rights to review and challenge the content of educational records, to control disclosure of personal and academic information to third parties, and to limit the routine disclosure of all or some information defined as "directory information" by the Act.[1]

---

[1]  The above statement is also true for international students and scholars, except where specified by the legislation, rules and regulations governing the particular visa status

# SYRACUSE UNIVERSITY
# CODE OF STUDENT CONDUCT

Students at Syracuse University are expected to conduct themselves in a manner supportive of the educational mission of the institution. Integrity, respect for the person and property of others and a commitment to intellectual and personal growth in a diverse population are values deemed fundamental to membership in this University community. Syracuse University considers the following behavior, or attempts thereof, by any student or student organization, whether acting alone or with any other persons, to violate the Code of Student Conduct:

1) Physical harm or threat of physical harm to any person or persons, including, but not limited to:  assault, sexual abuse, or other forms of physical abuse.

2) Harassment—whether physical, verbal or electronic, oral, written or video—which is beyond the bounds of protected free speech, directed at a specific individual(s), easily construed as "fighting words," or likely to cause an immediate breach of the peace.

3) Conduct— whether physical, verbal or electronic, oral, written or video— which threatens the mental health, physical health, or safety of any person or persons including, but not limited to hazing, drug or alcohol abuse, bullying or other forms of destructive behavior.

4) Academic dishonesty,[2] including but not limited to plagiarism and cheating, and other forms of academic misconduct, for example, misuse of academic resources or facilities, misuse of computer software, data, equipment or networks.

5) Intentional disruption or obstruction of lawful activities of the University or its members including their exercise of the right to assemble and to peaceful protest.

6) Theft of or damage to University, personal, public, or private property/services or illegal possession or use of the same.

7) Forgery, alteration or fabrication  of identification cards, records, grades, diplomas, University documents, possession of falsified identification cards or misrepresentation of any kind to a University office, University official, or law enforcement.

8) Unauthorized entry, use, or occupation of University facilities that are locked, closed or otherwise restricted as to use.

9) Disorderly conduct including, but not limited to, public intoxication, lewd, indecent or obscene behavior, libel, slander or illegal gambling.

10) Illegal use, possession, purchase, distribution, manufacture or sale of alcohol, drugs or controlled substances, or any other violation of the Syracuse University Policy on Alcohol, Other Drugs, and Tobacco.

---

[2]  Cases involving academic dishonesty are handled by the Office of Academic Integrity.

11) Failure to comply with the lawful directives of University officials who are performing the duties of their office, especially as they are related to the maintenance of safety or security.

12) Unauthorized possession or use of any weapon, including:  firearms, BB-guns, airsoft guns, air rifles, explosive devices, fireworks, or any other dangerous, illegal, or hazardous object or material, and improper use as a weapon of any otherwise permitted object or material.

13) Interference with or misuse of fire alarms, blue lights, elevators or other safety and security equipment or programs.

14) Violation of any federal, state, or local law which has a negative impact on the well-being of Syracuse University or its individual members.

15) Violation of University policies, rules or regulations that are published in the Student Handbook, or other official University publications or agreements.

Culpability is not diminished for acts in violation of this Code that are committed in ignorance of the Code or under the influence of alcohol, illegal drugs or improper use of controlled substances.

**Other policies of the University may be found on the Syracuse University website and in other University publications.**

# SYRACUSE UNIVERSITY POLICY ON SEXUAL ASSAULT, SEXUAL HARASSMENT, STALKING OR RELATIONSHIP VIOLENCE

Syracuse University is committed to the maintenance of an environment which is supportive of its primary educational mission and free from all exploitation and intimidation. The University does not tolerate rape, sexual assault, domestic or dating violence, stalking, sexual coercion and non-contact sexual abuse such as voyeurism, and sexual exploitation or other forms of sexual violence or non-consensual sexual activity. Prohibited behaviors include:

1. Harassment - intentional, unwanted and unwelcome words or conduct directed at a specific person that alarms, threatens or causes fear for that person. Sexual harassment is a form of sexual discrimination. It is unwelcome behavior of a sexual nature that relates to the gender, sex or sexual identity of an individual. It has the purpose or effect of creating an intimidating or hostile environment. Sexual harassment includes a full range of coercive and unwelcome behaviors, such as unwelcome sexual advances, request for sexual favors, and other verbal, visual or physical conduct of a sexual nature, including rape and other forms of sexual assault, sexual coercion and non-contact sexual abuse such as voyeurism and sexual exploitation.

2. Sexual assault - any actual or attempted nonconsensual sexual activity including, but not limited to: sexual intercourse, or sexual touching, committed with coercion, threat, or intimidation (actual or implied) with or without physical force; exhibitionism or sexual language of a threatening nature by a person(s) known or unknown to the victim. Forcible touching, a form of sexual assault, which is defined as intentionally, and for no legitimate purpose, forcibly touching the sexual or other intimate parts of another person for the purpose of degrading or abusing such person or for gratifying sexual desires.

   Rape - sexual intercourse without consent, committed with coercion, threat, or intimidation (actual or implied), with or without physical force by a person(s) known or unknown to the victim. Sexual intercourse can involve anal, oral, or vaginal penetration, no matter how slight.

   Intoxication of the respondent cannot be used as a defense to an alleged incident involving sexual assault.

3. Stalking – intentionally, and for no legitimate purpose, engaging in a course of conduct directed at a person knowing (or should reasonably know) that such conduct is likely to cause reasonable fear of material harm or does cause substantial harm to the other person or that person's family or another party of their acquaintance. This includes cyber stalking—using technology to stalk another person.

4. Relationship or dating violence and domestic violence - patterns of behavior in which an individual uses physical violence, coercion, threats, intimidation, isolation or other forms of emotional, sexual, verbal and/or economic abuse to control their current or former intimate partner.

5. It is against University policy retaliate against a person, either directly or via a third party, for making a complaint of sexual violence or any kind of harassment or discrimination.

**The Syracuse University Definition of Consent**

Affirmative consent is a knowing, voluntary and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression.

Consent to any sexual act or prior consensual sexual activity between or with any party does not necessarily constitute consent to any other sexual act. Consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol. Consent may be initially given but withdrawn at any time. Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent. Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent. Consent cannot be given when it is the result of any coercion, intimidation, force, or threat of harm. When consent is withdrawn or can no longer be given, sexual activity must stop.

**Amnesty for Reporting Individuals**

The health and safety of every student at Syracuse University is of utmost importance. Syracuse University recognizes that students who have been drinking and/or using drugs (whether such use is voluntary or involuntary) at the time that violence, including, but not limited to domestic violence, dating violence, stalking, or sexual assault occurs may be hesitant to report such incidents due to fear of potential consequences of their own conduct. Syracuse University strongly encourages students to report domestic violence, dating violence, stalking or sexual assault to institution officials. A bystander acting in good faith or a reporting individual acting in good faith that discloses any incident of domestic violence, dating violence, stalking, or sexual assault to Syracuse University's officials or law enforcement will not be subject to Syracuse University's Code of Student Conduct for violations of alcohol and/or drug use policies occurring at or near the time of the commission of the domestic violence, dating violence, stalking, or sexual assault.

**Bill of Rights**

All students have the right to:

1. Make a report to local law enforcement and/or state police.

2. Have disclosures of domestic violence, dating violence, stalking and sexual assault treated seriously.

3. Make a decision about whether or not to disclose a crime or violations and participate in the judicial or conduct process and/or criminal justice process free from pressure by the institution.

4. Participate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard.

5.  Be treated with dignity and to receive from the institution courteous, fair and respectful health care and counseling services where available.

6.  Be free from any suggestion that the reporting individual is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations.

7.  Describe the incident to as few institutional representatives as practicable and not be required to unnecessarily repeat a description of the incident.

8.  Be protected from retaliation by the institution, any student, the accused or the respondent and/or their friends, family and acquaintances within the jurisdiction of the institution.

9.  Access to at least one level of appeal of a determination.

10. Be accompanied by an advisor of choice who may assist and advise a reporting individual, accused or respondent throughout the judicial or conduct process including during all meetings and hearings related to such process.

11. Exercise civil rights and practice of religion without interference by the investigative, criminal justice, or judicial or conduct process of the institution.

<u>If You Experience Sexual or Relationship Violence</u> - The Sexual and Relationship Violence Response Team at the Counseling Center 315.443.4715, 200 Walnut Avenue, provides privileged and confidential support, advocacy, and counseling for survivors of sexual assault and can be accessed 24 hours, seven days a week.

Should a student impacted by sexual assault, relationship violence, sexual harassment or stalking choose to file a formal complaint, the following resources are available for reporting:

Department of Public Safety, 005 Sims Hall, 315.443.2224

Title IX Coordinator, 005 Steele Hall, 315.443.0211

Syracuse Police Department, 511 South State Street, 315.435.3016

New York State Police, 24-Hour dedicated hotline, 1.844.845.7269

Anonymous reporting is available: "TIPS" at 315.443.TIPS (8477) or online: *http://publicsafety.syr.edu*.

