# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JOHN NOAKES, | CIVIL NO.  5:18-cv-43 (DNH/DEP) |
| Plaintiff, |  |
| v. | OPPOSITION TO MOTION TO DISMISS |
| SYRACUSE UNIVERSITY, |  |
| Defendant. |  |

Plaintiff John Noakes, respectfully submits this Opposition to the Motion to Dismiss the Complaint by Defendant Syracuse University ("Syracuse").

**TABLE OF CONTENTS**

FACTS ................................................................................................................................... 1

A.   Syracuse's Crackdown Amid Public and OCR Pressure ................................................ 1

B.   The Syracuse Policies ................................................................................................... 1

C.   The Fall 2016 Incident And Syracuse's Disciplinary Actions Against John Noakes .................... 2

ARGUMENT .......................................................................................................................... 6

A.   Standard ......................................................................................................................... 6

B.   Judicial Deference Is Not Warranted ............................................................................ 6

B.   Title IX .......................................................................................................................... 9

C.   Title VI .......................................................................................................................... 15

D.   Breach of Contract and Promissory Estoppel ............................................................... 18

        1.   Lack Of Notice ..................................................................................................... 19

        2.   Lack Of Full And Fair Investigation .................................................................... 21

        3.   Lack Of Fundamental Fairness ............................................................................ 22

E.   Negligence ..................................................................................................................... 24

CONCLUSION ....................................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*A.W. v. Lancaster Cnty. Sch. Dist. 0001*, 280 Neb. 205, 784 N.W.2d 907 (2010) ..................................... 24

*Alexson v. Hudson Valley Cmty. Coll.*, 125 F.Supp.2d 27 (N.D.N.Y. 2000) ............................... 19

*Arista Records LLC v. Doe*, 604 F.3d 110 (2d Cir. 2010) ......................................................... 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................................... 6

*Atria v. Vanderbilt Univ.*, 142 F.App'x 246 (6th Cir.2005) ...................................................... 23

*Basile v Albany Coll. of Pharm. of Union Univ.*, 279 AD2d 770, 719 N.Y.S.2d 199 (3d Dept. 2001) ....... 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................... 6

*Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 86 (1978) .............................. 6

*Boeve v. Nationwide Mut. Ins. Co.*, E.D.Mich. No. 08-CV-12213, 2008 U.S. Dist. LEXIS 63575
(Aug. 20, 2008) ....................................................................................................................... 24

*Boykin v KeyCorp,* 521 F.3d 202 (2d Cir. 2008) ....................................................................... 16

*Chambers v. Time Warner, Inc.,* 282 F.3d 147 (2d Cir. 2002) ................................................. 6

*Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 151 N.E.2d 833, 176 N.Y.S.2d
259 (1958) .............................................................................................................................. 25

*Clark-Fitzpatrick v. Long Island R.R. Co.*, 70 N.Y.2d 382, 516 N.E.2d 190, 521 N.Y.S.2d
653 (1987) .............................................................................................................................. 25

*Collick v. William Paterson Univ.*, D.N.J. No. 16-471, 2016 U.S. Dist. LEXIS 160359
(Nov. 17, 2016) .................................................................................................................. 9, 22

*Collick v. William Paterson Univ.*, No. 16-471, 2016 U.S. Dist. LEXIS 160359 (D. N.J. 2016) ............. 13

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999); *Maas v. Cornell Univ.*, 94 N.Y.2d 87,
699 N.Y.S.2d 716, 721 N.E.2d 966 (1999) .......................................................................... 7

*Dempsey v. Bucknell Univ.*, Civil Action No. 4:11-cv-1679, 2012 U.S. Dist. LEXIS 62043
(M.D. Pa. May 3, 2012) ........................................................................................................ 22

*Doe v. Amherst College*, 238 F.Supp.3d 195 (D.Mass. 2017) ........................................... 9, 21

*Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D.Mass.2016) ...................................... 9, 13, 20, 22

*Doe v. Brown Univ.*, 166 F. Supp. 3d 177 (D.R.I. 2016) ...................................................... 15

*Doe v. Brown Univ.*, 210 F. Supp. 3d 310 (D.R.I. 2016) ...................................................... 7

*Doe v. Brown Univ.*, D.R.I. No. 15-144 S, 2016 U.S. Dist. LEXIS 21027 (Feb. 22, 2016) ................. 22

*Doe v. Case W. Reserve Univ.*, No. 1:14CV2044, 2015 U.S. Dist. LEXIS 123680
(N.D. Ohio Sept. 16, 2015) ............................................................................................ 15, 21

*Doe v. Columbia Univ.*, 831 F.3d 46 (2nd Cir. 2016) ................................................... *passim*

*Doe v. Cummins*, 662 F. App'x 437 (6th Cir. 2016) ............................................................. 12

*Doe v. Lynn Univ., Inc.*, S.D.Fla. No. 9:16-CV-80850, 2017 U.S. Dist. LEXIS 7529
(Jan. 19, 2017) ............................................................................................................... 9

*Doe v. Marymount Univ.*, E.D.Va. No. 1:17-cv-401, 2018 U.S. Dist. LEXIS 43164
(Mar. 14, 2018) .............................................................................................................. 11

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018) ........................................................... 12

*Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048 (S.D.Ohio 2017) ................................... 14

*Doe v. Ohio State Univ.*, S.D. Ohio No. 2:15-cv-2996, 2016 U.S. Dist. LEXIS 7700
(Jan. 22, 2016) ............................................................................................................... 13

*Doe v. Trustees of the Univ. of Pennsylvania*, E.D.Pa. No. 16-5088, 2017 U.S. Dist. LEXIS 148086
(Sep. 13, 2017) .......................................................................................................... 21, 24

*Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645
(May 8, 2017) ................................................................................................................. 20

*Doe v. University of Cincinnati*, 872 F.3d 393, 401 (6th Cir. 2017) .......................... 22, 23

*Doe v. Wash. & Lee Univ.*, W.D.Va. No. 6:14-cv-00052, 2015 U.S. Dist. LEXIS 102426
(Aug. 5, 2015) ................................................................................................................ 14

*Evans v. Columbia Univ.*, S.D.N.Y. No. 14-cv-2658 (NSR), 2015 U.S. Dist. LEXIS 48768
(Apr. 13, 2015) .............................................................................................................. 22

*Fletcher v. S. Peninsula Hosp.*, 71 P.3d 833 (Alaska 2003) ........................................... 25

*Gischel v. Univ. of Cincinnati*, S.D. Ohio No. 1:17-cv-475, 2018 U.S. Dist. LEXIS 18083
(February 5, 2018) .......................................................................................................... 12

*Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir. 2000) .............................................. 17

*Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897 (2d Cir. 1980) ........................................... 25

*Hospitals Gess v. United States*, 952 F.Supp. 1529 (M.D.Ala.1996) ............................. 25

*Jackson v. Univ. of New Haven*, 228 F. Supp. 2d 156 (D. Conn. 2002) ......................... 15

*Johnson v. Bon-Ton Dep't Stores, Inc.*, 278 F.App'x 56 (2d Cir.2008) .......................... 25

*Langadinos v. Am. Airlines, Inc.*, 199 F.3d 68 (1st Cir. 2000) ....................................... 18

*Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015) ........................................... 11

*Mandell v. County of Suffolk*, 316 F.3d 368 (2d Cir. 2003) ............................................ 17

*McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973) .............................................. 15

*McKie v. New York Univ.*, 2000 U.S. Dist. LEXIS 14925 (S.D.N.Y. 2000) .................... 15

*Miller v. Sutton*, D.Conn. No. 3:15-cv-1111 (MPS), 2016 U.S. Dist. LEXIS 95475
(July 21, 2016) ............................................................................................................... 18

*Naumov v. McDaniel College, Inc.*, D.Md. No. GJH-15-482, 2017 U.S. Dist. LEXIS 49887
(Mar. 31, 2017) ........................................................................................................... 9, 24

*Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 402 N.E.2d 1150, 426 N.Y.S.2d 248 (1980) ................... 22