# SYRACUSE UNIVERSITY ANTI-HAZING POLICY

Syracuse University is dedicated to promoting a safe and healthy campus environment for its students, faculty, staff and visitors. In addition, Syracuse University is committed to promoting an environment that fosters respect for the dignity and rights of all its community members. As such, the University will not tolerate hazing activities by any individuals, groups, teams, or recognized student organizations. For more information regarding Syracuse University's Statement of Student Rights and Responsibilities call the Office of Student Rights and Responsibilities at 315.443.3728 or the Office of the Senior Vice President and Dean of Student Affairs at 315.443.4357 for more information.

**Enforcement:** Syracuse University will enforce this policy through internal disciplinary procedures, the external prosecution of alleged offenders, or both. Individuals who participate in acts of hazing will be held accountable under this policy and the *Code of Student Conduct*. For more information regarding the Code of Student Conduct, call the Office of Student Rights and Responsibilities at 315.443.3728.

**Definitions** (as of May 21, 2002): Hazing is punishable under New York State Law as follows:

1. **New York Penal Law 120.16; Hazing in the First Degree:** A person is guilty of hazing in the first degree when, in the course of another person's initiation into or affiliation with any organization, he intentionally or recklessly engages in conduct which creates a substantial risk of physical injury to such other person or a third person and thereby causes injury. Hazing in the First Degree is a class A misdemeanor.

2. **New York Penal Law 120.17; Hazing in the Second Degree:** A person is guilty of hazing in the second degree when, in the course of another person's initiation or affiliation with any organization, he intentionally or recklessly engages in conduct, which creates a substantial risk of physical injury to such other person or a third person. Hazing in the second degree is a violation.

In addition, **Syracuse University defines hazing to include any action that intentionally or recklessly causes or poses a substantial risk of harm to the mental or physical health or safety of one or more persons.** Subjecting any person to and/or encouraging any person to commit an act that violates human dignity, the Code of Student Conduct, or the law for the purpose of initiating, promoting, fostering, or confirming any form of affiliation with a group or organization is prohibited. The express or implied consent of participants or victims will not be a defense.

**Examples:** Examples of hazing include, but are not limited to: forced consumption of alcohol or other substances, sleep deprivation, threats of harm, actual physical harm (e.g., paddling, beating, branding), performing any service or action under coercion or duress.

**Sanctions:** Hazing poses substantial risks to the safety and well-being of individual students and the University community. As such, violations of this policy will result in referral to the Office of Student Rights and Responsibilities and possible disciplinary action which may include, but not be limited to, any or all of the following: suspension or expulsion from the University, loss of University recognition and privileges, referral to law enforcement, participation in educational programs, and other educational or remedial action appropriate to the circumstances. Sanctions imposed under this policy do not diminish or replace the penalties available under generally applicable federal, state, and local laws.

**Reporting:** To make a report of hazing, or to determine whether a proposed activity constitutes or will constitute hazing, contact the Department of Public Safety at 315.443.2224, the Office of Fraternity and Sorority Affairs at 315.443.2718, the Office of Student Rights and Responsibilities at 315.443.3728, or the Office of the Senior Vice President and Dean of Student Affairs at 315.443.4357. Anonymous reports also can be made to the Department of Public Safety through the *Silent Witness Program* or by calling 315.443.TIPS (8477).

# SYRACUSE UNIVERSITY
# UNIVERSITY STUDENT CONDUCT SYSTEM PROCEDURES
# 2015 – 2016

### PART 1. ORGANIZATION AND PHILOSOPHY

1.1   The Trustees and Chancellor of Syracuse University have delegated authority to the University Student Conduct System to adjudicate cases alleging violations of the Code of Student Conduct by Syracuse University students. Students of the State University of New York College of Environmental Science and Forestry (SUNY ESF) also are subject to the procedures set forth below when allegations related to the behavior of a SUNY ESF student are determined to pose a significant threat to the safety and well-being of the Syracuse University community.

1.2   The procedures included herein apply to the resolution of matters of social misconduct and related matters.

1.3   Supervision of the University Student Conduct System is the responsibility of the Senior Vice President and Dean of Student Affairs. Implementation of these procedures is the responsibility of the Director of the Office of Student Rights and Responsibilities, or a designee, in cooperation with, the Director of Residence Life, the Director of Health Services, the Director of the Counseling Center, the Director of Fraternity and Sorority Affairs, the Director of Recreation Services and the Title IX Coordinator or their respective designees.

1.4   Syracuse University is an institution of higher learning where individual growth and development are fostered, excellence is pursued, and the highest standards of integrity are expected in all areas of life. Syracuse University is committed to providing an environment where persons are safe, property is secure, individual rights of all persons are respected, and education of the highest quality is achieved.

1.5   The Code of Student Conduct outlines the behavior that is expected of all students at Syracuse University. Having voluntarily enrolled at Syracuse University, all students have entered into an agreement to abide by the rules and regulations set forth in the Code of Student Conduct. Each student is responsible for conforming his or her conduct to the requirements of this code and applicable federal, state and local laws.

1.6   Syracuse University considers its Code of Student Conduct as a statement of minimal expectations and seeks to foster a commitment to the highest standards of ethical behavior by the coherent, consistent and fair manner in which it enforces its rules and regulations. The University views its student conduct process as a learning experience that is intended to result in the growth and understanding of individual responsibilities on the part of all persons.

1.7   The decision to pursue allegations of student misconduct through the University Student Conduct System is deemed acceptance of its philosophy that any potential sanctions will be designed to address the safety and security of persons and property and to educate students with regard to higher standards of behavior. Sanctions of the University Student Conduct System are not designed nor intended to be punitive in nature.

1.8    Violations of the Code of Student Conduct will be adjudicated by the University Student Conduct System, which is designed to reflect and to support the educational mission of the institution and ensure the fair and equitable treatment of all individuals and groups charged with or victimized by student misconduct.

**PART 2. JURISDICTION**

2.1    The University Student Conduct System has jurisdiction over all alleged violations of the Code of Student Conduct by any student or recognized student organization that may be brought to its attention. Jurisdiction of the University Student Conduct System extends to alleged misconduct that takes place on University owned or controlled property or on property close to the University, including the Greek chapter houses; alleged misconduct that takes place at any University sponsored event; and alleged misconduct that has a significant impact on the educational mission and well-being of the University community that takes place at any location off campus.

2.2    University student conduct proceedings are administrative in nature and independent of any criminal and/or civil proceedings that may be concurrently in process. University student conduct proceedings are intended to enforce the Code of Student Conduct at Syracuse University although the conduct in question may be simultaneously in violation of federal, state or local laws. The University may notify local and federal authorities when a crime is alleged to have been committed, but such notification will not modify the University's authority to adjudicate the alleged misconduct through its own student conduct system.

**PART 3. ROLES OF ADMINISTRATORS**

University administrators assume a variety of roles in the informal and formal resolution of most conduct matters. When a conduct complaint has been initiated, the roles of the University administrators are as outlined below.

3.1    The Office of Student Assistance is responsible for the coordination of support and advisory resources that are available to complainants and respondents involved in the University Student Conduct System. The Office of the Student Assistance will guide parties to referral sources for on-campus counseling and to a pool of community members that have volunteered and been trained to provide procedural advice or personal support to participants in the University Student Conduct System.

3.2    The OSRR Graduate Assistants and Practicum Assistants are graduate students who educate complainants and respondents with regard to University Student Conduct System procedures; act as case managers in reaching informal resolutions of conduct complaints; and manage student referrals to University and community resources designed to assist students in fulfilling conduct sanctions.

3.3    The Student Conduct Advisors are professional staff members who act as case managers in reaching informal resolution of student conduct complaints; design and provide training and educational Programming to the University community; and offer follow up support for students subsequent to the resolution of their conduct cases.

3.4    The Associate Director of Student Rights and Responsibilities acts as a case manager; supervises the assessment activities of the Office of Student Rights and Responsibilities; provides training,

advising, and educational programming to members of the University community concerning the University Student Conduct System; and acts on behalf of the Director of Student Rights and Responsibilities in their absence.

3.5    The Director of Student Rights and Responsibilities directs the activities of the University Student Conduct System and acts as a case manager. The Director of Student Rights and Responsibilities approves informal resolutions to conduct complaints; appoints University Conduct Board members; assigns case managers; confirms University Conduct Board decisions; advises or arranges for the legal advisement of the University Appeals Board; and assures that the overall functioning of the University Student Conduct System is consistent with applicable laws and regulations.

3.6    The Senior Vice President and Dean of Student Affairs is responsible for the overall supervision of the University Student Conduct System, the imposition of interim suspensions, the appointment of University Appeals Board members, and the confirmation of University Appeals Board decisions, except as otherwise provided herein.

**PART 4. INTERIM SUSPENSION, NO CONTACT ORDERS AND OTHER ADMINISTRATIVE ACTIONS**

4.1    The status of an respondent will not be changed while a case is pending, unless the Director of Student Rights and Responsibilities, in consultation with the Senior Vice President and Dean of Student Affairs, or a designee, determines that an interim suspension is required to promote the safety and well-being of the University community.