*Papaspiridakos v. Educ. Affiliates, Inc.*, E.D.N.Y. No. 10 CV 5628, 2013 U.S. Dist. LEXIS 129748

(Sep. 11, 2013) ................................................................................................................ 19

*Papelino v. Albany College of Pharm. of Union Univ.*, 633 F.3d 81 (2d Cir. 2011) ............................ 7

*Plummer v. Univ. of Houston*, 860 F.3d 767 (5th Cir. 2017) ................................................................ 8

*Rensselaer Socy. of Engrs. v Rensselaer Polytechnic Inst.*, 260 AD2d 992, 689 N.Y.S.2d 292
(3d Dept. 1999) .............................................................................................................................. 22

*Rolph v. Hobart & William Smith Colls.,* W.D.N.Y. No. 6:16-CV-06515 EAW,
2017 U.S. Dist. LEXIS 153838 (Sep. 20, 2017) .......................................................... 9, 11, 14, 15

*Schaumleffel v. Muskingum Univ.*, S.D.Ohio No. 2:17-cv-463, 2018 U.S. Dist. LEXIS 36350
(Mar. 6, 2018) ................................................................................................................................ 13

*Sheppard v. Beerman,* 18 F.3d 147 (2d Cir. 1994) .............................................................................. 6

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) ...................................................................... 15, 16

*U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711 (1983) .................................................. 16

*Valle v. Bally Total Fitness*, No. 01-CV-11614, 2003 U.S. Dist. LEXIS 17093
(S.D.N.Y. Sept. 30, 2003) ............................................................................................................. 15

*Vanden Bosch v. Bayer Healthcare Pharms., Inc.*, 13 F. Supp. 3d 730 (W.D.Ky.2014) ................... 24

*Ward v. N.Y. Univ.,* S.D.N.Y. 99 Civ. 8733, 2000 U.S. Dist. LEXIS 14067 (Sep. 25, 2000) ............... 19

*Wells v. Xavier Univ.*, 7 F. Supp. 3d 746 (S.D.Ohio 2014) ............................................................... 15

*Young v. Conway*, 698 F.3d 69 (2d Cir. 2012) ................................................................................... 17

*Yu v. Vassar Coll.*, 97 F. Supp. 3d 448 (S.D.N.Y. 2015) .................................................................. 18

*Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994) ............................................................................. 9

## OTHER AUTHORITIES

*20 USCS § 1099b et seq* ....................................................................................................... 25

20 U.S.C. § 1232g ...................................................................................................................... 2

34 C.F.R. § 106.8 ....................................................................................................................... 7

42 U.S.C. § 2000d .................................................................................................................... 15

72 Fed. Reg. 3432 ...................................................................................................................... 7

N.Y. C.P.L.R §7800 *et seq* ..................................................................................................... 18

Tara Anthony et al., *Cross-Racial Facial Identification: A Social Cognitive Integration*, 18 Personality
    & Soc. Psychol. Bull. 296, 299 (1992) ....................................................................... 16

Robert K. Bothwell et al., *Cross-Racial Identification*, 15 Personality & Soc. Psychol. Bull. 19
    (1989) ........................................................................................................................... 16

Ross Douthat, *Liberalism and the Campus Rape Tribunals*, NY Times (Sept. 13, 2017). .......... 18

Henry F. Fradella, *Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness
    Testimony*, 2006 Fed. Cts. L. Rev. 3, 14 (2007) ......................................................... 17

Letter from Office for Civil Rights, U.S. Dep't of Educ, (Apr. 4, 2011) ............................. 7, 8

*Open Letter From Members Of The Penn Law School Faculty: Sexual Assault Complaints: Protecting
    Complainants And The Accused Students At Universities*, Feb. 8, 2015 ............................ 8

Middle States Commission on Higher Education, *Standards for Accreditation and Requirements of
    Affiliation*, Thirteenth Edition .................................................................................... 2

Emily Yoffee, *The Question of Race in Campus Sexual-Assault Cases, Is the system biased against men of
    color?* Atlantic, September 11, 2017 ............................................................................ 18

## FACTS

**A.      Syracuse's Crackdown Amid Public and OCR Pressure**

In recent years, and during the period preceding the disciplinary actions against Plaintiff, there was substantial criticism of Syracuse, both in the student body and in the public media, accusing Syracuse of not taking seriously complaints of female students alleging sexual assault by male students. (Complaint ¶¶16-20.)[1]   Syracuse has been the subject of *at least two* investigations by the Department of Education, Office of Civil Rights ("OCR"), into how the school responded to allegations of sexual assault. On June 22, 2016 OCR notified Syracuse that OCR was investigating an allegation that Syracuse failed to respond "promptly and equitably" to a "report of sexual assault."   OCR Docket # 02-16-2168.   On January 17, 2017, OCR notified Syracuse that OCR was investigating a second allegation that Syracuse failed to respond "promptly and equitably" to a "report of sexual assault." OCR Docket # 02-16-2323.   Officials from OCR were scheduled to visit Syracuse on January 24, 2017. According to the news report in response to this visit, Syracuse administration officials sought to emphasize their actions in this area to appease OCR. (Complaint ¶25.)

**B.      The Syracuse Policies**

The Syracuse Student Conduct System Handbook ("Student Handbook") The Student Handbook explicitly guarantees "Fundamental Fairness" to students.[2]   (Complaint ¶40.)   The Student

---

[1] Syracuse responded to some of the criticism that it was not taking the problem of sexual assaults on campus seriously. One Syracuse Dean responded to allegations that Syracuse was not taking the issue seriously by stating, "the university has expelled and suspended students and put students on probation for sexual misconduct." (Complaint ¶21(b).)   In December 2014, Syracuse received a report from the Chancellor's Workgroup on Sexual Violence Prevention, Education, and Advocacy; the report observed that much of the focus of preventing sexual assault at Syracuse is the prevention of acts by males.   In July 2015, New York State Gov. Andrew Cuomo signed into law the "Enough is Enough" legislation to combat sexual assault on college campuses.   Syracuse Chancellor Kent Syverud adopted the "Enough is Enough" legislation in summer 2015, making him the first private college chancellor or president to do so.   (Complaint ¶¶18-19.)

[2] In addition to this explicit obligation, Syracuse has a duty under the accreditation standards to provide a disciplinary process that consistent with the liberal values of fairness and due process. The accreditation standards applied to the school require that Syracuse's "policies and procedures are fair and impartial, and assure that grievances are addressed promptly, appropriately, and equitably." *See* Middle States Commission on

Handbook also contains a section entitled "Syracuse University Policy On Sexual Assault, Sexual Harassment, Stalking Or Relationship Violence (the "Sexual Misconduct Policy.").   The Sexual Misconduct Policy prohibits, *inter alia* harassment, sexual assault, and relationship violence.  The Sexual Misconduct Policy contains a section referred to as the "Bill of Rights."  Under this section, Syracuse students have the right to "participate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard."  (Complaint ¶32(a).) Complaints alleging violations of the Sexual Misconduct Policy are made to the Syracuse Title IX Coordinator.  Upon the receipt of a complaint, the Title IX Coordinator will designate an investigator who may conduct an investigation.  Once the investigation report is complete, allegations of sexual misconduct are adjudicated by a University Conduct Board comprised of trained faculty and staff members.  Syracuse rules do not require a hearing.  Instead, "the University Conduct Board may rely upon the investigator's report for its understanding of the relevant facts . . . The complainant and respondent will be invited to speak to the University Conduct Board to present any additional information that they believe is relevant to the case."  The Board determines whether the respondent violated the Code of Student Conduct using the preponderance of the evidence standard.   Appeals of decision of the hearing are considered by the University Appeals Board; however, grounds for appeals are strictly limited.  (Complaint ¶37.)

## C.     The Fall 2016 Incident And Syracuse's Disciplinary Actions Against Plaintiff

Plaintiff[3] was a student at Syracuse.   He has completed six semesters of coursework at Syracuse, including a summer term.  He needs approximately 26 additional credits to obtain his

_____

Higher Education, *Standards for Accreditation and Requirements of Affiliation*, Thirteenth Edition.  (Complaint ¶33(b).)