4.2    A student who is suspended on an interim basis pending the outcome of proceedings against them will be given the opportunity to be heard by the University Appeals Board on the merits of the decision to impose the interim suspension within three (3) University business days of receipt by the Office of Student Rights and Responsibilities of the student's written request for such a hearing. Such a request must be made by the student within 30 University business days of the imposition of the interim suspension. If no such request is made, the interim suspension will remain in effect pending a hearing or Informal Resolution meeting on the merits of the conduct case. All recommendations of the University Appeals Board reviewing the imposition of an interim suspension are confirmed by the Senior Vice President and Dean of Student Affairs or his/her designee, and when confirmed, the decision is final and no further review of the interim suspension status is available.

4.3    Where an interim suspension is imposed in a case involving the arrest of the respondent, the University may require the associated criminal matter to be resolved in full prior to the pending conduct case being heard on its merits. In cases of sexual misconduct, the University will not make this requirement. In circumstances where a criminal matter remains pending or in other unusual circumstances, including those described herein at Sections 4.4 and 7.4, students who still seek to have their cases heard on the merits must file a written request for a meeting before the Director of Student Rights and Responsibilities, or a designee, who will attempt an Informal Resolution. If Informal Resolution is unsuccessful, the Director of Student Rights and Responsibilities will determine if the case will be referred to a University Conduct Board, Administrative hearing, or held until the criminal case concludes. This determination will be made on case-by-case basis.

Unless modified pursuant to Part 13 of these procedures, University Conduct Board Hearings will conform substantially to the procedures outlined at Parts 7 through 9 herein. The results of the proceedings may be appealed in writing to the University Appeals Board in accordance with Part 12 of these procedures.

4.4   Certain administrators have been granted authority to take specific administrative actions to promote the safety and well-being of members of the University community and to enforce other administrative policies.

    a.   The Director of Residence Life, or a designee, is authorized to respond to alleged violations of Office of Residence Life Residential Policies consistent with the policies published by the Office of Residence Life. These policies and procedures are independent of the University Student Conduct System. Questions about the Office of Residence Life Residential Policies process should be directed to the Office of Residence Life, 111 Waverly Avenue, Suite 200, or 315.443.3637.

    b.   The Director of Residence Life, or a designee, is also permitted to respond on an emergency basis to behavioral incidents alleged to violate the Code of Student Conduct occurring within or otherwise impacting the safety of any residential unit by relocating a student within or removing a student from University housing on a temporary basis pending fulfillment of specific conditions and/or review of the matter by the University Student Conduct System.

    c.   The Director of Health Services and the Director of the Counseling Center are authorized to respond to significant psychological, physical, or substance-abuse related conditions or other student behavior that poses a direct threat to others. A student who fails to attend and actively participate in an assessment, educational program, and/or other intervention as required or who engages in behaviors that pose a direct threat to others may be withdrawn for medical reasons from the University. The Associate Vice President for Health and Wellness, upon the recommendation of the Director of the Counseling Center or the Director of the Health Center, is authorized to withdraw a student for medical reasons. Such withdrawal will extend until the student demonstrates completion of an assessment, educational program and/or other intervention to the satisfaction of the Director of Health Services or the Director of the Counseling Center. During the period of such a withdrawal for medical reasons, the student is prohibited from entering onto Syracuse University owned, operated, or controlled property, including but not limited to University-owned land leased to a non-University affiliated party, and from participating in any course or program offered by Syracuse University. In addition, the student must demonstrate "good citizenship" to the Director of Student Rights and Responsibilities who, in consultation with the Senior Vice President and Dean of Student Affairs, or a designee, who will determine whether and under what conditions the student will be permitted to return to the University.

    d.   The Title IX Coordinator, or a designee, is authorized to respond to alleged violations of Title IX or other federal or state discrimination laws. This includes providing interim relief such as removing a Respondent from a class on a temporary basis, issuing a temporary no contact order or other actions consistent with the University's responsibilities. Questions about Title IX should be directed to Equal Opportunity, Inclusion and Resolution Services, 005 Steele Hall, 315.443.0211 or *titleix@syr.edu*.

e.   The Director of Recreation Services, or a designee, is authorized to respond to alleged violations of the Department of Recreation Services published and/or posted policies. These policies and procedures are independent of the University Student Conduct System. Questions about policies of the Department of Recreation Services should be directed to the Department of Recreation Services, 241 Archbold Gym, 315.443.4386.

f.   The Director of Fraternity and Sorority Affairs, or a designee, is authorized to respond to alleged violations of policies of the Office Fraternity and Sorority Affairs consistent with published policies and procedures. These policies and procedures are independent of the University Conduct System. Questions about policies of the Office of Fraternity and Sorority affairs should be directed to the Office of Fraternity and Sorority Affairs, 131 Schine Student Center, 315.443.2718.

Except in emergency circumstances related to a medical or psychological condition, or in situations where a student is in violation of local, state, or federal laws or regulations designed to safeguard the public's health, a student is entitled to an opportunity for a hearing before a hearing officer prior to withdrawal for medical reasons pursuant to this subsection. Such a hearing will be held in accordance with the procedures described above in Section 4.3, except that the hearing officer in such a case will be advised by an appropriately trained professional. The results of such a hearing may be appealed in writing to the University Appeals Board in accordance with Part 12 of these procedures.

In emergency medical or psychological circumstances, students may be removed immediately from the University pursuant to Part 17 of these procedures.

4.5   In certain circumstances a No Contact Order (NCO) may be issued by the Department of Public Safety, the Office of Residence Life, the Title IX Coordinator, or the Office of Student Rights and Responsibilities, as a temporary directive to prohibit communication to or among designated students when there is reason to believe that continued contact is in the best interest of the involved students to promote their safety and security.

4.6   No Contact Orders prohibit all forms of contact including, but not limited to, contact via social media, contact via a third party and/or in person contact. A student who receives a No Contact Order that is issued on behalf of another student is required to remove themselves from any public area in which both individuals are present.

4.7   If a No Contact Order is issued, both parties will receive a written copy of the NCO and both parties are expected not to have contact with one another.

4.8   No Contact Orders will be reviewed by the Director of the Office of Student Rights and Responsibilities, or a designee, within two business day of its issuance. The Director, or designee, will determine if there is a need to continue the order, amend the order, or remove the order. Both parties will be notified in writing of the decision of the Director, or the designee.

4.9   No Contact Orders may be removed or amended through an appeal to the Office of Student Rights and Responsibilities. In the event of an appeal, either involved student may submit a written request to have the Temporary Order of No Contact removed or amended. The letter must include:

a.   A description of the events resulting in the No Contact Order being issued.

16

      b.     Names of those listed on the No Contact Order.

      c.     Reasons why the No Contact Order should be removed or amended.

      d.     Plans to prevent any negative incidents from occurring between parties listed in the order.

      e.     Communication of the understanding that Syracuse University is not responsible for negative behaviors that may result from removal or amendment of the No Contact Order if the individual requesting the removal or amendment of the No Contact Order is the person who requested its issuance.

No Contact Orders will not be considered for removal or amendment if all elements of the written appeal are not addressed or if there is evidence of the potential for future negative behaviors between listed parties.

4.10  Violations of No Contact Orders may result the violating party's suspension on an interim basis from Syracuse University.

4.11  No Contact Orders are not part of a student's conduct file unless there is a related conduct case filed with the Office of Student Rights and Responsibilities.

**PART 5. OVERVIEW OF THE CONDUCT PROCESS FOR CASES NOT INVOLVING SEXUAL ASSAULT, STALKING, GENDER-RELATED HARASSMENT AND DOMESTIC/RELATIONSHIP VIOLENCE**

5.1  A University Student Conduct System complaint may be filed against any student or recognized student organization by any member of the University community. Complaints may be filed by a student, faculty member, or staff member by filling out a standard complaint form, which is available on the web at *studentconduct.syr.edu.* A non-University member may file a report with the Department of Public Safety against a student that may result in a student conduct complaint pursuant to this policy. A report by a non-University member may be adjudicated if the interests of the University community are sufficiently implicated. All documentation and other information associated with the complaint, e.g., Department of Public Safety or police reports and witness statements, should be included with the standard complaint form and returned to the Office of Student Rights and Responsibilities. More than one complaint may be filed arising out of the same incident.

5.2  The Office of Student Rights and Responsibilities will determine whether a complaint concerns students and/or recognized student organizations and whether the complaint concerns subject matter falling within the jurisdiction of the University Student Conduct System. The Office of Student Rights and Responsibilities further will determine whether the complaint demonstrates sufficient information of wrongdoing to warrant further investigation and/or commencement of the student conduct process.

5.3  The standard of proof applied within the University Student Conduct System is a preponderance of the evidence, which requires a demonstration that it is "more likely than not" that the respondent or recognized student organization has violated the Code of Student Conduct.