[3] The disclosure of John Noakes' identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34  CFR Part 99.  *See* Motion for Leave to Proceed Anonymously.  The name "John Noakes" was chosen in order to avoid confusion with a recent case filed in this Court. *John Doe v. Syracuse Univ.*, N.D.N.Y. No. 5:17-cv-00787-TJM-ATB.  The fictitious name, "John Noakes" or "John Nokes" has been used in litigation under English law.  *See e.g.* Albert Montefiore Hyamson, A Dictionary of English Phrases, at 205 (1922),  *Compare Nokes v. Miami University et al*, S.D. Ohio

undergraduate degree, and approximately another 30 additional credits after that to complete the "CPA Track." Noakes was planning to take courses for graduate credit at Syracuse. (Complaint ¶4.)

Plaintiff was suspended from Syracuse for events that allegedly occurred in the evening of October 24, 2015/early morning of October 25, 2015 (the "Incident"). (Complaint ¶ 42 *et seq*.) Plaintiff unequivocally denies committing a sexual assault against Jane Roe; he believes that he has been incorrectly identified as the person who sexually assaulted Jane Roe. Prior to the Incident, Plaintiff and Jane Roe did not know each other. On the evening of the Incident, Jane Roe had been drinking at the "Orange Crate Bar" on Crouse Avenue in Syracuse, NY. At about 1:00 in the morning, a black male at the bar pulled her into an alley, grabbed her, and sexually assaulted her. A passing female grabbed Jane Roe by the arm and pulled her away. Jane Roe reported the Incident to the police. The police took a report and Jane Roe agreed to a SANE examination. No suspect was identified. On January 24, 2016, Jane Roe contacted the Syracuse Police to state that she had observed "an unknown black male" in a bar who "looked like the suspect that [sic] forcibly touched her in an Alleyway near the bar back in October." This was John Noakes. (Complaint ¶51.) Shortly after the January 24, 2016 report, Jane Roe was shown a photo array by the Syracuse Police. This photo array included Plaintiff.[4] Jane Roe identified Plaintiff as her assailant. On March 4, 2016 – *three days before the matter was referred to Syracuse by the police and six days before Jane Roe formally reported the matter to Syracuse* – Plaintiff received a letter from the Assistant Dean of Student Affairs/Director of the Office of Student Rights and Responsibilities alleging that on or about October 25, 215 he sexually assaulted another Syracuse University student. Plaintiff was immediately suspended and prohibited from

---

No. 1:17-cv-00482-MRB (name selected at urging of court to avoid confusion with similar case *Doe v. Miami University*, S.D. Ohio No. 1:15-cv-00605-MRB).

[4] The Complaint alleges that this photo array was unduly suggestive and conducive to mistaken identification.

[5] Curiously, this is before any report was made to Syracuse officials. On March 7, 2016, the police referred the matter to Syracuse Office of Student Rights and Responsibilities and the Syracuse Athletic Department. A few days later, on March 10, 2016, Jane Roe "formally" reported the matter to Syracuse.

entering the campus. The letter does not indicate that Office of Student Rights and Responsibilities had conducted any investigation. (Complaint ¶56.)

On March 9, 2016, the University Appeals Board held a hearing on Plaintiff' appeal of his interim suspension. Jane Roe did not appear before the March 9, 2016 hearing of the University Appeals Board. Instead, a "University Representative" presented evidence to the Board. In its opinion, the Board found that the University representative "was extremely credible" but that Plaintiff was "not completely credible" in part because "he did not provide any statement of fact regarding the alleged incident." This is completely false; Plaintiff denied being the person who assaulted Jane Roe and presented documentary evidence in the form of screen shots and phone records indicating that he was texting or talking with friends when Jane Roe was assaulted.[6] (Complaint ¶¶60-62.) On March 10, 2016 – days after Plaintiff had already been suspended – Syracuse initiated a biased investigation of the claim by Jane Roe against Plaintiff. The investigator interviewed Jane Roe, Plaintiff, and eight potential witnesses, including friends of Plaintiff who could account for his actions when Jane Roe was assaulted. The investigator had already, before conducting any investigative work, concluded that Plaintiff was the person who assaulted Jane Roe. (Complaint ¶¶63-69.) On April 25, 2016, Plaintiff was informed by an Office Coordinator that he had the opportunity to review the report of the investigation. He was not permitted to obtain a copy of the report at that time. On May 17, 2016, Plaintiff was informed that his hearing before the University Conduct Board had been scheduled for May 25, 2016.

---

[6] In its opinion, the Board indicated that it did not consider the screen shots of texts provided by Plaintiff because they were "not an official phone record" and because they "did not support or refute whether the alleged incident occurred." This is nonsense, as Plaintiff did not dispute that the Incident occurred; he challenged identification. This also demonstrates extreme bias, as Syracuse does not conduct hearings pursuant to rules of evidence and otherwise permitted hearsay to be considered.

On May 25, 2016, the Student Conduct Board held a hearing.  Jane Roe did not testify before the Student Conduct Board and Plaintiff had no opportunity to ask Jane Roe any questions or in any manner confront his accuser.  As a result the Student Conduct Board had no ability to assess the credibility of Jane Roe or ask questions about her ability to make an adequate identification.  Nor did the Syracuse Police detective who obtained the identification of Plaintiff from a photo array testify.  One eye-witness who did testify stated that her identification was uncertain.  (Complaint ¶73.)  This Student suggested that the Title IX coordinators attempted to influence her identification:

> I was interviewed by one of the Title IX coordinators or something like that.  And in his office he had [Plaintiff] page pulled up and he asked me to confirm whether or not that was him and I said yes.

(Complaint ¶ 73(c)(iii).) Plaintiff testified before the Student Conduct Board hearing and denied that he was the person who had assaulted Jane Roe.  Plaintiff explained that he was "always with somebody" on the night that Jane Roe was assaulted. (Complaint ¶73(d).)

On May 27, 2016 Plaintiff was informed that the Student Conduct Board had issued a decision finding him responsible.  In doing so, the Student Conduct Board credited the identification from Jane Roe and the Student who testified.  Notably, the Student Conduct Board found that Jane Roe was "mostly credible" *even though the Board never heard testimony from Jane Roe.*  Plaintiff appealed the decision of the Conduct Board.  On June 15, 2016 the University Appeals Board rejected Plaintiff' appeal. In rejecting Plaintiff' argument, the Board wrote:

> [John Noakes] perceives that the preponderance of the evidence standard was not met, but fails to recognize the empowered bystander as an eye witness who intervened on the behalf of the complainant and made a positive identification of [John Noakes] in a lineup of people with similar physical characteristics.

5

(Complaint ¶79(a).)  This statement is inaccurate.  The so-called "empowered bystander"[7] never identified Plaintiff from a photo array or other non suggestive identification procedure. Plaintiff is currently expelled from Syracuse.[8]  This litigation followed.

## ARGUMENT

### A.     Standard

On a Rule 12(b)(6) motion, this Court must accept all well-pleaded factual allegations of the Complaint as true and construe the complaint in the light most favorable to the plaintiffs. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir. 1994).  The Complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" that is, "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### B.     Judicial Deference Is Not Warranted

Syracuse argues that school "disciplinary decisions must be afforded great deference."[9]  Def. Memo. at 9.  The deference sought by Syracuse is not appropriate in this case because Plaintiff has not asked the Court to "second guess" a school hearing panel. *Doe v. Brown Univ.*, 210 F. Supp. 3d 310,

---

[7] *See* http://healthpromotion.syr.edu/sexual-and-relationship-violence/its-on-us.html ("With the empowered bystander approach, rather than focusing on men as potential perpetrators of violence, or women as victims or potential targets of abuse, the focus is on men and women and transgender individuals as prosocial bystanders who intervene in the face of abusive or harassing behavior…")

[8] Expulsion has caused Plaintiff to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career. Plaintiff had received valuable scholarship from Syracuse, including a Higher Education Opportunity Scholarship and, in his junior year, a scholarship through the athletic department.  He has lost these scholarships as a result of Syracuse's actions in this case.