5.4  Some allegations of student misconduct require investigation prior to determining whether further student conduct proceedings are warranted. As appropriate, the University will conduct an

investigation concerning the allegations. The investigation may be conducted by DPS or another appropriate University office or representative. In cases involving alleged criminal conduct, DPS can assist a complainant in making a criminal complaint. A complainant need not pursue a criminal complaint in order to seek to hold the accused responsible through the University's student conduct system.

5.5   An individual may be permitted to withdraw a complaint subsequent to filing if the Office of Student Rights and Responsibilities is satisfied that the complainant's decision has not been influenced by pressure or intimidation. In the event that the complainant is determined to have been influenced by pressure or intimidation, or in other extenuating circumstances, or where the University's interests would be served by continuation of the case, the Senior Vice President and Dean of Student Affairs or the Director of the Office of Student Rights and Responsibilities may appoint a University complainant to continue the case.

5.6   Upon determining that the complaint is appropriate for further processing, the Office of Student Rights and Responsibilities will contact the student or recognized student organization. The respondent or recognized student organization will be offered an opportunity to participate in an informal resolution meeting with a case manager to discuss the allegations. If a student or recognized student organization does not attend the meeting without prior notice to the Office of Student Rights and Responsibilities, a decision may be rendered in the student's or organization's absence. Complainants do not attend informal resolution meetings with the respondents, but are informed of the outcome of these meetings to the extent legally permitted.

There are three possible results at this stage:

(1)   The student/organization is found to have no responsibility and/or that there is insufficient basis to proceed against the student. If that occurs, the case does not proceed to a hearing; or

(2)   The student/organization accepts responsibility and appropriate sanction(s) is/are agreed upon. If that occurs, the case is considered informally resolved; or

(3)   The student/organization does not accept responsibility and the case manager determines that the complaint warrants a hearing. If that occurs, the case proceeds to a hearing.

Once an informal resolution is reached, the decision is final and will only be revisited based on one or more of the following:

a.   new information not reasonably available at the time of the informal resolution, the absence of which can be shown to have had a detrimental impact on the outcome of the informal resolution;

b.   procedural error that can be shown to have had a detrimental impact on the outcome of the informal resolution;

c.   errors in the interpretation of University policy so substantial as to deny fair informal resolution;

d.   grossly inappropriate sanction having no reasonable relationship to the charges.

In such a case, the student or student organization may submit a written petition for reconsideration of the case to the Director of the Office of Student Rights and Responsibilities within three (3) business days of the informal resolution meeting.  Requests for review must be written and signed by the student. The decision of the Director of the Office of Student Rights and Responsibilities upon reconsideration is final.

5.8   If an informal resolution cannot be reached, and assuming the case manager finds that the complaint warrants a hearing, the case will be assigned to an appropriate hearing officer or hearing board for formal resolution. The hearing process is described in Parts 6 through 9 herein.

5.9   Students who need accommodations for a disability should contact the Office of Disability Services (ODS), located in Room 309 of 804 University Avenue, or call 315.443.4498 for an appointment to discuss their needs and the process for requesting accommodations before going through the informal resolution process. ODS is responsible for coordinating disability-related accommodations and will issue students with documented Disabilities Accommodation Authorization Letters, as appropriate. Since accommodations may require early planning and are not provided retroactively, students should contact ODS as soon as possible.

If a student is receiving on-going supportive services from a Syracuse University office, the student is welcome to discuss their case with their counselor/advocate prior to attending an initial meeting with OSRR. Students may ask their counselor/advocate to serve as a procedural advisor, but counselors from the University's Counseling Center may not be able to serve in this capacity.

5.10   Recording devices (audio and/or video) of any kind are not permitted for use during informal resolution meetings.

## PART 6. HEARING BOARDS FOR CASES THAT DO NOT INVOLVE SEXUAL ASSAULT, STALKING, GENDER-RELATED HARASSMENT AND DOMESTIC/RELATIONSHIP VIOLENCE

6.1   The University Conduct Board is comprised of five (5) students selected from a pool of at least ten (10) students. When the respondent is an undergraduate student, at least two (2) board members are undergraduate students; when the respondent is a graduate student, at least two (2) board members are graduate students. The University Conduct Board is advised by a trained designee of the Director of Student Rights and Responsibilities or, in cases of felony arrest, by the Director of Student Rights and Responsibilities, the Associate Director of Student Rights and Responsibilities, or an attorney appointed by the Director of Student Rights and Responsibilities.

6.2   The University Conduct Board may hear any case of alleged violations of the Code of Student Conduct filed against an individual student or student organizations, except cases of academic dishonesty. The University Conduct Board may impose sanctions up to and including expulsion from the University and may design sanctions that are educational and/or remedial specific to the facts of a given case. Standard Sanctioning Guidelines for specific offenses and the applicability of those guidelines are included in Part 11. Decisions of the University Conduct Board are confirmed by the Director of Student Rights and Responsibilities, or a designee.

6.3   Appeals from decisions of the University Conduct Board that meet the criteria set forth in Part 12 are heard by the University Appeals Board.

**PART 7. RIGHTS OF COMPLAINANTS AND RESPONDENTS FOR CASES THAT DO NOT INVOLVE
SEXUAL ASSAULT, STALKING, GENDER-RELATED HARASSMENT AND DOMESTIC/RELATIONSHIP
VIOLENCE**

7.1    Prior to a formal hearing on the merits of a case, each party (i.e., the complainant(s) and
       respondent(s)) will be given written notice of the charges stating:  the alleged facts upon which the
       charges are based, the sections of the Code of Student Conduct alleged to have been violated, the
       procedures to be used in resolving the charges, and the date, time, and location of the hearing.
       Notice will be emailed at least three (3) University business days prior to the hearing to the
       respondent's syr.edu email address or in any other manner reasonable designed to give notice to
       the student.

7.2    Each party will be given an opportunity to be heard before an impartial hearing board or hearing
       officer in a timely manner - usually within thirty (30) days of the filing of the written complaint.
       Attendance at hearings is limited to the hearing board and its advisor, and the parties immediately
       involved and their procedural advisors. Witnesses are permitted access to the hearing room solely
       for the purpose of and duration necessary to provide testimony.

7.3    Each party will have the opportunity to face the opposing party and to ask questions indirectly
       through the hearing board. The hearing board has the discretion to determine whether to permit
       questioning of witnesses through the hearing board. Formal rules of evidence do not apply. Any
       information or statement may be admitted (including hearsay) subject to the discretion of the
       hearing board chairperson.

7.4    Hearing boards may be advised at all times by an attorney or other advisor. Parties may be advised
       during the hearing by a procedural advisor who is a full-time member of the Syracuse University
       community. Persons who may serve as procedural advisors are limited to full-time students, faculty,
       and staff of Syracuse University and SUNY ESF. No attorney who is not also a full-time member of
       the Syracuse University or SUNY ESF faculty, staff, or student body will be permitted to participate
       in the conduct process on behalf of the complainant or the respondent, except where criminal or
       civil proceedings are also pending. When criminal or civil proceedings are pending, both the
       complainant and the respondent may be advised by an attorney, but the individual parties remain
       primarily responsible for conducting their own presentations.

       Attorneys for the complainant and the respondent, when permitted to participate, are limited to the
       role of the procedural advisor described below in Section 9.5. Any attorney who fails to conform his
       or her behavior to these requirements will be removed from the proceedings and barred from acting
       as a procedural advisor in future University Student Conduct System proceedings. In such
       circumstances the hearing board will determine whether to proceed with the hearing without the
       presence of the procedural advisor or to forward the case to the Director of Student Rights and
       Responsibilities who will determine if the case will be forwarded to a hearing officer for resolution or
       if another Board will be convened.

7.5    Each party may present objections to the participation of any board member for reason of conflict of
       interest. Any such objection will be ruled on by the chairperson, or by vote of the majority of the
       board, if the objection is to the chairperson's participation.

7.6    Each party will have the opportunity to present relevant testimony and/or information to the hearing
       board on his or her own behalf and the opportunity to respond to testimony or information

presented by other parties. Relevance of testimony will be determined by the respective board chairperson.

7.7    An audio recording will be made of all hearings involving felony arrest. Either party may request that a written transcript of these recordings be made at the expense of the requesting party or have access to the recordings by arrangement with the Director of Student Rights and Responsibilities. Printed transcripts may be redacted by the Office of Student Rights and Responsibilities prior to being provided to the requesting party in accordance with the Family Educational Rights and Privacy Act of 1974, as amended.

7.8    Each party will receive written notice of the hearing board's confirmed decision within five (5) University business days after the hearing is concluded. A hearing is considered concluded at the point the hearing board's deliberations are complete.