[9] The deference to schools has traditionally been seen regarding academic, and not disciplinary, matters.  *See Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 86 (1978) (noting "the significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct.").

313 (D.R.I. 2016).  The court in *Brown University*, when confronted by a similar argument by a school,

explained:

> It is not the Court's role to . . . decide whether the Court would have, in the panel's position, found John [Doe] responsible for sexual misconduct; to evaluate whether the Court would have made the same judgment calls on evidence and other issues as [the school] did; or to determine whether the procedure John [Doe] received was optimal. This Court is not a super-appeals court for sexual misconduct cases, nor is it an advisor to [the school] on how it should handle these messy and unfortunate situations.

210 F. Supp. 3d at 313 (finding in favor of accused student).  Like the plaintiff in *Brown University* case,

Plaintiff is only asking this Court to determine whether the proceedings and discipline imposed by

Syracuse was carried out in line with the statutory and contractual obligations of the school.[10]

Syracuse acknowledges, as it must, that this case arises amidst a growing national controversy

about the responses of colleges and universities to sexual assaults on campuses.  After years of criticism

for being too lax on campus sexual assault, at the urging of OCR and other high-ranking officials in

the Obama Administration, colleges and universities engaged in a crackdown on alleged perpetrators.

On April 11, 2011, OCR sent a "Dear Colleague" letter to colleges and universities.  *See* Letter from

Office for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011) (the "DCL").[11]  OCR regulations and

guidance required that schools "adopt and publish grievance procedures providing for the prompt

and equitable resolution of student and employee complaints alleging any action which would be

prohibited."  34 C.F.R. § 106.8(b).  Syracuse observes that its policies and procedures are intended to

---

[10] Syracuse cites a number of cases suggesting the schools should defer to school disciplinary decisions.  Def. Memo. at 9, *citing Papelino v. Albany College of Pharm. of Union Univ.*, 633 F.3d 81 (2d Cir. 2011); *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999); *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 92, 699 N.Y.S.2d 716, 721 N.E.2d 966 (1999).  These cases do not suggest that there is no role for the courts in protecting Title IX and related claims against schools.  Indeed, in one case relied upon by Syracuse, the court found that allegations involving sexual harassment created "one of those rare education cases where it is appropriate for a court to intervene." *Papelino* 633 F.3d at 94.

[11] Available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.  The DCL is a "significant guidance document," as defined by the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices. *See* DCL at 1 n. 1; 72 Fed. Reg. 3432.  It did "not add requirements to applicable law, but provide[d] information and examples to inform recipients about how [the Office for Civil Rights] evaluate[d] whether covered entities [were] complying with their legal obligations." DCL at 1 n.l.

comply with "Title IX's strictures." Def. Memo. at 6. In fact, Syracuse explicitly acknowledges that Syracuse sought to comply with the DCL. Def. Memo. at 2. The problem – and the reason Syracuse's efforts to comply with the DCL are not entitled to the traditional deference provided to schools – is that the DCL "was not adopted according to notice-and-comment rulemaking procedures; its extremely broad definition of 'sexual harassment' has no counterpart in federal civil rights case law; and the procedures prescribed for adjudication of sexual misconduct are heavily weighted in favor of finding guilt." *Plummer v. Univ. of Houston*, 860 F.3d 767, 779-80 (5th Cir. 2017) (Jones, J., dissenting).

On September 22, 2017, the Department of Education withdrew the DCL and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment." Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017).[12] In withdrawing the DCL, OCR might have been describing Syracuse's actions in this case: prior actions "may have been well-intentioned, but . . . led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints." *Id.* at 1-2. OCR further said:

> Legal commentators have criticized the 2011 Letter . . . for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." As a result, many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."

*Id.* at 1, *quoting Open Letter From Members Of The Penn Law School Faculty:  Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

---

[12] Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

Federal courts have not, as Syracuse suggests, simply deferred to school officials in similar situations.  Several recent lawsuits against private schools challenging Title IX procedures have survived preliminary motions as federal courts expressed concern about the discriminatory actions of schools and/or the failure of schools to comply with their own procedures.  *See e.g Rolph v. Hobart & William Smith Colls.*, W.D.N.Y. No. 6:16-CV-06515 EAW, 2017 U.S. Dist. LEXIS 153838, *34 (Sep. 20, 2017) (denying motion to dismiss; "plaintiff has adequately alleged facts that plausibly support at least a minimal inference of gender bias on the part of" school); *Brown Univ.*, *supra* (denying motion to dismiss based on alleged "pressure [from OCR] on universities"); *Doe v. Amherst College*, 238 F.Supp.3d 195, 216 (D.Mass. 2017) (denying motion for judgment on pleadings; policies enacted due to OCR pressure); *Naumov v. McDaniel College, Inc.*, D.Md. No. GJH-15-482, 2017 U.S. Dist. LEXIS 49887, at *29 (Mar. 31, 2017) (rejecting argument that DCL required breach of college handbook); *Collick v. William Paterson Univ.*, D.N.J. No. 16-471, 2016 U.S. Dist. LEXIS 160359, at *69-70 (Nov. 17, 2016)("the Complaint sufficiently alleges that Defendants did not adhere to [the school's] own rules, that the procedure they followed was unfair, and that the decision was not based on sufficient evidence"); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 600 (D.Mass.2016)("the Court concludes that the complaint plausibly alleges that [the school] did not provide 'basic fairness' to" accused student); *Doe v. Lynn Univ., Inc.*, S.D.Fla. No. 9:16-CV-80850, 2017 U.S. Dist. LEXIS 7529, at *17 (Jan. 19, 2017) (plaintiff stated valid claims in connection with sexual assault investigation).

**B.     Title IX Erroneous Outcome**

Plaintiff has asserted a valid erroneous outcome claim against Syracuse based on Title IX, the federal statute designed to prevent sexual discrimination in educational institutions receiving federal funding. 20 U.S.C. § 1681 *et seq.*.  The key cases in evaluating Plaintiff's erroneous outcome claim are *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714-16 (2d Cir. 1994), and *Doe v. Columbia Univ.*, 831 F.3d 46 (2nd Cir. 2016). In *Yusuf*, the Second Circuit explained that in order to assert a claim based on an erroneous

outcome theory the Plaintiff needs to allege that the hearing was flawed due to the Plaintiffs' gender.

The key language from the decision addresses the allegations at the pleading stage:

> A plaintiff must . . . also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.  Allegations of a causal connection in the case of university disciplinary cases can be of the kind that are found in the familiar setting of Title VII cases. Such allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.

35 F.3d at 715 (citations omitted).

*Yusuf* was followed in *Columbia*.  In *Columbia*, the Second Circuit reversed a decision of the district court dismissing a Title IX claim brought by a student who had been disciplined for an alleged sexual assault.  The complaint in *Columbia* alleged that the school was motivated "to refute criticisms circulating in the student body and in the public press that Columbia was turning a blind eye to female students' charges of sexual assaults by male students."  831 F.3d at 56. Among the Complaint's allegations that supported the inference of sex discrimination were that the investigator, the hearing panel, and the reviewing dean reached conclusions that were incorrect and contrary to the weight of the evidence. The Complaint further alleged that there had been "substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students."  831 F.3d at 57. The court concluded:

> Against this factual background, it is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault…
>
> The Complaint alleges that, having been severely criticized in the student body and in the public press for toleration of sexual assault of female students, Columbia was motivated in this instance to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students—especially varsity athletes. There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in

10

favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults.