**PART 8. RESPONSIBILITIES OF COMPLAINANTS AND RESPONDENTS FOR CASES THAT DO NOT INVOLVE SEXUAL ASSAULT, STALKING, GENDER-RELATED HARASSMENT AND DOMESTIC/RELATIONSHIP VIOLENCE**

8.1    It is the responsibility of each party to investigate, prepare, and present his or her case before a hearing board or other body. This responsibility includes identifying and presenting any witnesses or witness statements. The University Student Conduct System is not authorized to compel the appearance of any witness at a University Student Conduct System proceeding. Similarly, neither parties nor their representatives are authorized to compel or attempt to compel the appearance of any person at a University Student Conduct System proceeding.

All parties are expected to appear at the hearing as specified. If either party fails to appear at the hearing, the hearing board may proceed with the hearing, dismiss the complaint, or reschedule the hearing, as the facts and circumstances of the case indicate. In cases in which either party is unable to appear before the Board as described in section 13.1, alternative means for participation may be made available which may include telephone or video conferencing. In such cases, individual parties will be required to supply and use their own communication equipment and/or hardware.

8.2    Each party must act in a manner that is respectful of the proceedings and the rights of all individuals involved. It is the responsibility of each party to assure advisors, witnesses, and other affiliates act in a manner that is respectful of the proceedings and all individuals involved. The board chairperson shall retain the option to discontinue the hearing and forward the case for administrative resolution by the Director of Student Rights and Responsibilities, or a designee, when the behavior of any person has become an encumbrance likely to have a detrimental impact on the outcome of the hearing.

8.3    All parties are expected to answer pertinent questions truthfully during the hearing or choose to remain silent. The board may draw inferences from the statements and silence of any person with respect to pertinent questions. False testimony by any person may give rise to further disciplinary action or an enhancement of sanction at the discretion of the board.

8.4    At the hearing, each party must offer all information known or available to that they desire to be considered. Each party is responsible for calling witnesses to testify on his or her behalf regarding the facts of the case and for providing a list of potential witnesses. This list must be submitted to

the Office of Student Rights and Responsibilities at least 24 hours in advance of the hearing. Witness lists will be made available to the opposing party by the Office of Student Rights and Responsibilities. The hearing board chairperson will have the discretion to limit the number of witnesses to be called by either party unless the board chairperson determines information is cumulative or irrelevant, or would unnecessarily compromise the confidentiality of the hearing.

**PART 9. HEARING PROCEDURES FOR CASES THAT DO NOT INVOLVE SEXUAL ASSAULT, STALKING, GENDER-RELATED HARASSMENT AND DOMESTIC/RELATIONSHIP VIOLENCE**

9.1   The purpose of the hearing is to provide the opportunity for complainants and respondents to present all relevant testimony and other information with regard to alleged violations of the Code of Student Conduct. It is the responsibility of the hearing board to consider impartially all relevant testimony and other information, determine the facts, and impose appropriate sanctions. Decisions of the respective hearing boards are subject to review and confirmation by the appropriate University officials, as outlined in Part 3 above.

9.2   University Student Conduct System hearings are administrative, rather than criminal or civil, in nature. Rules of information and the criminal standard of proof do not apply.

9.3   University Student Conduct System hearings are confidential and closed to persons not directly related to the case. The results of University Student Conduct System hearings are held confidential in accordance with applicable law. The University reserves the right to correct any misinformation with regard to University Student Conduct System actions that may be circulated in the media when the well-being of the community so requires. The University will publish data related to the activities of the University Student Conduct System on a periodic basis consistent with constraints imposed by law.

9.4   Complainants, respondents, and the University, as represented by the respective hearing boards, are the principal parties in University Student Conduct System proceedings. All parties, procedural advisors, witnesses, and hearing board members are expected to maintain the confidentiality of conduct system proceedings.

9.5   Procedural advisors, including attorneys where applicable, have no standing in University Student Conduct System proceedings, except to provide advice to their respective parties in a quiet, non-disruptive manner. Advisors, and attorneys when applicable, do not represent or speak for their respective parties, except at the request of the board chairperson. Excluding interim suspension hearings, requests for a procedural advisor should be made at least 72 hours prior to the hearing to the Office of Student Assistance via email at *studentassistance@syr.edu*.

9.6   Chairpersons appointed by the Director of Student Rights and Responsibilities, or a designee, will preside at each hearing.

9.7   The order of presentation at the hearing will be as follows:

   a.   introductions and reading of the complaint/appeal by the chairperson;

   b.   opening statements;

   c.   presentation of testimony/information/witnesses by the complainant

    d.    presentation of testimony/information/witnesses by the respondent;

    e.    closing statement by the complainant

    f.    closing statement by the respondent.

In cases involving felony arrest, or in other appropriate circumstances, the order of presentation at the hearing may be changed at the discretion of the board chairperson.

9.8    The hearing board members may ask questions at any time subject to limitations of relevance, as determined by the chairperson. The parties may ask questions indirectly through the board chairperson subject to reasonableness and relevance, as determined by the chairperson. Hearing board decisions are made in private and by a majority vote of the board members. All hearing board decisions are subject to confirmation by the appropriate University official.

9.9    All parties will be informed of the confirmed hearing board decision in writing within five (5) University business days after the conclusion of the hearing. A hearing is considered concluded when all hearing board deliberations are complete. Decisions of the Board are effective immediately, unless a written notice from either party requesting a review by the University Appeals Board has been received by the Office of Student Rights and Responsibilities. Procedures for requesting a review by the University Appeals Board are outlined in section 12 of this Handbook.

## PART 10. OVERVIEW OF THE CONDUCT PROCESS FOR CASES INVOLVING SEXUAL ASSAULT, STALKING, GENDER-RELATED HARASSMENT AND DOMESTIC/RELATIONSHIP VIOLENCE

10.1    To file a formal complaint against a student alleging any prohibited behaviors included in the Syracuse University Policy on Sexual Misconduct, Gender Related Harassment, Stalking or Relationship Violence an individual (complainant) should contact the University's Title IX Coordinator, 315.443.0211. If the complainant would like to file a criminal complaint they should contact the Department of Public Safety, 315.443.2224.

The health and safety of every student at Syracuse University is of utmost importance. Syracuse University recognizes that students who have been drinking and/or using drugs (whether such use is voluntary or involuntary) at the time that violence, including, but not limited to domestic violence, dating violence, stalking, or sexual assault occurs may be hesitant to report such incidents due to fear of potential consequences of their own conduct. Syracuse University strongly encourages students to report domestic violence, dating violence, stalking or sexual assault to institution officials. A bystander acting in good faith or a reporting individual acting in good faith that discloses any incident of domestic violence, dating violence, stalking, or sexual assault to Syracuse University's officials or law enforcement will not be subject to Syracuse University's Code of Student Conduct for violations of alcohol and/or drug use policies occurring at or near the time of the commission of the domestic violence, dating violence, stalking, or sexual assault.

If a victim files a complaint that proceeds to a formal conduct process, that person is the "complainant". The student against whom the complaint is filed is the "respondent". In cases in which the Title IX Coordinator has filed a complaint without the cooperation of the victim(s) in a specific incident the Title IX Coordinator serves as the "complainant." If a victim serves as the complainant, the rights as outlined in Section 10 apply to that person. If the Title IX Coordinator serves as the complainant, then the rights as outlined in Section 10 belong to the Title IX

Coordinator who will communicate in writing to the victim regarding the date of the University Conduct Board hearing as well as any determinations of the University Conduct Board and the University Appeals Board.

If the Title IX Coordinator files a complaint without the cooperation of a victim, but the victim later decides to participate in the formal process, the victim will need to notify the Office of Student Rights and Responsibilities in writing of their decision to participate in the formal resolution process prior to the formal hearing date. The victim may submit a written victim impact statement for consideration by the University Conduct Board without serving as the complainant.

10.2   If a complainant also chooses to file a criminal report and pursue criminal charges against the respondent, the University will not delay its investigation unless requested to do so by the appropriate legal authorities and, if a delay is requested, the delay will only be temporary.

10.3   Interim relief such as no-contact orders, moving the respondent, changes in living and/or working and/or academic situations, protective escort services, and referrals to counseling may be provided as requested and when available. Such relief can be sought without regard to whether the complainant chooses to report the matter to DPS or to local law enforcement. Additional relief such as protective orders may be available through the criminal and/or family court process. Students may refer to the Title IX Resource Guide for information on how to obtain interim relief.

10.4   Upon the receipt of a complaint, the Title IX Coordinator will designate an investigator who may conduct an investigation. A hold will be placed on the respondent's academic records until a final resolution of the complaint. The investigator will have the authority to meet with both the complainant, respondent, and witnesses to the alleged incident to gather information regarding the facts and circumstances of the incident.

The complainant, respondent and witnesses involved in the case may be advised by an advisor of their choice. For a University-trained procedural advisor, parties may contact the Office of Student Assistance at 315.443.4357. Procedural advisors, including attorneys where applicable, have no standing in the University investigation or in the University Student Conduct System proceedings, except to provide advice to their respective parties in a quiet non-disruptive manner,  Advisors and attorneys when applicable, do not represent or speak for their respective parties. Any advisor, including attorneys, who fails to conform their behavior to these requirements will be removed from the proceedings and barred from acting as an advisor in future University Student Conduct System proceedings. In such cases, the Board will determine whether to proceed with the formal resolution process without the presence of an advisor or to reschedule the proceedings at which time the case will be forwarded to the Director of Student Rights and Responsibilities for further processing.