831 F.3d at 58.

The *Columbia* decision is precisely akin to the present case and, as binding precedent, compels this Court to deny the Motion to Dismiss. *See Rolph,* 271 F. Supp. 3d at 402 (*Columbia* remains binding precedent on this Court). The Complaint mirrors *Columbia* in alleging that, having been severely criticized in the student body and in the public press for toleration of sexual assault of female students, Syracuse was motivated to accept the female's accusation of sexual assault and reject the male's claim of consent, to appear to the student body and the public as though Syracuse was serious about protecting female students from sexual assault by male students. (Complaint ¶¶21, 87-88.) Syracuse, further ignores that in 2016, in response to some of the criticism that it was not taking the problem of sexual assaults on campus seriously, a member of the Syracuse administration said, "the university has expelled and suspended students and put students on probation for sexual misconduct." (Complaint ¶21(b).) This language, by itself, puts this case precisely within the holdings of *Yusef* and *Columbia*.[13]

---

[13] Syracuse suggests that Plaintiff has "cherry-picked" snippets of reports and communications in an "effort to paint Syracuse as a place obsessively and single-mindedly focused on sexual assault." Def. Memo. at 12. This is, of course, an overly dramatic description of the Complaint in an effort to set up an 'impossible-to-meet' legal standard. Plaintiff does not need to show that Syracuse of "obsessively and single mindedly focused on sexual assault;" Plaintiff need only show that the system employed by the school was biased on account of gender. That was not the standard in *Columbia* or *Miami Univ.* Those cases establish that, at the pleading stage, Plaintiff's Title IX allegations need only create the plausible inference of intentional gender discrimination. *See Rolph,* 271 F. Supp. 3d at 400, *quoting Littlejohn v. City of New York,* 795 F.3d 297, 311 (2d Cir. 2015) ("The facts required by *Iqbal* to be alleged in the complaint need . . . only give plausible support to a minimal inference of discriminatory motivation.").

There is nothing implausible or unreasonable about the Complaint's suggested inference that Syracuse's investigators and hearing panel adopted a biased stance in favor of the accusing female and against the defending male student to avoid further criticisms that Syracuse turned a blind eye to such assaults and to appear as though Syracuse is 'tough' on sexual assault. (Complaint ¶51.) This is the essential holding of *Columbia,* 831 F.3d at 57-58. *See also Doe v. Marymount Univ.,* E.D.Va. No. 1:17-cv-401, 2018 U.S. Dist. LEXIS 43164, at *27 (Mar. 14, 2018) (denying motion to dismiss Title IX claim brought by accused student where a statement by a senior university official "appears to be an implicit acknowledgment that [the school's] sexual

The Complaint also describes how Syracuse, like Columbia, was under investigation by the Department of Education at the time it was evaluating the claims against the Plaintiff. (Complaint ¶¶19-21, 54(b).) This fact means that Syracuse faced pressure not only from the OCR's DCL, but by the fact the OCR had opened a Title IX investigation into whether Syracuse discriminated against students based on sex by failing to equitably respond to reports of sexual violence. (Complaint ¶ 25.) A recent decision observed that being investigated by the federal government for potential Title IX violations is a relevant allegation suggesting that the university might be induced to discriminate against males in disciplinary hearings for alleged sexual assault. *Gischel v. Univ. of Cincinnati*, S.D. Ohio No. 1:17-cv-475, 2018 U.S. Dist. LEXIS 18083 *26 (February 5, 2018) ("being investigated by the federal government for potential Title IX violations is a relevant allegation suggesting that the university might be induced to discriminate against males in disciplinary hearings for alleged sexual assault"), *citing Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016).

Syracuse questions the link between pressure, such as provided by the 2011 DCL, and discriminatory actions against Plaintiff. *See e.g.* Def. Memo. at 11 (suggesting "there is no fact alleged that would support a finding that these circumstances impacted the proceedings . . ."). A recent decision from the Sixth Circuit disposes of this argument. *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018). In *Miami* the Sixth Circuit found that a complaint of gender discrimination stated a valid claim. The court first considered whether there statistical evidence of gender discrimination, but observed that such information may be hard to include in a complaint because the "information, . . . is currently controlled by the defendants." 882 F.3d at 593. The court, instead, held that a plaintiff in a Title IX

---

assault policies and Title IX procedures were influenced, at least in part, by political pressure to convict respondents in sexual assault cases").

case involving allegations of sexual misconduct may rely circumstantial evidence of gender

discrimination, such as pressure from the federal government:

> [Plaintiff] also asserts that Miami University faced external pressure from the federal
> government and lawsuits brought by private parties that caused it to discriminate
> against men. Specifically, he argues that pressure from the government to combat
> vigorously sexual assault on college campuses and the severe potential punishment—
> loss of all federal funds—if it failed to comply, led Miami University to discriminate
> against men in its sexual-assault adjudication process. . . . Considering all of these
> factual allegations relating to Miami University's pattern of activity respecting sexual-
> assault matters and the asserted pressures placed on the University, [plaintiff] has
> pleaded sufficient specific facts to support a reasonable inference of gender
> discrimination.

882 F.3d at 594 (citations to record omitted).  The motion to dismiss, thus, should be denied because

the exact same allegations appear in the Complaint in this case.  *See Schaumleffel v. Muskingum Univ.*,

S.D.Ohio No. 2:17-cv-463, 2018 U.S. Dist. LEXIS 36350, at *49 (Mar. 6, 2018) (relying on *Miami*

*Univ.* to deny motion to dismiss Title IX claims by accused student), *citing Collick v. William Paterson*

*Univ.*, No. 16-471, 2016 U.S. Dist. LEXIS 160359, at *35 (D. N.J. 2016) ("At the pleading stage, . . .

an allegation that the process was one-sided, irregular, and unsupported by evidence may give rise to

an inference of bias").

Syracuse urges the Court to reject the linkage btween Federal pressure and bias, despite

*Columbia* and *Miami Univ.*, suggesting the evidence of pressure is merely "gender–neutral and thus of

no moment."  Def. Memo. at 11.  However, the inference that schools were motivated by pressure

from OCR is, in fact, a reasonable inference that other district courts, in addition to *Columbia* and

*Miami,* have, on a motion to dismiss standard, drawn.  In *Ohio State I*, a district court, in denying a

motion to dismiss, observed that the failure of a school to comply with guidance by the Office of Civil

Rights on Title IX "could jeopardize its federal funding."  *Doe v. Ohio State Univ.*, S.D. Ohio No. 2:15-

cv-2996, 2016 U.S. Dist. LEXIS 7700, at *30 (Jan. 22, 2016) ("*Ohio State I*").  In *Brandeis*, *supra*, a federal

court refused to dismiss a lawsuit of a student who was disciplined for unwanted sexual conduct arising

in the course of a dating relationship.  The court noted that that the school had, in fact, adopted

procedures that "substantially impaired, if not eliminated, an accused student's right to a fair and impartial process" as a direct result of pressure from OCR.  The court said:

> When considering the issues presented in this case, it is impossible to ignore entirely the full context in which they arose. In recent years, universities across the United States have adopted procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response. That process has been substantially spurred by [OCR], which issued a "Dear Colleague" letter in 2011 demanding that universities do so or face a loss of federal funding.

177 F.Supp.3d at 572. And in *Doe v. Wash. & Lee Univ.* a federal court observed, "it is plausible that [the school] was under pressure to convict students accused of sexual assault in order to demonstrate that the school was in compliance with the OCR's guidance." *Doe v. Wash. & Lee Univ.*, W.D.Va. No. 6:14-cv-00052, 2015 U.S. Dist. LEXIS 102426, at *23-24 (Aug. 5, 2015).[14]

Two recent post-*Columbia* decisions are particularly instructive and support denial of the Motion.  *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048 (S.D.Ohio 2017) ("*Ohio State II*"); *Rolph , supra*. In *Ohio State II*, as in this case, the Plaintiff suggested that there was a temporal connection between an OCR investigation of the school and the actions against the plaintiff.  The court denied a motion to dismiss, observing:

> There is little doubt that universities around the country have felt pressure to tighten the investigation and punishments in sexual misconduct cases because this is a very sensitive issue. However, there are genuine concerns raised in these cases and general publications regarding how universities are handling the investigations.