10.5   Once the investigation report is complete, both the respondent and the complainant will be given the opportunity to review the report and provide a written response within three (3) business days both of which will be provided to the Office of Student Rights and Responsibilities and the other party by the Title IX investigator.

Files will be redacted in accordance with the Family Educational Rights and Privacy Act of 1974, as amended. Complainants and respondents will not be permitted to create copies of the files.

10.6   Both the complainant and respondent will be invited to participate in an individual pre-hearing meeting in the Office of Student Rights and Responsibilities to review the hearing process, but

neither the complainant nor the respondent are required to attend. Both the complainant and the respondent are permitted to have a procedural advisor of their choice attend the meeting. The procedural advisor will need to conform his/her behavior to the standards outline in section 10.4.

10.7   The investigator will provide the alleged Code of Student Conduct violations, the written report, and the written responses to a three-member University Conduct Board comprised of trained faculty and staff members, as appointed by the Director of the Office of Student Rights and Responsibilities or a designee. The report will describe the relevant facts and circumstances learned during the course of the investigation and will contain all of the interviews conducted by the investigator. The report will not include any conclusions regarding responsibility for violations of the Code of Student Conduct.

The University Conduct Board is comprised of three (3) members who are full-time faculty or staff from Syracuse University.  Members of the University Conduct Board are appointed by the Senior Vice President and Dean of Student Affairs from a pool of at least ten (10) members recommended by the University community.  The University Conduct Board is advised by the Director of Student Rights and Responsibilities, by the Associate Director of Student Rights and Responsibilities or an attorney appointed by the Director of Student Rights and Responsibilities.

Chairpersons, appointed by the Director of the Office of Student Rights and Responsibilities, or a designee, will preside at each University Conduct Board hearing.

10.8   At its sole discretion, the University Conduct Board may rely upon the investigator's report for its understanding of the relevant facts, or it may conduct additional witness interviews and/or gather other additional information. The University Conduct Board may also interview the investigator. The complainant and respondent will be invited to speak to the University Conduct Board to present any additional information that they believe is relevant to the case.  Any interviews conducted by the University Conduct Board will be recorded.

Either party may request that a written transcript of these recordings be made at the expense of the requesting party or have access to the recordings by arrangement with the Director of Student Rights and Responsibilities. Printed transcripts may be redacted by the Office of Student Rights and Responsibilities prior to being provided to the requesting party in accordance with the Family Educational Rights and Privacy Act of 1974, as amended.

10.9   Based on the information contained in the final report, any written statements, and witness information provided to the Board, the Board will determine whether it is more likely than not that the respondent violated the Code of Student Conduct using the preponderance of the evidence standard. Rules of evidence and criminal standards of proof do not apply. University Conduct Board decisions are made in private and by a majority vote of the Board members.

Once a finding of responsibility is made and prior to deliberations regarding sanctions, the Board will consider any other relevant information including impact statements and prior conduct history.

The hearing will be considered complete with the Board has agreed upon the final written version of the Board's decision. The University Conduct Board may impose sanctions up to and including expulsion from the University and may design sanctions that are educational and/or remedial specific to the facts of a given case. Standard sanctions for alcohol, safety, sexual harassment and

violence related behaviors are listed in section 11 of this Handbook. The University Conduct Board will render a decision on all Code of Student Conduct violations listed in the complaint.

Decisions of the University Conduct Board are confirmed by the Director of Student Rights and Responsibilities or a designee.

University Conduct System formal resolution proceedings are confidential and closed to persons not directly related to the case.  The results of University Student Conduct System formal resolution process are held confidential in accordance with applicable law. The University reserves the right to correct any misinformation with regard to University Student Conduct System action that may be circulated in the media when the well-being of the community so requires. The University will publish data related to the activities of the University Student Conduct System on a periodic basis consisted with constraints and requirements imposed by law.

10.10 The process of investigation and the Board's decision will be concluded within 60 days of the original complaint, pending special circumstances. If circumstances arise that delays either the investigation or the Board's determination of an outcome, both parties will be sent written notification of the delay and its cause. Each party will receive written notification of the decision of the University Conduct Board including a finding of responsibility and sanctions.

10.11 In all cases of sexual assault, stalking, gender-related harassment, and domestic/relationship violence the decisions of the University Conduct Board are effective immediately. Information on how to appeal decisions of the University Conduct Board can be found in section 12 of this handbook.

## PART 11. SANCTIONS FOR ALL CONDUCT CASES

11.1  University Student Conduct System sanctions are official actions of the University. Failure to comply with sanctions that are imposed by the University Student Conduct System, or with specific conditions related to the safety and security of any persons or property while a case is pending, may result in immediate, indefinite suspension or expulsion from the University without benefit of further process.

11.2  The following sanctions, or any combination thereof, may be applied to any individual student, group of students, or student organization, for violations of the Code of Student Conduct and related University policies:

   a.   **EDUCATIONAL**

        The primary goal of the University Student Conduct System is education. Respective boards and case managers may design sanctions that are specific to an individual case when it is determined that educational value may result and the interests of the University community are maintained. Examples of educational sanctions include, but are not limited

to: community service, Community Involvement Assignment (CIA)[3], Decision Making, Civility Workshop, monetary restitution, and research and writing assignments.

**b.     RESIDENTIAL WARNING**

This status is a formal warning on behalf of the residential living program and is intended to warn the student about the consequences of continuing such behavior.

**c.     RESIDENTIAL REPRIMAND**

This status is a formal admonition on behalf of the residential living program and is intended to clearly document in a student's disciplinary file that student's behavior has been deemed unacceptable.

**d.     RESIDENTIAL PROBATION**

This status indicates that a student is no longer in good standing within the University's residential living program. Further violations may result in the immediate loss of eligibility to live in or visit the University's residence and/or dining facilities or in more serious sanctions, as circumstances warrant.

**e.     RESIDENTIAL RELOCATION/SUSPENSION/EXPULSION**

These statuses indicate that a student is not eligible to live in or visit some or all of the University's residence and/or dining facilities. A residential relocation involves the reassignment of a student's living unit within University housing and usually prohibits the student from returning to the residential area associated with the former living assignment. A residential suspension or expulsion involves the student's removal from housing altogether. These statuses may extend for a specific period of time, until the completion of specific conditions, or permanently. These statuses may be limited to a specific facility or applied to all facilities.

**f.     SOCIAL PROBATION**

This status is applied as a result of a breach of specific social regulations. Its primary effect is to suspend a privilege related to the nature of the offense and/or restrict access to specific campus facilities or programs.

**g.     WARNING**

In instances of less serious deviations from the University norms of conduct, the student may be formally warned of the possible consequences of continuing such behavior. No other specific action is taken unless further misconduct occurs.

---

[3] Community Involvement Assignment (CIA) includes a series of University community activities, events, and lectures designed to promote student engagement and life changing experiences.

h.   **DISCIPLINARY REPRIMAND**

This status is a formal admonition on behalf of the University community and is intended to clearly document in a student's or student organization's disciplinary file that his/her/its behavior has been deemed unacceptable. This status extends for a specific period of time as determined by the case manager or formal hearing body.

i.   **DISCIPLINARY PROBATION**

This action constitutes a change in status between good standing and suspension or expulsion from the University. The student or student organization is permitted to remain enrolled at or retain recognition by the University under stated conditions, depending upon the nature of the violation and upon the potential learning value that may derive from specific restrictive measures. Further violations may result in immediate suspension, indefinite suspension, or expulsion from the University. This status extends for a specific period of time as determined by the case manager or formal hearing body.

j.   **INTERIM SUSPENSION**

This action by the Director of Student Rights and Responsibilities, or a designee, in consultation with the Senior Vice President and Dean of Student Affairs is a temporary suspension of certain rights or privileges while a conduct case is pending. An interim suspension may be broad and inclusive or may be restricted to a specific location and/or function and is based on the determination that the safety and well-being of the University community or specific persons are at risk.

k.   **INDEFINITE SUSPENSION**

This action results in a student's involuntary withdrawal from the University, or in loss of University recognition and related privileges for a student organization, for an indefinite period of time. A suspended student or student organization is prohibited from any presence or activity on University owned, operated, or controlled property, including but not limited, to University-owned property leased to a non-University affiliated party, and from participation in any class or program offered by Syracuse University. A student or student organization placed on a status of indefinite suspension is permitted, after a minimum period of separation, to submit a petition demonstrating his/her good citizenship in the time away from the University and potential for making positive contributions in the future.