239 F. Supp. 3d at 1062.  In *Rolph*, a court in the Western District of New York applied *Columbia* to conclude that a male student had adequately alleged facts that plausibly support at least a minimal inference of gender bias on the part of the school.  As in this case, the school had been criticized in

---

[14] Syracuse suggests that bias against those accused of sexual assault is distinct from bias based on gender and that Syracuse merely is demonstrating "heightened awareness of sexual assault." Def. Memo. at 14. This argument carries no weight, as it was expressly rejected by the *Columbia* court. 831 F.3d at 58, n. 11 ("A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action.").

the media for failing to take seriously female students' complaints of sexual assault by male students. And, as in this case, the school in *Rolph* "faced pressure from the federal government to take a hard stance on sexual assault on campus" both in terms of "OCR's threat to withhold federal funding from schools not in compliance" and the fact that the school was "under investigation for possibly violating rules aimed at preventing sexual harassment." This, the court concluded, when combined with allegations of unfairness in the proceeding, "met [the] low burden at the pleading stage" under *Columbia*. 2017 U.S. Dist. LEXIS 153838, at *38-39. *See also Brown Univ.*, *supra*. (observing that a complaint brought by a male student does not, on a 12(b)(6) standard, require "statistical evidence and/or data analysis that female students accused of sexual assault were treated differently"); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D.Ohio 2014) (plaintiff pleaded facts sufficient to cast doubts on the accuracy of a disciplinary proceeding); *Doe v. Case W. Reserve Univ.*, No. 1:14CV2044, 2015 U.S. Dist. LEXIS 123680, at *5 (N.D. Ohio Sept. 16, 2015) (plaintiff pleaded facts sufficient to cast doubts on accuracy of a disciplinary proceeding outcome).

## C.    Title VI

Section 601 of Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. A complaint sets forth a sufficient claim if it includes "factual allegations that would indicate how his race, gender, age, or national origin played a role" in the actions against plaintiff. *Valle v. Bally Total Fitness*, No. 01-CV-11614, 2003 U.S. Dist. LEXIS 17093, at *7-*8 (S.D.N.Y. Sept. 30, 2003), citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). Plaintiff's discrimination claims brought under Title VI is analyzed under the familiar burden-shifting analysis set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See McKie v. New York Univ.*, 2000 U.S. Dist. LEXIS 14925, , at *3 n.1 (S.D.N.Y. 2000) ("Title VI claims are governed by the same McDonnell Douglas

burden shifting inquiry applied to claims brought under Title VII . . ."); *Jackson v. Univ. of New Haven*, 228 F. Supp. 2d 156, 160 (D. Conn. 2002) (applying *McDonnell Douglas* framework in Title VI context).

The Complaint emphasizes that certain actions were taken against Plaintiff because of his race and that a totality of circumstances strongly suggests discrimination. In a racial animus case, intent may be difficult to establish as "[t]here will seldom be 'eyewitness' testimony as to the [defendants'] mental processes." *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716 (1983). Plaintiff's allegations, taken as true, indicate the possibility of discrimination and thus present a plausible claim of disparate treatment. *See Boykin v KeyCorp*, 521 F.3d 202, 212 (2d Cir. 2008) (to survive a motion to dismiss on a claim of racial animus, a plaintiff "need not allege 'specific facts establishing a prima facie case of discrimination.'"), *quoting Swierkiewicz,* 534 U.S. at 508.  In this case, the Complaint alleges racial bias from the fact that a hearing panel determined that Jane Roe, a white woman, was "credible" and Plaintiff, an African-American man, was not credible.[15]  (Complaint ¶75.)

The most significant evidence of racial bias, however, comes from the allegation that Syracuse accepted as credible an identification of Plaintiff by Jane Roe even though Jane Roe admitted to having been intoxicated.  The Complaint states, "Syracuse assumed that Plaintiff, as a young African American male, sexually assaulted Jane Roe despite the lack of a reliable identification."  (Complaint ¶102.)  The inference of bias from the cross-race identification is reasonable and plausible; the Second Circuit, after reviewing the relevant social sciences research, has observed that racial bias is often present in identifications.

> [S]ocial science research indicates that people are significantly more prone to identification errors when trying to identify someone of a different race, a phenomenon known as "own-race bias." "There is a considerable consistency across [scientific] studies, indicating that memory for own-race faces is superior to memory

---

[15] While a panel is permitted, in general, to assess credibility, the credibility assessment in this case is suspect because the white woman, Jane Roe, was found to be credible *even though she never actually appeared before the hearing panel.*  Additional bias may be inferred from the allegations that the investigator made excuses for the inconsistencies in Jane Roe's statements.

for other-race faces." Robert K. Bothwell et al., *Cross-Racial Identification*, 15 Personality & Soc. Psychol. Bull. 19, 19, 23 (1989) (conducting meta-analysis of 14 studies finding that own-race bias effect "occurs for both Black and White subjects in 79% of the samples"). Studies have thus found a "tendency for people to exhibit better memory for faces of [members of their own race] than for faces of [members of another race]." Tara Anthony et al., *Cross-Racial Facial Identification: A Social Cognitive Integration*, 18 Personality & Soc. Psychol. Bull. 296, 299 (1992). Studies suggest that own-race bias is especially pronounced where, as here, the person making the identification is Caucasian and the person being identified is African-American. Henry F. Fradella, *Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness Testimony*, 2006 Fed. Cts. L. Rev. 3, 14 (2007).

*Young v. Conway*, 698 F.3d 69, 81 (2d Cir. 2012).[16]

In addition, the Second Circuit has articulated a comparator test, which allows a plaintiff to establish an inference of discrimination by comparing his or her treatment to the treatment of a person who is similarly situated to the plaintiff in all material respects. *See Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *see also Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (holding that "a showing that the employer treated plaintiff less favorably than a similarly situated employee outside of his protected group . . . is a recognized method for raising an inference of discrimination for purposes of making out a *prima facie* case."). In this case, Plaintiff asserts, on information and belief, that "Syracuse has disproportionately imposed discipline on minority students accused of sexual assault." (Complaint ¶104.) These allegations of intentional disproportionate discipline is sufficient for an inference of discrimination at the pleading stage. Syracuse dismisses these allegations "conclusory" and "not based on any information specific to Syracuse." Def. Memo. at 20. The problem with Syracuse's argument is that all of the information needed to establish a detailed factual basis for this claim remains in the sole possession of Syracuse. The Second Circuit has ruled that

---

[16] In this case, the allegations of Complaint alleging racial bias in the identification are supported by and consistent with other allegations in the Complaint. The Complaint alleges that Syracuse failed to conduct a full and fair investigations and credited the statements of Jane Roe, a white female over the denials of Plaintiff, an African-American male. The identification by Jane Roe was questionable, yet accepted at face value by Syracuse administrators.

pleading on information and belief in discrimination suits can suffice to meet the relevant plausibility standard when the relevant facts are particularly within the possession, knowledge, and control of the defendant. *See, e.g., Arista Records LLC v. Doe*, 604 F.3d 110, 120 (2d Cir. 2010); *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008). *See also Miller v. Sutton*, D.Conn. No. 3:15-cv-1111 (MPS), 2016 U.S. Dist. LEXIS 95475, at *53 (July 21, 2016) (Pleading on 'information and belief' is allowed as to matters that are peculiarly within the defendants' knowledge); *Purdie v. City Univ. of New York*, S.D.N.Y. , 2015 U.S. Dist. LEXIS 2458, at *18 (Jan. 8, 2015) ("*Twombly* 'does not prevent a plaintiff from pleading facts 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible."), *quoting Arista Records, LLC* v. 604 F.3d at 120. The Complaint satisfies the good faith basis requirement for pleading on information and belief by stating the basis for this belief: an article in a national and well-respected publication finding that "in response to the DCL, disproportionately imposed discipline on minority students." (Complaint ¶104(b), *citing* Emily Yoffee, The Question of Race in Campus Sexual-Assault Cases, Is the system biased against men of color? Atlantic, September 11, 2017 (collecting cases). *See also* Ross Douthat, *Liberalism and the Campus Rape Tribunals*, NY Times (Sept. 13, 2017). (citing Yoffee article; "it is a not-much-talked-about truth that minority students seem to be accused of rape well out of proportion to their numbers on campus"). This report provides a good faith basis for the "on information and belief" allegations. *See  Langadinos v. Am. Airlines, Inc.*, 199 F.3d 68, 73 (1st Cir. 2000) (plaintiff entitled to make allegations on information and belief, as long as there is good faith basis for doing so after reasonable inquiry).