Individual student petitions are required to include:  a personal essay evidencing the learning the student has gained from the incident that led to the indefinite suspension; the manner in which the student has been occupied since his/her departure from the University; and, the specific commitments the student will make to contributing positively to the University community if offered the opportunity for readmission; documented information of the student's completion of substantial service to the community; documented information of gainful employment and/or completion of academic course work at an accredited institution of higher education; and, documented information of completion of any special assignments identified for the student by the Office of Student Rights and

Responsibilities at the time of or subsequent to the student's departure. This petition is reviewed by the Director of Student Rights and Responsibilities and the Senior Vice President and Dean of Student Affairs, or a designee, who will determine whether and under what conditions a student may be permitted to return to the University in a future semester.

Student organization petitions will include elements specific to the type of student organization, as determined by the Director of Student Rights and Responsibilities.

I.   **EXPULSION**

This action results in the permanent separation of the student, or student organization, from the University, its programs and facilities. It is the most severe disciplinary action that the University Student Conduct System can impose.

**11.3   APPLICATION OF STANDARD SANCTIONING GUIDELINES**

Standard sanctions have been adopted by Syracuse University to respond to substance abuse-related and other serious violations of the Code of Student Conduct. Syracuse University is deeply concerned about the extent to which some students engage in underage consumption of alcohol, unlawful use of drugs, and/or consumption of alcohol or other drugs to a degree that renders them in need of emergency medical intervention or other extraordinary assistance. In addition, Syracuse University seeks to deter students from engaging in conduct that poses risks to the safety and well-being of the individual student and/or the University community as a whole. Standard sanctions are intended to alert students and other members of the University community to the seriousness of alcohol- and drug-related behaviors, violence, and safety violations; provide meaningful consequences for violations of University expectations; and, ensure that students are provided opportunities to access education, counseling, and support.

Standard sanctions apply only to those offenses described in Sections 11.4, 11.5, 11.6, 11.7 and 11.8. Incidents falling within the Code of Student Conduct but not described in Section 11.4, 11.5, 11.6, 11.7 and 11.8 will be handled on a case-by-case basis in light of all the circumstances.

Other specific situations to which standard sanctions do not apply are as follows:

a.   where a student is found to have engaged in multiple violations of the Code of Student Conduct in a single incident, rather than solely in the violation addressed by the standard sanction;

b.   where a student is already on a conduct sanction status equal to or greater than the standard sanction for a previous offense; and/or

c.   where a specific incident presents exacerbating circumstances, an ongoing risk to persons or property, or other serious concerns.

In these situations, the appropriate sanctions will be determined on a case-by-case basis in light of all the circumstances. Generally, these situations will result in sanctions in excess of the standard

sanction. The presence of substantial mitigating or other appropriate circumstances may result in the reduction of a standard sanction in the discretion of the Director of Student Rights and Responsibilities, or the University Appeals Board.

### 11.4  STANDARD SANCTIONS FOR SUBSTANCE ABUSE-RELATED VIOLATIONS

| Category | First Violation | Second Violation | Third Violation |
|---|---|---|---|
| Use or possession of alcohol under prohibited circumstances | Disciplinary Reprimand<br><br>Community Involvement referral and/or Educational project(s) | Disciplinary Probation<br><br>Community Involvement referral<br><br>Educational project(s) and/or<br><br>Options Program referral | Indefinite Suspension for a minimum of one academic year |
| Supplying alcohol to underage person(s) | Disciplinary Probation<br><br>Community Involvement referral or Community Service project(s) and/or<br><br>Educational project(s) | Indefinite Suspension for a minimum of one academic year | Not applicable* |
| Extreme alcohol intoxication posing a substantial risk to the health and well-being of self and/or others | Disciplinary Reprimand<br><br>Appropriate Educational assignments<br><br>Options Program referral | Disciplinary Probation<br><br>Residential relocation (at the discretion of the case manager or hearing board)<br><br>Options Program referral<br><br>Community Involvement referral and/or Other Educational project(s) | Indefinite Suspension for a minimum of one academic year |
| Manufacture or sale of alcohol under prohibited circumstances | Disciplinary Probation<br><br>Community Involvement referral or Community Service project(s) and/or<br><br>Educational project(s) | Indefinite Suspension for a minimum of one academic year | Not applicable* |

| Category | First Violation | Second Violation | Third Violation |
|---|---|---|---|
| Driving any motor vehicle while intoxicated or while under the influence of unlawful drugs | Indefinite Suspension for a minimum of one academic term<br><br>Community Involvement referral or Community Service project(s) and/or<br><br>Educational projects | Expulsion or Indefinite Suspension for a minimum of one academic year | Not applicable* |
| Use or possession of drug paraphernalia, marijuana, illegal drugs or controlled substances without an appropriate prescription | Disciplinary Probation<br><br>Residential relocation (at the discretion of the case manager or hearing board)<br><br>Options Program referral<br><br>Community Involvement or Community Service referral and/or<br><br>Other Educational project(s) | Indefinite Suspension for a minimum of one academic year | Not applicable* |
| Extreme drug intoxication or abuse-related behavior posing a substantial risk to the health and well-being of self and/or others | Disciplinary Probation<br><br>Residential relocation (at the discretion of the case manager or hearing board)<br><br>Options Program referral<br><br>Community Involvement referral and/or Other Educational project(s) | Indefinite Suspension for a minimum of one academic year | Not applicable* |
| Manufacture, sale, purchase, or distribution of illegal drugs or controlled substances | Expulsion or Indefinite Suspension for a minimum of one academic year | Not applicable* | Not applicable* |

*In these circumstances, sanctions will be determined on a case-specific basis by the adjudicator or appropriate adjudicative body.

**DWI and serving alcohol to minors do not apply.

31

**11.5   STANDARD SANCTIONS FOR WEAPONS-RELATED VIOLATIONS**

| Category | Sanction |
|---|---|
| Possession of a prohibited weapon or other dangerous object, including, but not limited to firearms, BB-guns, airsoft guns, air rifles, explosive devices, fireworks, or any other dangerous, unlawful, or hazardous object or material | Disciplinary Probation, Indefinite Suspension, or Expulsion as determined by the case manager or hearing board, <br><br> Expulsion from student housing, if the student is not suspended, <br><br> Indefinitely Suspended, or expelled and lives in a University residence, <br><br> Minimum of 80 hours of Community Service and/or other Educational sanctions as deemed appropriate by the case manager or hearing board |
| Any improper use, attempted use, or threat of use of a weapon or other dangerous, illegal, or hazardous object; any improper use as a weapon of any otherwise permitted object or material | Expulsion or Indefinite Suspension for a minimum of one academic year |

**11.6   STANDARD SANCTIONS FOR VIOLENCE-RELATED VIOLATIONS**

| Category | Sanction |
|---|---|
| Physical harm or threat of physical harm without a weapon resulting in little or no physical injury to involved persons | Disciplinary Probation or Indefinite Suspension as determined by the case manager or hearing board, <br><br> Participation in the Conflict Resolution Program, Options Program referral, if alcohol or other drugs were a factor in the incident, <br><br> Minimum of 80 hours of community service and/or other Educational sanctions as deemed appropriate by the case manager or hearing board |
| Physical harm without a weapon resulting in significant physical injury to another person | Expulsion or Indefinite Suspension for a minimum of one academic year |

**11.7   STANDARD SANCTIONS FOR SAFETY AND FIRE-RELATED VIOLATIONS**

| Category | Sanction |
|---|---|
| Tampering with smoke detectors in on campus residential facilities | Disciplinary reprimand, educational projects and residential probation |
| Lighting candles or incense in on campus residential facilities | Disciplinary probation with residential suspension and educational projects |
| Interference with, improper activation of, or damage to any elevator or safety or emergency equipment, including, but not limited to: fire alarms, fire extinguishers, sprinkler systems, and blue lights; lighting any unauthorized fire on University property | Indefinite suspension for a minimum of one academic semester; Expulsion |

**11.8   STANDARD SANCTIONS FOR GENDER RELATED VIOLENCE/HARASSMENT**

| Category | Sanction |
|---|---|
| Sexual harassment including unwanted sexual advances, requests for sexual favors and some visual and physical conduct of a sexual nature; Stalking | Disciplinary probation with appropriate educational projects; Indefinite suspension for a minimum of one academic year or suspension until the survivor graduates, whichever is longer (as appropriate) |
| Sexual assault, including, but not limited to sexual touching without consent, forcible touching; stalking with threats of harm; use of physical violence in a dating or sexual relationship | Indefinite Suspension for a minimum of one academic year or suspension until the survivor graduates, whichever is longer (as appropriate); Expulsion |
| Sexual intercourse without consent | Indefinite Suspension for a minimum of one academic year or suspension until the survivor graduates, whichever is longer (as appropriate); Expulsion |
| Retaliation against an individual who has filed a report of gender related violence/harassment | Disciplinary probation with appropriate educational projects; Indefinite suspension for a minimum of one academic year; Expulsion |

PART 12. APPEALS

12.1  In cases of violence related violations, sexual assault, stalking, gender-related harassment, or domestic/relationship violence, decisions of the respective boards are effective immediately. In all other cases, decisions of the respective boards are effective immediately, unless a written notice of intention to appeal has been received by the Office of Student Rights and Responsibilities within twenty-four (24) hours after the confirmed decision is made available.