### D.    Breach of Contract and Promissory Estoppel

"In New York, the relationship between a university and its students is contractual in nature." *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 481 (S.D.N.Y. 2015), *quoting Papaspiridakos*, 2013 U.S. Dist. LEXIS 129748, at *3. Syracuse first argues that plaintiff should have brought this claim as an Article

78 proceeding within four months of when the challenged decision became final.  Def. Memo. at 20, *citing* N.Y. C.P.L.R §7800 *et seq.*   However, Article 78 is not applicable to this case because the Plaintiff does not challenge, in bringing breach of contract or other state law claims, an internal administrative and academic determination of a school but seeks money damages.  *Papaspiridakos v. Educ. Affiliates, Inc.,* E.D.N.Y. No. 10 CV 5628, 2013 U.S. Dist. LEXIS 129748, at *6-7 (Sep. 11, 2013) (where a plaintiff does not seek to compel any action by a school, and instead seeks monetary damages for breach of contract and other state law claims, the action is not precluded by Article 78); *citing Alexson v. Hudson Valley Cmty. Coll.,* 125 F.Supp.2d 27, 29 (N.D.N.Y. 2000) (permitting student to bring action after his alleged expulsion); *Rolph,* 271 F. Supp. 3d at 405 (state law claims would be construed as only permitting monetary damages and thus not subject to Article 78).

A complaint for breach of contract must identify "a specific breached promise or obligation." *Gally v. Columbia Univ.,* 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998). *See also Ward v. N.Y. Univ.,* S.D.N.Y. 99 Civ. 8733, 2000 U.S. Dist. LEXIS 14067 at *4 (Sep. 25, 2000) (in order to state a claim for breach of such a contract, a student must identify "specifically designated and discrete promises.").  Syracuse, correctly citing this law, argues:

> [T]he Complaint does not identify a single specific provision of the Syracuse Policy or the Syracuse Procedures that was not followed or substantially complied with in the conduct of the investigation, the disciplinary hearing[,] or the internal appeal involving Plaintiff.

Def. Memo. at 22.  Syracuse is incorrect on the application of this law.  As shown below, Plaintiff has identified, in a non-conclusory manner, at least three separate ways in which Syracuse violated the express guarantees of the Student Handbook.

## 1.    Lack Of Notice

The Student Handbook contains a specific guarantee to provide notice of alleged misconduct to students prior to any hearing. The Student Handbook provides: "Students have the right to written notice."  (Complaint ¶118.)    This is also specifically described elsewhere in the Student Conduct

System Handbook: "All Students have the right to . . . Participate in a process that . . . is fair, impartial, *and provides adequate notice* and meaningful opportunity to be heard." (Complaint ¶ 26(a)(emphasis supplied).  *See also* Complaint ¶¶ 65, 68.)

On March 4, 2016  Plaintiff received a letter from an Assistant Dean alleging only, "This office has received information . . ., alleging that on or about October 25, 2015  you sexually assaulted another Syracuse University student."  (Complaint ¶56.) This notice did not provide a location or the name of the alleged victim, making it impossible for Plaintiff to begin to investigate the allegations and prepare a defense.  Over two months later, on May 17, 2016, Plaintiff was again informed merely that he was alleged to have violated certain provisions of the Code of Student Conduct. He was informed only "the complaint arises from an incident occurring on or about October 25, 2016 at approximately 1:00 a.m. when it is alleged that you sexually assaulted a Syracuse University Student." Notably, the notice still did not provide the location of the alleged sexual assault. (Complaint ¶72.) Courts have found that allegations contained in such misleading or vague notices by schools can support a breach of contract claim. In *Brandeis*, the court warned that a student should not be "expected to defend himself against [a] vague and open-ended charge." 177 F. Supp. 3d at 603.  The court observed that such vague notice is insufficient: "There is little practical difference between a school failing to inform the accused of the charge against him or . . . having informed him of the formal charge, refusing to provide him with the specific factual conduct alleged to have given rise to the charge." *Id.* The court in *Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645 (May 8, 2017), went further, noting that even providing the student with access to the investigative report detailing alleged misconduct still does not constitute adequate notice. In *Notre Dame*, the court observed that a detailed report including witness statements does "not provide [the student] with a statement of the particular conduct alleged to have been a violation of particular" policies. 2017 U.S. Dist. LEXIS 69645 at *29.

2.      **Lack Of Full And Fair Investigation**

The Student Handbook contains a guarantee to conduct an investigation. This is specifically described in the Student Conduct System Handbook: "Upon the receipt of a complaint, the Title IX Coordinator will designate an investigator who may conduct an investigation."  (Complaint ¶68(c).) The obligation to conduct an investigation must be read in conjunctions with other guarantees that this be a "full and fair" investigation; otherwise the contractual guarantee is meaningless.

A similar breach of contract claims based on the failure to conduct an adequate investigation survived motions to dismiss in *Doe v. Trustees of the Univ. of Pennsylvania*, E.D.Pa. No. 16-5088, 2017 U.S. Dist. LEXIS 148086 (Sep. 13, 2017) and *Amherst*, *supra*. The parallels between these cases and this case are striking.  In this case, Plaintiff alleges, among other failings in the investigation: "The investigator failed to conduct follow-up interviews or gather relevant physical evidence or information."  (Complaint ¶68(c)(iii).) In *Univ. of Pennsylvania*, the complaint alleged that the investigator, among other failings, failed to review documentation, physical evidence, and other relevant evidence. 2017 U.S. Dist. LEXIS 148086 at *25-26.  The *Univ. of Pennsylvania*, like Syracuse, argued that a complaint failed to state a cognizable breach of contract claim based on investigative deficiencies.  The court said, "We reject this argument, however, because the Complaint plainly alleges, and the contract requires, that the investigator must conduct a *thorough* investigation that includes witness interviews and a review of relevant evidence."  2017 U.S. Dist. LEXIS 148086 at *35 n. 10 (emphasis supplied).  The court in *Amherst* reached the same conclusion.  In *Amherst*, like in this case, a student alleged that the school had "obligated itself to conduct a fair investigation and fact-finding process, but did not do so."  The court denied a motion to dismiss because the student had alleged sufficient facts, from which a court can plausibly infer the investigation and fact-finding process was inadequate. 238 F. Supp. 3d at 217-218.  *See also Case W. Res. Univ.,* 2017 U.S. Dist. LEXIS 142002, at

21

*28-29 (denying motion to dismiss complaint alleging that school, *inter alia*, failed to "perform a fair, thorough and non-discriminatory investigation").

### 3.    Lack Of Fundamental Fairness

The Student Conduct System Hand Book contains a specific guarantee of fundamental fairness.  (Complaint ¶32.) The Sexual Misconduct Policy contains a section referred to as the "Bill of Rights." Under this section, Syracuse students have the right to "participate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard."[17]  (Complaint ¶26.) The allegation of lack of fundamental fairness is best evaluated by considering the process as a whole.[18] In *Collick*, *supra,* for example, a court denied a motion to dismiss where a student alleged that a school did not adhere to its own rules and "that the procedure they followed was unfair, and that the decision was not based on sufficient evidence."  2016 U.S. Dist. LEXIS 160359, at *70.[19]  Similarly, in *Brandeis*, *supra*, the court found a breach of contract claim survived a motion to dismiss "based on the entirety of the procedures employed by [the school], given the nature of the charges and the circumstances of the case."  177 F. Supp. 3d at 607. *See also Brown Univ.*, *supra*, at *36 (complaint had adequately alleged

---

[17] Syracuse suggests that it has not breached its contract because the contract is consistent with New York's 'Enough is Enough' Law.  Def. Memo. at 22-23.  Syracuse ignores the fact that the contract between the parties is consistent with long-established New York law holding that implicit in the contract between a school and a student is the requirement that the institution "act in good faith in its dealing with its students." *Evans v. Columbia Univ.*, S.D.N.Y. No. 14-cv-2658 (NSR), 2015 U.S. Dist. LEXIS 48768, at *10 (Apr. 13, 2015), *citing Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 402 N.E.2d 1150, 426 N.Y.S.2d 248, 251 (1980).  Further, New York law provides that a private school's disciplinary determinations must not be arbitrary and capricious. *Basile v Albany Coll. of Pharm. of Union Univ.*, 279 AD2d 770, 719 N.Y.S.2d 199 (3d Dept. 2001); *Rensselaer Socy. of Engrs. v Rensselaer Polytechnic Inst.*, 260 AD2d 992, 689 N.Y.S.2d 292 (3d Dept. 1999).  Nothing in the 'Enough is Enough" law appears to be intended to change these holdings.