12.2  Either party may appeal the decision of the hearing board in writing within three (3) University business days after the written decision is made available. All appeals must be authored and signed by the submitting party. Appeal submission must not be more than ten (10) pages, double-spaced, using 12-point font and 1-inch margins (not including attachments). An appeal by one party will be forwarded by the Office of Student Rights and Responsibilities to the other party. Appeals produced by procedural advisors or other non-parties will not be considered by the University Appeals Board.

12.3  Appeals must be based on one or more of the following:

   a.  new information not reasonably available at the time of the original hearing, the absence of which can be shown to have had a detrimental impact on the outcome of the hearing;

   b.  procedural error that can be shown to have had a detrimental impact on the outcome of the hearing;

   c.  errors in the interpretation of University policy so substantial as to deny either party a fair hearing;

   d.  grossly inappropriate sanction having no reasonable relationship to the charges.

12.4  When an appeal has been filed, the other party will be permitted to respond in writing, specifically addressing the issues raised in the appeal, within three (3) business days after the appeal has been made available. Responsive submission must not be more than ten (10) pages, double-spaced, using 12-point font and 1-inch margins (not including attachments.) Any responsive document will be forwarded by the Office of Student Rights and Responsibilities to the appealing party.

12.5  The University Appeals Board is comprised of three (3) members who are full-time faculty or staff from Syracuse University. Members of the University Appeals Board are appointed by the Senior Vice President and Dean of Student Affairs from a pool of at least ten (10) members recommended by the University community. The University Appeals Board has authority to hear appeals from decisions of any lower non-academic conduct board that meet the criteria set forth in Part 12.3. In addition the University Appeals Board has authority to review the decision rendered by any hearing officer described within these procedures. The University Appeals Board is advised by the Director of Student Rights and Responsibilities, if he or she has not been involved in the original hearing, or by a designee of the Senior Vice President and Dean of Student Affairs.

12.6  The University Appeals Board will determine whether the prescribed criteria for appeals have been met and what process, if any; will be required to resolve the case. The Board may re-hear cases or limit the proceedings to the specific issues outlined in the appeal, depending on the nature of the

case. The Board may uphold the decision, change lower board decisions, alter sanctions up or down, or return cases to the respective lower board for further process. The University Appeals Board may impose sanctions up to and including expulsion from the University and may design educational and/or remedial sanctions appropriate to a given case. The University Appeals Board may alter the Standard Sanctioning Guidelines in Part 11 where the board determines that substantial mitigating or exacerbating circumstances warrant reduction or enhancement of the standard sanction.

12.7   Findings of fact will be accepted as determined by the original board, unless the appellate body determines that the original board acted in an arbitrary, capricious, or unfair manner.

12.8   The University Appeals Board will make a decision based on the written submissions within three (3) business days after all written submissions are received, or indicate in writing what further process is necessary for final resolution.

12.9   Decisions of the University Appeals Board, will be final when reviewed and confirmed by the Senior Vice President and Dean of Student Affairs or a designee. The Senior Vice President and Dean of Student Affairs, or a designee, as appropriate, may interview any participant in an earlier proceeding, change the decision, alter the sanction up or down, or return the case to the University Appeals Board or another hearing board for further process. Decisions of the Senior Vice President and Dean of Student Affairs or a designee, are final. Review and confirmation by the Senior Vice President and Dean of Student Affairs, a designee, will be made within three (3) business days after the decision of the University Appeals Board is complete. Parties will be informed of the outcome of any appeals only upon confirmation by the Senior Vice President and Dean of Student Affairs, or a designee.

## PART 13. MODIFICATION OF PROCEDURES

13.1   Syracuse University reserves the right to modify its conduct procedures and appeals processes with written notice to the complainant and the respondent when classes are not in session, while any involved individual is studying abroad, during the summer session, when safety and security issues so demand, when special expertise is needed to ensure fairness, or in other circumstances where in the University's sole discretion the procedures described herein are deemed insufficient to meet the objectives of educating and protecting members of the University community. Modified procedures, nonetheless, will provide students with required elements of fundamental fairness.

## PART 14. DISCIPLINARY RECORDS AND TRANSCRIPT NOTATIONS

14.1   Access to disciplinary records is provided in accordance with the Family Educational Rights and Privacy Act of 1974, as amended. FERPA gives parents certain rights with respect to their children's education records. These rights transfer to the student when he or she reaches the age of 18 or attends a school beyond the high school level. Students to whom the rights have transferred are "eligible students."

Except in unusual circumstances as determined in its sole discretion, and consistent with federal law, Syracuse University will seek to notify parents or guardians of conduct issues involving dependent students as follows:

a.   In an emergency; and

b.   After final adjudication and finding of responsibility in all alcohol  and drug-related offenses; and,

c.   After final adjudication and finding of responsibility in all offenses resulting in disciplinary probation, suspension or expulsion.

A student is not a dependent student if the student:

- is or will be 24 years old during the academic year;

- is enrolled in a graduate or professional program;

- is married;

- is a veteran of the U.S. Armed Forces;

- is an international student.

14.2   Disciplinary records maintained are retained for seven (7) years from the date of the most recent incident in the student's file or until one (1) year after the student has graduated from the University, whichever is longer. Records of students who were suspended, expelled, prohibited from future enrollment or otherwise withdrawn for disciplinary reasons are retained indefinitely. Students are advised to consult the Academic Integrity Office with regard to the records retention policies associated with academic dishonesty cases.

14.3   Students found to be responsible for non-violence related violations who are suspended or expelled will have the following notation listed on their transcript: "Administrative Withdrawal – University Initiated". Students found to be responsible for violence related violations as defined by the Clery Act who are suspended or expelled will have their University transcripts issued with the following notations:

- In cases of suspension – "suspended after a finding of responsibility for a code of conduct violation".

- In cases of expulsion – "expelled after a finding of responsibility for code of conduct violation".

- If a student who has alleged to have been involved in an incident involving violence related violations withdraws from the University with an investigation or conduct case pending, the following notation will be listed on their University transcript: "withdrew with conduct charges pending."

Students who have been suspended for a violence related violation who would like to appeal the suspension notation on their transcript may do so one year after the conclusion of the suspension via the process listed in section 14.4. Notations for expulsion will not be removed.

14.4   Students who choose to appeal a suspension notation on their transcript may do so via the following process:

    a.   Appeals submitted prior to one year after the completion of the suspension will not be considered.

    b.   In order to appeal a suspension notation on a University transcript, all readmission or other sanction requirements must be completed at the time of the request.

    c.   If a student has been determined to be responsible for any additional conduct related incidents which took place after the start of the suspension, appeals will not be considered.

    d.   Submissions for a request for removal of a suspension notation should be submitted in writing to the Office of Student Rights and Responsibilities at, 310 Steele Hall, Syracuse, NY 13244 or via email at *studentconduct@syr.edu.* Submissions should contain the following:

- A brief description of the incident and the sanction imposed.

- Your reflections on your actions, how they have impacted you as well as others.

- An account of your decision-making and behavior since the incident.

- An explanation as to why you believe that the transcript notation indicating suspension should be removed from your transcript.

- Any supporting material (letters of recommendation, verification of community service and/or employment)

    e.   All requests will be responded to in writing. If your request is granted, the notation of suspension will be changed to "Administrative Withdrawal – University Initiated."

**PART 15. STUDENT INITIATED WITHDRAWAL**

15.1   In order to obtain a Syracuse University degree (undergraduate or graduate), students must be in good standing with the University. "Good standing" includes a requirement that all matters pending before the University Student Conduct System have been fully and finally resolved (including, but not limited to, full satisfaction of any sanctions imposed). Students who are not in good standing will not be granted a degree, will not have access to transcripts, and are not eligible to participate in graduation ceremonies.

**PART 16. GOOD STANDING**

16.1   In order to obtain a Syracuse University degree (undergraduate or graduate), students must be in good standing with the University. "Good standing" includes a requirement that all matters pending before the University Student Conduct System have been fully and finally resolved (including, but not limited to, full satisfaction of any sanctions imposed). Students who are not in good standing will

not be granted a degree, will not have access to transcripts, and are not eligible to participate in graduation ceremonies.

**PART 17. ENFORCED MEDICAL WITHDRAWAL**

17.1   Syracuse University reserves the right to withdraw a student temporarily from the institution for misconduct that is based on a significant psychological, physical or substance abuse-related condition. Such action of the Senior Vice President and Dean of Student Affairs and/or a designee, or the Director of Student Rights and Responsibilities or a designee, will be done with appropriate professional consultation. The student will be provided written notice of the reason(s) for the withdrawal and an opportunity to be heard by the Senior Vice President and Dean of Student Affairs or one or more designee(s), as deemed appropriate under the circumstances.

**PART 18. RIGHTS TO AMEND**

18.1   The procedures and policies outlined above supersede all previous statements and policies of Syracuse University with respect to student rights and responsibilities as may appear in any Syracuse University publication. The University reserves the right to amend these policies and procedures from time to time.