[18] Some aspects of the Syracuse process are inherently unfair even when simply examined in isolation.  For example, the Student Conduct Systems Handbook states:  "Students have the right to . . . the opportunity for a hearing before any change in status."  (Complaint ¶32.)  Plaintiff had a hearing, but the Complaint alleges that at the hearing "Plaintiff was prohibited from confronting his accuser."  (Complaint ¶69(b).)  The Sixth Circuit recently observed that in "he said/she said" sexual assault matters, a school's "failure to provide any form of confrontation of the accuser made the proceeding . . . fundamentally unfair."  *Doe v. Univ. of Cincinnati*, 6th Cir. No. 16-4693, 2017 U.S. App. LEXIS 18458 at *2 (Sep. 25, 2017).

[19] Syracuse, notably, fails to offer an alternative method of analyzing the specific contractual guarantee of "fundamental fairness."

a number of violations of the student handbook); *Dempsey v. Bucknell Univ.*, Civil Action No. 4:11-cv-1679, 2012 U.S. Dist. LEXIS 62043, at *18-*19 (M.D. Pa. May 3, 2012) (plaintiff alleged the school acted in a manner that was fundamentally unfair in a number of respects); *Atria v. Vanderbilt Univ.*, 142 F.App'x 246, 254-255 (6th Cir.2005) (a student's allegations of violations of a student handbook were sufficient to survive a motion for summary judgment).

Moreover, despite the school's promise of "fundamental fairness," the alleged victim failed to appear at the hearing. The Sixth Circuit has observed that fundamental fairness includes the ability to confront adverse witnesses when the information supplied by those witnesses is the reason for the adverse action and there is a question of credibility to be resolved by the finder of facts. *Doe v. University of Cincinnati*, 872 F.3d 393, 401 (6th Cir. 2017). Of relevance to a case involving a private school, such as Syracuse, the court observed that the lack of ability to question adverse witnesses affects the fundamental fairness of the hearing. *Id.* at 402-03. The same analysis has been applied to cases involving private schools. In *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D.Mass. 2016), a federal court considered whether a private school had complied with a contractual and common law obligation to provide "basic fairness" to the student. The court concluded that the accused student's inability to question his accuser violated this guarantee. The court said, "the lack of an opportunity for cross-examination may have had a very substantial effect on the fairness of the proceeding." 177 F.Supp.3d at 605.

Syracuse's basic response is: our process was fair because "we did what we were required to do" by New York law and/or federal guidance.[20]  *See e.g.* Def. Memo. at 23 (suggesting procedures are consistent with "Enough is Enough" law). This does not get Syracuse very far, as many of these laws

---

[20] Syracuse, for example, suggests that Plaintiff "never comes to grip with the fact that the Syracuse Policy and Procedures" are written in gender neutral terms. Def. Memo. at 23. This is a puzzling argument, as it would be shocking to find such an admission. University administrators are too smart to make such a mistake. As a result, as in almost all discrimination cases, bias must be inferred.

and guidance have been withdrawn or modified after having been shown to undermine the rights of accused students. *See supra* (discussing withdrawal of DCL). Moreover, one court has observed that the requirements of the DCL cannot supersede the terms of the contract between the parties. "There are certainly clear statements of policy in the DCL" the court said, but cautioned "It is not for the Court to invalidate a contract between the parties based on its sense of public policy, where, as here, the correct application of that public policy to the particular circumstances of the case is not clear." *Naumov* , 2017 U.S. Dist. LEXIS 49887 at *30. Finally, this argument fails because it seeks to explain *why* Syracuse breached its contract. To the extent that this is a legitimate defense, consideration of this argument is improper at a motion to dismiss stage. Much of the information to support Syracuse's actual motives for its actions remains in the possession of Syracuse and is not available to Plaintiff, this is an argument that can only be evaluated on a summary judgment standard following discovery. *Cf. Trustees of the Univ. of Pennsylvania,* 2017 U.S. Dist. LEXIS 148086, at *53 (denying motion to dismiss and permitting discovery because information is undeniably within the University's exclusive control"). *See e.g. Vanden Bosch v. Bayer Healthcare Pharms., Inc.*, 13 F. Supp. 3d 730, 749 (W.D.Ky.2014) (denying motion to dismiss breach of contract claim; observing that claims "will be better fleshed out at the summary judgment stage"); *Boeve v. Nationwide Mut. Ins. Co.*, E.D.Mich. No. 08-CV-12213, 2008 U.S. Dist. LEXIS 63575, at *19 (Aug. 20, 2008) (denying motion to dismiss breach of contract and unjust enrichment claims "in deference to further discovery").

## E.    Negligence

Syracuse argues that the Negligence claim should be dismissed because it is duplicative of the breach of contract claims. Def. Memo. at 24. This is incorrect. The Complaint alleges that the obligation of Syracuse to conduct an investigation and adjudicatory process in a non-negligent manner

is derived form an independent source:  the accreditation standards applicable to the schools.[21] (Comp. ¶74.) Syracuse fails to address this aspect of the complaint.  A party may bring both a breach of contract and a tort claim where there is a legal duty independent of the contract itself that has been violated. *See, e.g., Clark-Fitzpatrick v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987).  Such a legal duty must, like in this case, "spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract." *Id.*   Accordingly, Plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct when an independent tort duty is identified. *See Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 898-99 (2d Cir. 1980), *citing Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 408 (1958).

In this case, the Complaint alleges an independent tort duty imposed by the accreditation obligations of the Middle States Commission on Higher Education. *See* 20 USCS § 1099b *et seq* (establishing role of accreditation agencies for higher education funding).  While New York does not appear to have addressed this issue,[22] the failure of Syracuse to comply with the independent obligation imposed by accreditation agencies constitutes a valid claim for negligence in other states. *Cf. Hospitals Gess v. United States*, 952 F.Supp. 1529, 1552 (M.D.Ala.1996) (finding negligence from failure of hospital to comply with standards from "Joint Commission of Accreditation"). *Fletcher v. S. Peninsula Hosp.*, 71 P.3d 833, 837 (Alaska 2003) (defendant hospital "voluntarily assumed a broader duty by seeking accreditation").

## CONCLUSION

The Motion to Dismiss should be denied.

---

[21] State Courts have found that accreditation standards for school may be evidence of the relevant standard of care for schools and whether the standard of care was breached.  *See e.g. A.W. v. Lancaster Cnty. Sch. Dist. 0001*, 280 Neb. 205, 222, 784 N.W.2d 907 (2010).

[22] Perhaps:  *Johnson v. Bon-Ton Dep't Stores, Inc.*, 278 F.App'x 56, 58 (2d Cir. 2008) (referring to failure of elevator operator to comply with an industry standard, promulgated by the American Society of Mechanical Engineers and accredited by the American National Standards Institute").

Respectfully submitted,

_____/s/ Joshua Engel_____
Catherine H. Josh, Esq. ((5025036)
45 Exchange Boulevard, Suite 915
Rochester, NY 14614
585-423-1974
585-325-6075 (fax)
chjesq@gmail.com

Joshua Adam Engel (Ohio No. 0075769)
(*pro hac vice*)
ENGEL AND MARTIN, LLC
5181 Natorp Blvd., Suite 210
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

**CERTIFICATE OF SERVICE**

This certifies that the foregoing was filed electronically on April 8, 2018.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

_____/s/ Joshua Engel_____
Joshua Adam Engel (Ohio No. 0075769)
(*pro hac vice*)

26