**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOHN NOAKES,**

               **Plaintiff,**

     **v.**                            **No. 5:18-cv-43**
                                        **(TJM/DEP)**

**SYRACUSE UNIVERSITY,**

               **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


## DECISION & ORDER

Before the Court is Defendant Syracuse University's motion to dismiss the

Complaint.  See dkt. # 11.  The parties have briefed the issues, and the Court has

determined to decide the matter without oral argument.

**I.**    **Background**

Plaintiff, identified by the pseudonym "John Noakes," is an Afircan-American male

and former student at Defendant Syracuse University ("Syracuse" or "the University").  See

Complaint ("Complt."), dkt. # 1, at ¶ 4.  He has completed six semesters at Syracuse and

needs approximately 26 credits to complete his undergraduate degree.  Id. at ¶ 4(b).  He

needs around 30 more credits to complete the "CPA Track," and had been planning to take

graduate courses at the University.  Id.  Syracuse placed John Noakes on Indefinite

Suspension after the University found he had engaged in unwanted sexual conduct with

another student, identified here by the pseudonym "Jane Doe." Id. at ¶ 81. This case

arises out of the gender and racial discrimination that Plaintiff alleges motivated Syracuse's

decision. Plaintiff brings claims of gender discrimination pursuant to Title IX of the

Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq. ("Title IX"), and discrimination

because of race pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et

seq. Plaintiff also raises state-law breach-of-contract and negligence claims.

After being served with the Complaint, Defendant filed the instant motion to dismiss

pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff had failed to state

a claim upon which relief could be granted. The parties briefed the issues, bringing the

case to its present posture.

## II.    Legal Standard

The Defendant has filed a motion to dismiss Plaintiff's claims pursuant to Federal

Rule of Civil Procedure 12(b)(6). Defendant argues that Plaintiff has not stated a claim

upon which relief could be granted, even if all factual allegations in the complaint were

proved true. In addressing such motions, the Court must accept "all factual allegations in

the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." Holmes

v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009). This tenet does not apply to legal

conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice."

Id. at 678. "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting

Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)). Still, even though "the facts a plaintiff

alleges in a complaint may turn out to be self-serving and untrue," a court at the motion-to-dismiss "stage . . . is not engaged in an effort to determine the true facts." Doe v. Columbia Univ., 831 F.3d 46, 48 (2d Cir. 2016).  In deciding a Rule 12(b)(6) motion, "[t]he issue is simply whether the facts the plaintiff alleges, if true, are plausibly sufficient to state a legal claim."  Id.  After all, "[i]f the complaint is found sufficient to state a legal claim, the opposing party will then have ample opportunity to contest the truth of the plaintiff's allegations and to offer its own version."  Id.

III.    Analysis

    A.    Facts

The Court will begin with a recitation of the relevant facts alleged in Plaintiff's detailed Complaint.  For the purposes of the instant motion, the Court assumes those facts to be true.

    i.    National Controversy Concerning Sexual Assaults on College Campuses

Plaintiff alleges that recent political developments and governmental pressure have led American colleges and universities to become more aggressive in policing sexual misconduct on campus.  In April 2011, the U.S. Department of Education's Office for Civil Rights ("OCR") issued a "Dear Colleague Letter" to colleges and universities in order to explain its interpretation of Title IX.  Complt. at ¶¶ 11-13. The Letter instructed colleges and universities that compliance with Title IX requires transparent and prompt procedures for investigating and resolving complaints of sexual misconduct.  Id. at ¶ 11(a).  The Letter required colleges and universities to employ a "more likely than not" standard of proof in sexual misconduct cases; this standard was less exacting than the "clear and convincing" or

"beyond a reasonable doubt" standards utilized at some colleges.  Id. at ¶ 11(b).  The Letter

also instructed universities that they should "minimize the burden on the complainant,"

"focus more on victim advocacy," and transfer "alleged perpetrators" away from any "shared

courses or housing."  Id. at ¶ 11(c)-(d).  Many colleges changed their sexual misconduct

policies and procedures after the Dear Colleague Letter was issued.  Id. at ¶ 11(e).  In

addition to the Dear Colleague Letter, the Obama administration pressured colleges to

investigate sexual assaults on campus aggressively.  Id. at ¶ 12.

The Letter, Plaintiff alleges, was only the first part of the government's efforts to

address sexual assault.  Id. at ¶ 12(a).  Members of the Department of Education publically

urged "'radical' change," which colleges interpreted as "'marching orders'" that required

them to take the issue more "'seriously.'"  Id. at ¶ 12(b)-(c).  Plaintiff asserts that schools

"including Syracuse, were scared of being investigated or sanctioned by the Department of

Education." Id. at ¶ 13.  The government, Plaintiff claims, also "created a significant amount

of pressure on colleges and universities to treat all those accused of sexual misconduct with

a presumption of guilt."  Id. at ¶ 13(a).  These policies also tended to treat men as

aggressors and women as victims, applying different standards.  Id.  Some administrators

expressed concern that "schools are running so scared of violating the civil rights of alleged

victims that they end up violating the due process rights of" the accused.  Id. at ¶ 13(b).

Schools appeared to risk losing federal funding unless they altered policies.  Id. at ¶¶ 13(c)-

(e).  In July 2016, then-Vice President Joseph Biden suggested that schools that do not

comply with Title IX administration guidelines could be stripped of federal funding.  Id. at ¶

13(g).[1]  All of these pressures led colleges and universities established policies that reduced "procedural protections" to men, like Plaintiff, accused of sexual misconduct.  Id. at ¶ 16.

### ii.  Syracuse's Alleged Crackdown Amid Public and OCR Pressure

In recent years, and during the period preceding the disciplinary action against John Noakes, Syracuse experienced substantial criticism from both the student body and the public media for failing to take seriously female students' allegations of sexual assault by male students.  Id. at ¶ 17.  Critics attacked the way that Syracuse handled Title IX investgiations.  Id. at ¶ 17(a).  In September 2014, students, faculty and staff gathered on the steps of Hendricks Chapel at Syracuse to protest the University's changes to sexual assault policies.  Id. at ¶ 17(c).  An organization called "THE General Body," a collective of student organizations, spent close to three weeks occupying the Syracuse administration building.  Id.  Among the organization's demands were an increase in attention to the issue of sexual assault.  Id. at ¶17(c)(i).  The group also protested closure of the Advocacy Center, which focused on the needs of sexual-assault survivors.  Id. at ¶ 17(c)(ii).

In December 2014, Syracuse received a report from the Chancellor's Workgroup on Sexual Violence Prevention, Education, and Advocacy.  Id. at ¶ 18.  The report observed that much of the University's focus in preventing campus sexual assault is the prevention of acts by males.  Id. at ¶18(a).  The report says: "The discourse on campus about sexual assault and relationship violence typically focuses on male-on-female violence involving

---

[1]Plaintiff further alleges that the current presidential administration has withdrawn the Dear Colleague Letter.  See Complt. at ¶ 14.  Plaintiff argues that such a change will be unlikely to change the attitudes of colleges and universities towards sexual misconduct claims.  Id. at ¶ 15.  The events at issue here occurred before the change in Administrations, and current policies are therefore irrelevant to the questions here before the Court.

students who are fulltime undergraduates, White, and heterosexual."  Id.  Plaintiff contends that the report "suggested" that Syracuse had not invested sufficient staff and resources to investigate claims of sexual assault and relationship violence, nor to educate members of the Syracuse community on those issues.  Id at ¶ 18(b).  The report also criticized the Chancellor for closing the Advocacy Center.  Id. at ¶ 18(c).   Further, Plaintiff alleges, the report urged Syracuse to adopt more "victim-centered" policies.  Id. at ¶ 18(d).

In July 2015, New York State Gov.  Andrew Cuomo signed into law so-called "Enough is Enough" legislation designed to combat sexual assault on college campuses. Id. at ¶ 19.  Syracuse Chancellor Kent Syverud adopted the "Enough is Enough" legislation in summer 2015, making him the first private college chancellor or president to do so.  Id. at ¶ 19(a).  Syracuse officials expressed pride at being the first private university to adopt the "Enough is Enough" program and alleged "progress" on the issue of sexual misconduct in recent years.  Id. at ¶ 19(c).

Various other events highlighted the alleged sexual assault problem on the Syrcause campus.  Syracuse received national attention as a result of a September 2015 CNBC report titled, "One of the most dangerous places for women in America."  Id. at  ¶ 20.  The report highlighted a 2012 sexual assault on campus, praising "'courageous students–both male and female–[who are] continuing to speak out, refusing to be silenced until the crisis stops.'"  Id. In 2016, Syracuse responded to some of the criticism that it was not taking the problem of sexual assaults on campus seriously.  Id. at  ¶ 21.  One Syracuse Dean responded to such allegations by stating, "the university has expelled and suspended students and put students on probation for sexual misconduct."  Id. at ¶ 21(b).  In October 2016, Syracuse students dragged mattresses covered with messages in red tape to protest

rape culture on campus.  Id. at  ¶ 22.  The protesters described Syracuse as an "institution that lets perpetrators walk free while survivors, activists, and our families must bear the injustice silently."  Id. at ¶ 22(b).

Plaintiff further alleges that "[o]n information and belief, Syracuse was aware of OCR investigations of other schools and took actions to either [avoid] OCR scrutiny or to make sure that it had a record of aggressive enforcement to show OCR."  Id. at ¶ 23.  The Chancellor admitted that the University had "engaged in 'aggressive efforts to crack down on campus sexual assaults.'"  Id. at ¶ 24.  In an email sent to the campus community after the current presidential administration rescinded the "Dear Colleague" letter, Chancellor Syverud "'re-emphasized'" that the University continues to be committed to fighting sexual assault and "'exceeding'" the legal requirements that have been the subject of national debate on the issue.

Syracuse has been the subject of at least two investigations by OCR into the school's responses to allegations of sexual assault.  Id. at ¶ 25.  On June 22, 2016, OCR notified Syracuse that it was investigating an allegation that Syracuse failed to respond "promptly and equitably" to a "report of sexual assault."  Id. at  ¶ 25(a).  In connection with this investigation, OCR requested a significant amount of data and information from Syracuse. Id.  On January 17, 2017,[2] OCR notified Syracuse that it was investigating a second allegation that Syracuse failed to respond "promptly and equitably" to a "report of sexual assault."  Id. at ¶ 25(b).   Plaintiff alleges that the graduate student "at the center of the

---

[2]Plaintiff alleges in the Complaint that "[a]lthough the letter is dated January 17, 2016, Plaintiff believes that the actual date of the OCR letter was in 2017 based on the August 2016 date of the complaint referenced in the letter and contemporaneous media reporting."  Compl. at ¶ 25(b)(i).

second OCR investigation" withdrew that complaint and OCR closed the investigation in February 2017.  Id. at ¶ 25(b)(ii).

OCR officials scheduled a visit at Syracuse on January 24, 2017.  Id. at ¶ 26. According to news reports, University officials attempted to emphasize actions they had taken to appease OCR.  Id.  During that January 2017 visit, federal officials hosted two meetings for students, faculty and staff.  Id. at ¶ 27.  OCR attorneys asked students and faculty general questions about how they viewed Syracuse's response to allegations of sexual assault and discrimination.  Id.

Plaintiff also alleges, on information and belief, that Syracuse provided OCR with information about the investigation and adjudication of sexual misconduct claims against John Noakes.  Id. at ¶ 28.  The University provided this information "in response to inquiries."  Id.

### iii. The Syracuse Policies

Plaintiff contends that the relationship between John Noakes and Syracuse is governed by the Student Conduct System Handbook.  Id. at ¶ 29.  Plaintiff also contends that the Student Conduct System Handbook is a contract between students and the school and between John Doakes and Syracuse.  Id. at ¶ 29(a).  The Syracuse Student Conduct System Handbook, attached to the Complaint as Exhibit A, contains a section entitled "Syracuse University Policy On Sexual Assault, Sexual Harassment, Stalking Or Relationship Violence (the "Sexual Misconduct Policy.")."  Id. at ¶¶ 30-31.  The Sexual Misconduct Policy prohibits, among other conduct, sexual assault and relationship violence. Id. at ¶ 31(a). This section provides that students who violate the Sexual Misconduct Policy

will be disciplined under the University's Code of Conduct whether or not a criminal

prosecution occurs, and that violations of this policy may result in counseling, educational

sanctions, disciplinary probation, suspension, expulsion, and referral to the proper law

enforcement authorities for prosecution.  Id. at ¶ 31(b-c).

The Sexual Misconduct Policy contains a section referred to as the "Bill of Rights."

Id. at ¶ 32.  Syracuse students have the right to "participate in a process that is fair,

impartial, and provides adequate notice and meaningful opportunity to be heard."  Id. at ¶

32(a).  Students have a right to appeal and a right "to 'be accompanied by an advisor of

choice who may assist and advise a reporting individual, accused or respondent throughout

the judicial or conduct process including during all meetings and hearings related to such

process.'"  Id. at ¶ 32(b-c).  Students may not be represented by an attorney unless they

also face criminal or civil proceedings related to the incident.  Id. at ¶ 32(c)(i).  Plaintiff

further alleges that Syracuse employs "a biased, 'victim centered' approached aimed at

always believing and supporting the victim without regard to results of any investigation or

adjudicatory process."  Id. at ¶ 32(d).  Plaintiff contends that, under the written policy,

alleged victims are guaranteed "[t]he right to 'be treated with dignity and to receive from the

institution courteous, fair and respectful health care and counseling services where

available.'"  Id. at ¶ 32(d)(i).  Alleged victims also have a right "to be 'free from any

suggestion that the reporting individual is at fault when their crimes and violations are

committed, or should have acted in a different manner to avoid such crimes or violations.'"

Id. at ¶ 32(d)(ii).  Such persons also enjoy a "right to 'describe the incident to as few

institutional representatives as possible'" and protection from "'retaliation by the institution,

any student, the accused or respondent and/or their friends, family and acquaintances

within the jurisdiction of the institution.'" Id. at ¶ 32(d)(iii-iv).  Plaintiff alleges that adopting

such "victim-centered" approaches have caused "erroneous and unfair outcomes in the

investigation and adjudication of claims of sexual misconduct."  Id. at ¶ 33.  Indeed,

Syracuse's web page addresses Title IX matters, but lists no rights for the accused.  Id. at ¶

34.

### iv. Process for Investigation and Review of Sexual Misconduct Complaints

Also attached to the Complaint are portions of the Student Conduct System

Handbook the provide the procedures Syracuse follows upon receipt of an allegation of

sexual misconduct. See Exh. A to Complt.  After a complaint of sexual misconduct/sexual

violence, the University's Title IX Coordinator designates a trained Title IX investigator to

conduct a comprehensive fact-finding.  Id. at 24.  Each party (complainant and respondent)

at this stag is entitled to an advisor of their choice, including University-trained procedural

advisors. See generally id. at 24-25.  That right continues throughout the process.  Id.  The

Syracuse Procedures provide that "[p]rocedural advisors, including attorneys where

applicable, have no standing in the University investigation or in the University Student

Conduct System proceedings, except to provide advice to their respective parties in a quiet

non-disruptive manner.  Advisors and attorneys when applicable, do not represent or speak

for their respective parties.  Any advisor, including attorneys, who fails to conform their

behavior to these requirements will be removed from the proceedings and barred from

acting as an advisor in future University Student Conduct System proceedings." Id. at 24.

The fact-finding process led by the Title IX Investigator can include interviews with

witnesses, as well as the parties.  Id.  Upon completion of the interviews and

information-gathering, the Investigator prepares a report summarizing relevant factual findings.  Id.  Both the complaining and responding parties are then given an opportunity to reply to the report.  Id.  Upon receipt of this input from the parties, the Investigator submits a final report ("Investigative Report"), together with the written replies (if any) from the parties and a statement of the underlying charges to a  three-member University Conduct Board, comprised of trained faculty and staff members.  Id. at 24-25. The Investigative Report describes all relevant facts learned during the investigation, and summarizes the interviews conducted by the Investigator, but it does not include any conclusions regarding responsibility for the charged violations, as that remains the province of the Board.  Id. at 25.

After the initial investigation is complete, the parties and their advisors attend individual pre-hearing meetings to review the hearing process.  Id. at 24-25.  The Syracuse Procedures provide that the University Conduct Board may, in its discretion, choose to rely solely on the Investigative Report and any written replies from the parties to establish the facts, but may conduct its own interviews and/or it may gather such additional information as it deems appropriate.   Id. at 25.  The Board "will invite" both complainant and respondent to address it and to provide any additional information they deem pertinent. The Procedures also afford the parties an opportunity to access the records of any interviews conducted.  Id.

At the conclusion of that portion of the process, the Conduct Board determines whether it is more likely than not that the responding party violated the Code of Student Conduct.  Id.  The Board uses a preponderance of evidence standard.  Id.  The Board

makes that decision privately, and "by a majority vote of the board members." Id.  After the hearing process closes, if responsibility is found by the University Conduct Board it may impose a sanction, up to and including expulsion from the University. Id. at 26-30.

The Syracuse Procedures allow either party to appeal the Conduct Board's decision on one or more of the following grounds: (i) new information that was not available at the time of the original hearing; (ii) a procedural error which detrimentally impacted the outcome of the hearing; (iii) errors in the interpretation of University policy so substantial as to deny either party a fair hearing; and/or (iv) the Board assessed a grossly inappropriate sanction having no reasonable relationship to the charges. Id. at 34.  If an appeal is submitted by one party, the other party may submit a written response.  Id.

The Syracuse Procedures provide the three-member Appeals Board wide latitude in its review.  The Board can re-hear the case or limit its review to the issues raised in the appeal filings.  Id. at 34-35.  The Appeals Board issues a decision within three days after receipt of all submissions related to the appeal, unless it determines additional proceedings are warranted.  Id. at 35.  Thereafter, the Senior Vice President and the Dean of Students reviews the Appeals Board's decision.  Id.  That review is also broad in scope.  Id.  The reviewing official considering the Appeals Board determination "may interview any participant in an earlier proceeding, change the decision, alter the sanction up or down, or return the case to the University Appeals Board or another hearing board for further process."  Id.

Syrcause's Student Conduct System Handbook promises "Fundamental Fairness" to students.  Complt. at ¶ 40.  Plaintiff alleges that Syrcause "has a duty under accreditation standards to provide" students "a disciplinary process" that features "fairness and due

process." Id. at ¶ 41.  According to Plaintiff "[a]ccreditation standards" require colleges and universities to relate to students with "truthfulness, clarity, and fairness" and apply educational policies and procedures "equitably." Id. at ¶ 41(a).  The Middle States Commission on Higher Education provides Syracuse's accreditation. Id. at ¶ 41(b).  The standards that apply to Syracuse require the University to have "'policies and procedures [which] are fair and impartial, and assure that grievances are addressed promptly, appropriately, and equitably.'" Id.

### iv.   Accusation and Disciplinary Proceedings Against John Noakes

Syracuse suspended John Noakes for an incident that occurred during the evening of October 24, 2015 and the early morning hours of October 25, 2015. Id. at ¶ 42.  Plaintiff denies all allegations against him and contends that he was incorrectly identified as the person who sexually assaulted Jane Roe. Id. at ¶ 43.  Plaintiff and Jane Roe did not know each other before the incident. Id. at ¶ 44.

Plaintiff alleges that on October 24, 2015, Jane Roe had been drinking at the "Orange Crate Bar," an establishment on Crouse Avenue in Syracuse, New York. Id. at ¶ 45.  While in the bar, Jane Roe observed a black male at the bar, staring at her. Id. at ¶ 46.  Roe left the bar about 1 a.m. Id.  She alleges that the black male followed her out of the bar, pulled her into an alley, grabbed her, and attempted to kiss her. Id.  She also claims that the man put his hands down her pants and penetrated her vagina with a finger. Id.  At that point, a female passing by grabbed Jane Roe by the arm and pulled her away. Id.

Roe reported the incident to the police, providing them with a description of her attacker. Id. at ¶ 47.  She alleged that the attacker was a "dark skinned male," about "5'09", heavy set with black dreadlock style hair." Id.  The attacker's hair hung down to his

13

shoulders.  Id.  He spoke in a very deep voice.  Id.  The attacker had on a black t-shirt and

dark pants.  Id.  Roe could remember nothing else.  Id.  Police took a report.  Id. at ¶ 48.

Police could not locate the alleged attacker.  Id. at ¶ 49.  On December 11, 2015, a

Syracuse Police detective showed Plaintiff a photo array.  Id. at ¶ 50.  John Noakes was not

included.  Id.  Plaintiff did not identify her attacker from the array.  Id.

On January 24, 2016, Jane Roe contacted the Syracuse Police to report that she had

seen a person in a bar who looked like the man who had attacked her outside the bar in

October.  Id. at ¶ 51.  Two men who were with the suspect Jane Roe observed identified

him as John Noakes.  Id. at ¶ 51(a).  Those men were Syracuse football players; they knew

Noakes because he served as a graduate assistant for the football team.  Id.  Police filed a

report.  Id. at ¶ 51(b).  Shortly after filing this report on January 24, 2016, police showed

Roe another photo array; this one included a picture of Plaintiff.  Id. at ¶ 52(a).  Roe

identified Plaintiff as her assailant.  Id. at ¶ 52(b)(i).  Plaintiff contends that this was

"unsurprising," since Roe had recently seen him on the street.  Id.  Plaintiff also alleges that

he "only vaguely" fits the description of the attacker that Roe had provided earlier.  Id. at ¶

52(b)(ii).  He is 5'8" and weighs around 250 pounds.  Id.

Jane Roe informed Syracuse police that she did not want to bring criminal charges

but would prefer to have Syracuse and the University's Title IX Office handle the situation.

Id. at ¶ 53.  Police referred the matter to the University on March 7, 2016.  Id. at ¶ 54.  Roe

formally reported the matter to Syracuse on March 10, 2016.  Id. at ¶ 55.  Plaintiff alleges

that Syracuse has not disclosed to him "exactly when it became aware of the alleged sexual

assault . . . or when John Noakes was identified as a suspect."  Id. Syracuse documents

show that the University formally opened an investigation on March 10, 2016.  Still, on

14

March 4, 2016, before the police referral or Roe's formal report, Noakes received a letter from the Assistant Dean of Student Affairs/Director of the Office of Student Rights and Responsibilities.  Id. at ¶ 56.  The letter did not provide any details about Noakes' alleged misconduct or the identity of the alleged victim.  Id. at ¶ 56(a).  The letter simply reported that the "Office ha[d] received information from the Office of Equal Opportunity, Inclusion and Resolution Services, alleging that on or about October 25, 2[0]15 you sexually assaulted another Syracuse student."  Id.  Nothing in the letter indicates that the Office of Student Rights and Responsibilities had conducted an investigation.  Id. at ¶ 52(b).  Still, Roe's allegation was sufficient for the University to suspend Noakes and prohibit him from entering campus immediately.  Id.  Plaintiff could appeal that suspension, but the letter discouraged such action, noting that "'[y]ou should anticipate that this interim suspension will continue at least until this matter is resolved in full through the University Conduct System.'"  Id. at ¶ 52(c).

On March 7, 2016, John Noakes learned that the University Appeals Board would hold a hearing on his interim suspension on March 9, 2016.  Id. at ¶ 57.  The Associate Director of Syracuse's Office of Student Rights and Responsibilities issued a "no contact order" that prohibited Plaintiff from having "direct or indirect contact" with Roe on March 8, 2016.  Id. at ¶ 58.  That order caused Noakes difficulty in investigating the matter, since he was also prohibited from contacting Roe's friends or family.  Id. at ¶ 59.

The University Appeals Board held a hearing on the interim suspension on March 9, 2016.  Id.  at ¶ 60.  Jane Roe did not appear; a University Representative presented evidence instead.  Id. at ¶ 61.  The Appeals Board issued a written opinion.  Id. at ¶ 62.  The Board found that Plaintiff had allegedly committed sexual assault on a Syracuse

Student.  Id. at ¶ 62(a)(1).  He had been at the same bar as Roe on October 25, 2016 and

January 24, 2016.  Id. at ¶ 62(a)(2).  Roe identified Plaintiff as her attacker to Syracuse City

Police on January 24, 2016.  Id. at ¶ 62(a)(3).  The Board also found that Plaintiff was

"black out drunk" on October 25, 2016.  Id. at ¶ 62(a)(4).  The Board concluded that the

University Representative who testified "'was extremely credible.'" Id. at ¶ 62(b).  Plaintiff, by

contrast, appeared to the Board to be "'not completely credible'" because he failed to

provide any factual statement regarding the event.  Id.  Plaintiff disputes this

characterization and alleges that the conclusion represents "extreme bias."  Id.  He denied

assaulting Jane Roe and offered documentary evidence from his phone records that

showed him talking or texting with friends at the time of the attack.  Id.  The Board rejected

this evidence because the texts Plaintiff provided did not constitute an "'official phone

record'" and did nothing to "'support or refute whether the alleged incident occurred.'" Id.

Noakes disputes these findings as well, alleging that they demonstrate "extreme bias."  Id.

Syracuse does not apply rules of evidence to such hearings and otherwise permitted the

introduction of hearsay.  Id.

Syracuse initiated an investigation of Jane Roe's claim against Plaintiff on March 10,

2016, after Plaintiff had already been suspended.  Id. at ¶ 63.  Noakes received a letter

from the Associate Vice President of Student Affairs on March 11, 2016, indicating that the

Appeals Board had affirmed the interim suspension.  The University completed the

investigation on April 22, 2016.  Id. at ¶ 65.  The investigator had interviewed the alleged

victim.  Id. at ¶ 66.  She told the investigator she had been drinking heavily and was

intoxicated when she left the bar, alone, about 1:00 a.m. on the night in question.  Id. at ¶

66(a).  She alleged that she had been sexually assaulted by a person she did not know in

16

an alley.  Id. at ¶ 66(b).  Roe saw Plaintiff outside the bar on January 24, 2016 and learned

his name from some football players in the bar.  Id. at ¶ 66(c).  She later identified Plaintiff

in a photo array.  Id.   The investigative packet did not include a copy of the photo array.  Id.

The investigator spoke with eight witnesses.  Id. at ¶ 67.  "Student 1," a friend of

Jane Roe, reported that she had seen Jane Roe and her assailant in the alley .  Id. at ¶

67(a)(i).  She described the attacker as "'heavyset with long dreads . . . wearing jeans and a

t-shirt.'"  Id. at ¶ 67(a)(ii).  She identified Plaintiff as the attacker from a photo on his

Facebook profile.  Id. at ¶ 67(a)(iii).  "Student 2," who knew both Plaintiff and Jane Roe,

reported that he could not remember speaking to Roe outside the bar in January 2016

thought he may have spoken with Noakes outside the bar.  Id. at ¶ 67(b).  "Student 3," a

friend of Plaintiff, reported that he had been in the bar with Plaintiff and two other students,

"Student 4" and "Student 5."  Id. at ¶ 67(c)(i).  "Student 3" reported that he had received a

text from "Student 4" around 1 a.m. indicating that "Student 4" and Plaintiff were at

Acropolis, a pizza restaurant.  Id. at ¶ 67(c)(ii).  He called "Student 4" a few minutes later.

Id.  "Student 4," a friend of Plaintiff, reported that he had been at the bar with Noakes and

"Student 3."  Id. at ¶ 67(d)(i).  He and Plaintiff left the bar about 12:50 a.m. to get pizza.  Id.

at ¶ 67(d)(ii).  Plaintiff left the pizza place and "ran back to the bar to get something."  Id.

He texted or called Plaintiff around 1:04 a.m.  Id.  "Student 4" reported that Plaintiff and

Student 3 arrived at the restaurant a few minutes later.  Id. at ¶ 67(d)(iii).  Another of

Plaintiff's friends, "Student 5," saw Plaintiff at the bar.  Id. at ¶ 67(e)(I).  He saw Plaintiff kiss

a woman at the bar for about five seconds.  Id.  The kissed appeared "'consensual.'"  Id.

"Student 5'" never saw Plaintiff outside hte bar.  Id. at ¶ 67(e)(iii).  "Student 6," Plaintiff's

friend, reported that Plaintiff and others had been drinking in "Student 6's" room before

17

going to the bar.  Id. at ¶ 67(f)(i).  He saw Plaintiff at the bar, but did not know where he was

for much of the evening.  Id. at ¶ 67(ii).    Another student, "Student 7," recognized Plaintiff

from his photograph and saw him at the bar.  Id. at ¶ 67(g)(I).  He did not see Plaintiff

assault Roe, and did not observe him for much of the evening.  Id. at ¶ 67(g)(ii).  "Student 8"

saw Noakes at the bar.  Id. at ¶ 67(h)(i).  "Student 8" worked at the bar.  Id. at ¶ 67(h)(ii).

There is often a line to get in at 1 a.m., but people previously admitted to the bar can

reenter.  Id.  If Plaintiff had been admitted but then left the bar, reentry would have

happened "'without trouble.'"  Id.  "Student 8" did not see Plaintiff assault Roe.  Id. at ¶

67(h)(iii).

The investigator interviewed Plaintiff as well.  Id. at ¶ 68.  Plaintiff denied assaulting

Roe.  Id. at ¶ 68(a).  He reported that he was in the bar with "Student 3," "Student 4," and

others.  Id. at ¶ 68(b).  Plaintiff provided the investigator with copies of text messages sent

around 1:03 a.m. to "Student 4" about meeting at the pizza restaurant.  Id. at ¶ 68(c).  The

hearing panels also had copies of the messages.  Id.  Plaintiff called "Student 4" at about

1:04 a.m.  Id. at ¶ 68(d).  The investigator and the review panels had copies of Plaintiff's cell

phone records.  Id.  Plaintiff returned to the bar with "Student 3."  Id. at ¶ 68(e).  Plaintiff

showed the investigator copies of selfies he took at the bar at 1:42 a.m. and 1:49 a.m.  Id.

He gave the investigator copies of the pictures, and the panels had them as well.  Id.

Plaintiff admitted that his memory of the evening was unclear, as he had been drinking

heavily.  Id. at ¶ 68(f).  Plaintiff alleges that the investigator discouraged him from getting

advice from an advisor connected to Syracuse.  Id. at ¶ 69.  The investigator informed

Plaintiff that the matter was "confidential," and requested Plaintiff to "refrain from discussing

this with any other faculty, staff or students."  Id.

Plaintiff alleges a number of other deficiencies and biases in Syracuse's investigation.  He contends the investigator "made excuses for inconsistencies in Jane Roe's statements.  Id. at ¶ 70(a).  Roe had given different accounts of the incident; the report did not find her incredible, but chose "to believe one version," finding that "'[w]here a witness gives two conflicting statements the statement nearer in time to the incident tends to be more accurate.'"  Id. at ¶ 70(a)(i).  The report deemed statements in police reports that did not match Roe's statements "inaccurate."  Id. at ¶ 70(a)(ii).  While acknowledging that Roe was "'heavily intoxicated'" during the incident, the investigator failed to take that intoxication into account in accepting her identification of Plaintiff.  Id. at ¶ 70(b).  In summarizing the assault, the investigator assumed that Plaintiff was the assailant.  Id. at ¶ 70(c).  Plaintiff alleges that the "statement indicates that the investigator had already, before conducting any investigative work, concluded that" Plaintiff had perpetrated the assault.  Id.  The investigator, Plaintiff claims, failed to conduct any follow-up interviews and made no effort to resolve the differences in the accounts witnesses provided.  Id. at ¶ 70(d).  Moreover, Plaintiff alleges that the investigator's interviews were not rigorous: "the investigator merely took down what Jane Roe or the witnesses said."  Id.  Plaintiff also contends that the investigator failed to "determine the reliability of the identifications."  Id. at ¶ 70(e).  He never got the photo array Syracuse Police used with Jane Roe and never reviewed it independently.  Id. at ¶ 70(e)(i).  The investigator did not use a photo array or other "non-suggestive technique" to obtain an identification from "Student 2."  Id. at ¶ 70(e)(ii).  Finally, Plaintiff contends that the investigator erred in failing to determine "what, if any accommodations or benefits" Roe received "as a result of her claim to be a victim of sexual assault."  Id. at ¶ 70(f).  Plaintiff contends such information would have been helpful

in determining Roe's credibility.  Id.

An Office Coordinator informed Plaintiff on April 25, 2016 that he had an opportunity to review the investigation report.  Id. at ¶ 71.  He was not allowed to obtain a copy at that time.  Id.  On May 17, 2016, Plaintiff learned that his hearing before the University Conduct Board was scheduled for May 25, 2016.  Id. at ¶ 72.  The University alleged that Plaintiff had violated provisions of the Code of Condcut.  Id. at ¶ 72(a).  The complaint, Plaintiff learned, arose from an incident that took place on October 25, 2016 at approximately 1 a.m.  Id. at ¶ 72(a).  The notice did not name the location of the alleged sexual assault.  Id. at ¶ 72(b).

The Student Conduct Board held a hearing on May 25, 2016.  Id. at ¶ 73.  Jane Roe did not testify.  Id. at ¶ 73(a).  Her failure to testify, Plaintiff claims, left the Student Conduct Board unable to "assess [her] credibility" or to ask about whether she could "make an adequate identification."  Id. at ¶ 73(a)(i).  Her absence also prevented Plaintiff from confronting her.  Id. at ¶ 73(a)(ii).  The Syracuse Police detective who used a photo array to obtain Plaintiff's identification also failed to testify.  Id. at ¶ 73(b).  The Board therefore had no means to "assess the reliability of the identification" or determine if "the identification was made in accordance with current best practices" and Plaintiff had no ability to cross-examine him.  Id. at ¶ 73(b)(i-ii).  "Student 1" also testified.  Id. at ¶ 73(c).  She reported that she had only seen the alleged assailant "out of the corner of [her] eye[.]"  Id. at ¶ 73(c)(i).  She saw him again, and Roe "kind of pointed him out to me and I didn't really think anything of it."  Id.  She could not provide "a detailed description" of the attacker.  Id. at ¶ 73(c)(ii).  She testified that the attacked was "'Average height.  African American, larger build, long dreadlocks.'"  Id.  Her description of his clothing only referenced "'darker wash jeans.'"  Id.

20

Her photo identification of Plaintiff came not from a photo array, but from a Facebook photo shown her at the Title IX office.  Id. at ¶ 73(c)(iii).  "Student 1" also testified that Jane Roe had been drinking, and that her identification may not have been that reliable as a result. Id. at ¶ 73(c)(iv).

Plaintiff also testified at the Student Conduct Board hearing as well.  Id. at ¶ 73(d). He testified that he was never alone on the night of Jane Roe's assault.  Id. at ¶ 73(d)(i). Plaintiff denied he ever saw Jane Roe on that night.  Id. at ¶ 73(d)(ii).  Plaintiff also testified that his memory of the night was not that clear; he had been drinking.  Id. at ¶ 73(d)(iii).  He stated, however, that text messages and photos from the evening corroborated his account. Id. at ¶ 73(d)(iv).  He had been wearing khaki pants, not the jeans Roe's assailant allegedly wore.  Id.

The Student Conduct Board informed Plaintiff of its decision on May 27, 2016.  Id. at ¶ 74.  The Board placed Plaintiff on "indefinite suspension."  Id. at ¶ 74(a).  That status permitted him to apply for readmission for the Spring 2017 terms.  Id.  The Conduct Board found that "'on or about October 25, 2015, you sexually assaulted a Syracuse University student.'"  Id. at ¶ 74(b).  The written decision the Board issued made a number of indings of fact.  Id. at ¶ 75.  The Board concluded that Plaintiff and Jane Roe were in the bar in question on October 25, 2015, though they were not together.  Id. at ¶ 75(a)(1-2).  Both students were intoxicated.  Id. at ¶ 75(a)(3).  Someone Roe did not know assaulted her when she left the bar.  Id. at ¶ 75(a)(4).  Jane Roe saw Plaintiff in the bar in January 2016 and identified him as her attacker on October 25, 2015.  Id. at ¶ 75(a)(5).  She also identified a photograph of him.  Id. at ¶ 75(a)(6).  The Board found it "more likely than not" that Plaintiff attacked Roe on October 25, 2015.  Id. at ¶ 75(a)(7).  Despite never hearing

21

testimony from Roe, the Board found her testimony "mostly credible" and supported by the testimony of another student.  Id. at ¶75(b).  The Board concluded that Plaintiff "'lacked credibility'" in part because of inconsistencies between his story and those told by "Student 3" and "Student 4."  Id. at ¶ 75(c).

Plaintiff alleges that Syracuse found him responsible for the attack "based on a flawed identification by Jane Roe."  Id. at ¶ 76.  Moreover, Plaintiff contends, "numerous errors," caused the identification to be the result of an unfair, subjective and suggestive process.  Id.  Plaintiff points to a number of alleged flaws in the identification process.  Id.  First, he argues, Syracuse police employed a "false and unreliable" photo identification method.  Id. at ¶ 76(a).  Police provided the photos for the array "*after* Jane Roe identified" Plaintiff "as a suspect on the street."  Id.  The photo array failed because Jane Roe simply picked out a picture of the person she had recently seen and accused, a procedure courts have found flawed.  Id. at ¶ 76(a)(i-ii).  Moreover, recent research calls into doubt the general reliability of eyewitness identifications.  Id. at ¶ 76(b).  The Board, Plaintiff claims, also failed to take into account the "Cross-Race Effect," which notes the tendency of people of one race to mistakenly identify a person of another race.  Id. at ¶ 76(c).  Finally, Plaintiff complains that the Board believed Jane Roe's allegations, even though they had never heard testimony from her.  Id. at ¶ 76(d).

Plaintiff appealed the Conduct Board's decision.  Id. at ¶ 77.  Jane Roe f ailed to respond.  Id. at ¶ 77(a).  Plaintiff argued that he had been improperly identified.  Id. at ¶ 77(b).  He also claimed to have submitted documentary evidence proving he could not have committed the assault, including text messages that showed him communicating with a friend at the time the incident allegedly occurred.  Id. at ¶ 77(c).  Plaintiff argued that Roe's

identification was suspect.  Id. at ¶ 77(d).  She admitted to being intoxicated at the time of the attack.  Id.  He argued in the end that "there is no actual evidence . . . that I did what they are alleging."  Id. at ¶ 77(e).  His suspension, Plaintiff claimed, came solely on Roe's "words."  Id.

The University Appeals Board heard Plaintiff's appeal on June 15, 2016.  Id. at ¶ 78. The Board's written opinion rejected Plaintiff's arguments, pointing out that an "empowered bystander [was] an eyewitness who intervened on behalf of the complainant and made a positive identification of [Plaintiff] in a lineup of people with similar characteristics."  Id. at ¶ 79(a).  Plaintiff disputes the accuracy of this statement.  Id. at ¶ 79(b).  He contends that the witness "never identified" him "from a photo array or other non suggestive identification procedure."  Id.  The University's Associate Vice President of Student Affairs wrote Plaintiff to inform him that the Appeals Board had reached a decision on June 17, 2016.  Id. at ¶ 80. The Appeals Board upheld the Conduct Board's decision, but modified the sanction.  Id. at ¶ 80(a).  The Board placed Plaintiff on Indefinite Suspension from Syracuse.  Id. at ¶ 80(b). He could apply for readmission.  Id.  He could petition to return to Syracuse "as early as the spring 2017 academic term."  Id. at ¶ 80(c).

### B.   Analysis

Syracuse moves to dismiss each claim asserted in the Complaint.  The Court addresses each in turn.

### i.   Title IX

Plaintiff's first a cause of action alleges gender-based discrimination in violation of Title IX of the Education Amendments Act of 1972.  He alleges that the University's

decisions in the hearing and appeal "were erroneous outcomes which were the direct result of a flawed and biased proceeding."  Complt. at ¶ 86.  "Syracuse . . . assumed that [Plaintiff] was guilty because he was a male accused of sexual assault rather than evaluating the case on its own merits."  Id.

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX, "which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities."  Columbia Univ., 831 F.3d at 53.  "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[ ] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'"  Id. (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)).

Cases attacking university disciplinary proceedings on the ground of gender bias "fall generally within two categories."  Yusuf, 35 F.3d at 715.  In the first category, "erroneous outcome" cases, "the claim is that the plaintiff was innocent and wrongly found to have committed an offense."  Id.  In the second, "selective enforcement" cases, the "claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."  Id.  Under either theory, Plaintiff must plead and prove that "the complained-of conduct was discriminatory."  Yusuf, 35 F.3d at 715.  Thus, in order to establish a claim of discrimination under Title IX, Plaintiff must ultimately show that the defendant discriminated against him because of sex;

that the discrimination was intentional; and that the discrimination was a "substantial" or "motivating factor" for the defendant's actions. <u>Prasad v. Cornell Univ.</u>, No. 5:15-CV-322, 2016 WL 3212079, at *14 (N.D.N.Y. Feb. 24, 2016)(internal quotation marks and citation omitted).

Defendant argues that Plaintiff cannot make out either a selective enforcement or an erroneous outcome claim.  The University contends that a selective enforcement claim must fail because Plaintiff fails to allege that Syracuse treated similarly situated women different than the University treated him.  He does not allege facts to make it plausible that a woman who was similarly accused of sexual assault received treatment disparate to his.  Defendant likewise contends that Plaintiff has not made out an erroneous outcome claim.  Syracuse insists that Plaintiff has failed to plead facts indicating that gender was the motivating factor in the Defendant's erroneous finding.  Plaintiff, Defendant insists, has not adequately alleged facts demonstrating gender bias on the part of investigators.

Plaintiff argues that he has stated a viable erroneous outcome claim.  He contends that the University wrongfully found him to have assaulted Jane Roe, and that Syracuse's decision and his punishment were the result of his gender.  A plaintiff who brings an erroneous outcome Title IX claim "must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." <u>Yusuf</u>, 35 F.3d at 715.  "If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail." <u>Id.</u>  Congress did not intend "Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming, absent a claim of selective enforcement." <u>Id.</u>

However, the pleading burden in this regard is not heavy.  For example, a

complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof.  However, allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss. The fatal gap is, again, the lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias.  A plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.  Allegations of a causal connection in the case of university disciplinary cases can be of the kind that are found in the familiar setting of Title VII cases.  Such allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.  Of course, some allegations, such as statements reflecting bias by members of the tribunal, may suffice both to cast doubt on the accuracy of the disciplinary adjudication and to relate the error to gender bias.

Id. (citations omitted); see Columbia Univ., 831 F.3d at 55–56 ("[A] complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination.").  "[T]he inference of discriminatory intent supported by the pleaded facts [need not] be the most plausible explanation of the defendant's conduct.  It is sufficient [at the Rule 12(b)(6) stage] if the inference of discriminatory intent is plausible." Columbia Univ., 831 F.3d at 57.

Plaintiff's factual allegations, related above, are sufficient to case an articulable doubt on the outcome of his disciplinary hearing.  He alleges that Roe's identification of him as her attacker was mistaken.  He insists that he was not involved in the behavior about which she complained to the police.  Moreover, he contends that her identification of him was influenced both by Roe's level of intoxication and by the techniques used by police and

other investigators in their photo lineups.  Moreover, he contends, investigators ignored evidence he presented which would have made it impossible for him to have attacked Roe. Such allegations cast an articulable doubt on the outcome of the disciplinary proceeding and are sufficient to state a claim in that respect.

The question for the Court is now whether Plaintiff has pled facts sufficient to make it plausible that gender was a motivating factor behind the erroneous outcome.  Plaintiff pleads that Syracuse has faced "substantial criticism" from both the student body and in public media, "accusing schools of not taking seriously complaints of female students alleging sexual assault by male students."  Complt. at ¶ 87(a).  Plaintiff alleges, "[o]n information and belief," that "Syracuse's administration was cognizant of, and sensitive to, these criticisms."  Id.  This fear "motivated" Syracuse administrators "to favor the accusing female over the accused male."  Id.  This desire to show that Syracuse supported female victims and took their claims seriously led "[t]he investigators, hearing panel, and administration" to "[adopt] a biased stance in favor of the" accuser and against Plaintiff "to avoid the criticism that Syracuse turned a blind eye to . . . assaults by men."  Id. at ¶ 87(b). Plaintiff points to "[p]articular circumstances" he claims demonstrate bias, such as: pursuing discipline against Plaintiff despite the alleged victim's unwillingness to participate in hearings or respond to Plaintiff's appeals; putting in place "solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women"; using "flawed or incorrect legal standards" and "biased or negligent investigatory techniques; and failing to correct improper investigatory methods.  Id. at ¶ 88(a-d).   He also points to a broader campus atmosphere in which female accusers are immediately labeled "survivors" and men suspects, where the University had adopted an aggressive approach

motivated by New York's "Enough is Enough" law, and a flawed investigatory and hearing system that does not provide accused men with the ability to defend themselves.  Id. at ¶ 90.  He also identifies evidence he claims the University ignored in Syracuse's alleged effort to valorize Jane Roe's testimony and discount his.  Id. at ¶ 91.  He contends that Syracuse ignored Jane Roe's intoxication at the time of the incident, an unreasonably suggestive photo array used by the Syracuse Police, and a suspect eyewitness identification.  Id. at ¶ 91(a).  Plaintiff also asserts that the University failed to do any investigation into Jane Roe's credibility and any "accommodations" she may have received for testifying as she did.  Id. at ¶ 91(b).

In Columbia University, the Second Circuit vacated a district court's dismissal of a complaint that alleged that Columbia University had violated Title IX by acting with gender bias in investigating and suspending a male student for an alleged sexual assault.  Columbia Univ., 831 F.3d at 48.  In reaching this conclusion, the Second Circuit found that the complaint in that action pleaded "sufficient specific facts giving at least the necessary minimal support to a plausible inference of sex discrimination to survive a Rule 12(b)(6) motion to dismiss[.]"  Id. at 56.  The allegations that supported that inference in Columbia University included:

> (1) the investigator and hearing panel did not seek out all witnesses that the plaintiff had identified as sources of information favorable to him; (2) the investigator and panel failed to comply with Columbia University's procedures designed to protect accused students; (3) the investigator, the panel, and the reviewing Dean reached conclusions that were erroneous and contrary to the weight of the evidence; (4) during the period before the disciplinary hearing, both the student body and public media heavily criticized Columbia University and accused it of not taking seriously complaints of female students alleging sexual assault by male students; and (5) Columbia University was aware of and sensitive to those criticisms.

Rolph v. Hobart & William Smith Colleges, 271 F. Supp. 3d 386, 401 (W.D.N.Y. 2017)(citing Columbia Univ., 831 F.3d at 56–57).

Plaintiff's allegations that Syracuse assumed that he was guilty because he was a male accused of sexual assault, and that Syracuse assumed that Roe was truthful because of her gender, border on being "mere conclusory statements . . . not entitled to the assumption of truth." Iqbal, 556 U.S. at 678.  Nonetheless, Plaintiff has pointed to flaws in the investigation, assumptions made by investigators, and an unwillingness by investigators to consider evidence he had presented of his innocence in the attack.  He also contends that Syracuse did not question Roe's credibility and did not require her to explain the circumstances of her identification of Plaintiff or her memory of the event at Plaintiff's hearing or in any investigation.   Plaintiff's allegations could reasonably be read to support an understanding that the Investigator, the University Conduct Board, the Appeals Board, and other Syracuse officials ignored any evidence or contradictions in Roe's story and refused to investigate any evidence that supported Plaintiff's version of events.  While these issues standing alone "may not necessarily support an inference of bias on account of gender," Rolph, 271 F. Supp. 3d at 402, Noakes, like the plaintiffs in Columbia University and Rolph, has coupled his factual allegations with the allegations of public pressure on the University to more aggressively prosecute sexual abuse allegations.  As in these other cases, Plaintiff's disciplinary proceeding occurred in the context of public criticism of the University's handling of sexual abuse complaints against males.  A reasonable inference could be drawn that Defendant's agents were "motivated to refute [public] criticisms [of Syracuse's handling of sexual abuse allegations] by siding with the accusing female and against the accused male." Columbia Univ., 831 F.3d at  58.  In light of OCR's Dear

29

Colleague Letter and its two prior notifications to Syracuse that it was investigating whether the University was properly handling sexual abuse complaints, a reasonable inference could be drawn that the Investigator, the University Conduct Board, the Appeals Board, and other University officials were motivated to appease OCR by siding with Roe and imposing the maximum penalty of expulsion on Noakes.  Plaintiff has presented allegations of facts supporting a minimal plausible inference of discriminatory intent. Thus, the motion is denied on this ground.

### ii.    Title VI

Defendant also seeks dismissal of Plaintiff's Title VI claim.  Defendant contends that Plaintiff has failed to plead any facts which make it plausible that Plaintiff faced any intentional discrimination because of his race.  Any allegations related to race, Defendant claims, are merely conclusory and unsupported by any factual claims that Defendant's actions were motivated by Plaintiff's race.  Plaintiff responds that his allegation that Syracuse found credible Jane Roe's identification of him as her attacker, even though she admitted to being intoxicated at the time of the alleged assault represents a claim of racial bias because courts have recognized the role that racial bias often plays in "cross-race" identification.  He also points to his allegation that, "on information and belief," "Syracuse has disproportionately imposed discipline on minority students accused of sexual assault." See Comptl. at ¶ 104.  That allegation, Plaintiff claims, creates an inference of discrimination.

"Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin."  Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 664 (2d Cir. 2012) (citing 42 U.S.C. § 2000d).  "Public educational institutions that receive federal funds

are subject to this mandate."  Id.  To establish a Title VI claim, a "plaintiff must show, *inter alia*, that the defendant discriminated against him on the basis of race, that that discrimination was intentional, and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions."  Tolbert v. Queens College, 242 F.3d 58, 69 (2d cir. 2001) (internal citations omitted).  Under Title VI, "an actionable 'discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences . . . [it] implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" Clyburn v. Shields, 33 Fed. Appx. 552, 555 (2d Cir. 2002) (quoting Personnel Administrator v. Feeney, 442 U.S. 256, 279 (1979)).

Plaintiff's Title VI count alleges that "Syracuse engaged in intentional discrimination through discriminatory animus and deliberate indifference.  Syracuse found that Plaintiff, a young African American male, sexually assaulted Jane Roe despite the lack of reliable identification.  As a result, racial bias influenced the outcome of the disciplinary proceedings."  Complt. at ¶ 102.  As "[c]ircumstances giving rise to a plausible inference of racially discriminatory intent," Plaintiff points to: the investigator's alleged "assumption" of his guilt "before conducting any investigation"; the credibility assigned to Jane Roe's account as opposed to Plaintiff's, when Jane Roe was white and Plaintiff black; and "[t]he investigator and hearing panel accept[ing] an inherently unreliable identification and fail[ing] to take into account the bias inherent in cross-race identification."  Id. at ¶ 103.  Plaintiff also alleges, "on information and belief," that "Syracuse has disproportionately imposed discipline on minority students accused of sexual assault."  Id. at ¶ 104.  Plaintiff admits "that [t]his information and belief is not based on any information specific to Syracuse, as

31

Syracuse does not publicly disclose data on the racial composition of students accused of sexual misconduct," but argues that "based on anecdotal evidence that schools, in response to the Dear Colleague Letter, disproportionately imposed discipline on minority students." Id. at ¶ 104(a-b).

The Court finds these allegations insufficient to state a Title VI claim.  Unlike Plaintiff's Title IX claim, Plaintiff here does not situate his claims of racial discrimination within the context of a larger movement that urged universities to believe the claims of alleged white victims over the denials of their alleged black attackers.  Plaintiff has not alleged that any Syracuse official or investigator made any comment about his race, and Plaintiff has not pointed to any conduct by any official that indicated that race was a substantial motivating factor in the decision to discipline him for the alleged assault.  His claims that Plaintiff found Roe credible instead of him because of his race, unlike his geder-discrimination claims, are merely conclusory.  His allegations that Syracuse has disciplined black students more frequently than white students for sexual assault are also conclusory, which Plaintiff admits.  Though he has alleged that Roe's identification of him may have been a result of systemic cultural biases that produce false identifications when the identification involves a person whose race is different than the accuser's, Plaintiff does not offer more than a conclusory allegation that Syracuse accepted this flawed identification because Plaintiff is black.  A "naked allegation that [defendant] 'selectively enforc[ed] the College rules . . . against [plaintiff] . . . because [he is] black' . . . is too conclusory to survive a motion to dismiss."  Albert v. Carovano, 851 F.2d 561, 572 (2d Cir. 1988) (stating the rule for a 42 U.S.C. § 1981 case); Kajoshaj v. N.Y. City Dep't of Educ., 543 Fed.Appx. 11, 14 (2d Cir. 2013) (applying the rule from Albert in a Title VI case).  Because Plaintiff has failed

to plead facts sufficient to make plausible a claim of racial discrimination in the University's disciplinary process, the Court will grant the motion to dismiss in this respect.

The Court will permit Plaintiff to re-plead this claim if Plaintiff can allege facts which plausibly give rise to a claim that Plaintiff's race was a "substantial or motivating factor" in the University's decision to discipline him.

### iii.    Breach of Contract

Plaintiff's third cause of action alleges breach of contract.  He contends that Syracuse breached its express and/or implied agreements with him, and that these "breaches" caused him damage.  Defendant argues that Plaintiff's claim is untimely[3] and that in any case he has failed to state a claim.

"'In New York, the relationship between a university and its students is contractual in nature.'" Xiaolu Peter Yu v. Vassar College, 97 F. Supp. 3d 448, 481 (S.D.N.Y. 2015)(quoting Papaspiridakos v. Educ. Affiliates, Inc., 2013 WL 4899136, at *3 (E.D.N.Y. Sept. 11, 2013).  "[A]n implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree.  The terms of the implied contract are contained in the university's bulletins, circulars and regulations made available to the student." Papelino v. Albany College of Pharm. of Union Univ., 633 F.3d 81, 93 (2d Cir. 2011)(internal quotation marks and citations omitted).

In New York, "[t]he essential elements of a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance pursuant to the

---

[3]The Court has determined that Plaintiff cannot state a claim on the merits and will not address the timeliness issue.

contract, the defendant's breach of its contractual obligations, and damages resulting from the breach." PFM Packaging Mach. Corp. v. ZMY Food Packing, Inc., 16 N.Y.S. 3d 298, 2015 N.Y. App. Div. LEXIS 6711 at *2 (2d Dept. Sept. 16, 2015). "A student may sue his college or university for breach of an implied contract in certain situations," Routh, 981 F. Supp. 2d at 207, but "[t]he application of contract principles to the student-university relationship does not provide judicial recourse for every disgruntled student." Faiaz v. Colgate Univ., 64 F. Supp. 3d 336, 359 (N.D.N.Y. 2014).

"'[T]o state a valid claim for a breach of contract, a plaintiff must state when and how the defendant breached the specific contractual promise.'" Habitzreuther v. Cornell Univ., No. 5:14cv1229, 2015 WL 5023719, at *4 (N.D.N.Y. Aug. 25, 2015) (quoting Radin v. Albert Einstein Coll. of Medicine of Yeshiva Univ., 2005 WL 1214281, at *10 (S.D.N.Y. May 20, 2005)). Thus, while "[a] college is 'contractually bound to provide students with the procedural safeguards that it has promised,'" Xiaolu Peter Yu, 97 F. Supp. 3d at 481 (quoting Fellheimer v. Middlebury Coll., 869 F. Supp. 238, 243 (D. Vt.1994)), a plaintiff must identify a specific promise or obligation that was breached in order to pursue a contract claim. See Okoh v. Sullivan, 2011 U.S. Dist. LEXIS 18524, at * 14-15 (S.D.N.Y. Feb. 24, 2011) ("the mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted"). "Conclusory allegations that a defendant breached an agreement are insufficient to support a breach of contract claim." Habitzreuther, 2015 WL 5023719, at *5 (N.D.N.Y. Aug. 25, 2015); see Ward v. N.Y. Univ., 2000 WL 1448641, at *5 (S.D.N.Y. Sept.28, 2000)("[B]ald assertions and conclusory allegations claiming that the University's rules or procedures were not followed, do not state a valid claim."); Gally v. Columbia Univ., 22 F. Supp. 2d 199, 207 (S.D.N.Y.

1998)("mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted").

Plaintiff's opposition papers point to three ways that Syracuse allegedly violated the "express guarantees of the Student Handbook." First, Plaintiff argues that he failed to receive "notice of alleged misconduct" prior to any hearing, and that the Handbook provides that "Students have a right to written notice." Moreover, the Handbook provides a right to a "fair and impartial" process offering "adequate notice and meaningful opportunity to be heard." He complains that the notice he received alleged only that "on or about October 25, 2015 you sexually assaulted another Syracuse University student." That notice did not tell him the location of the alleged assault or "the name of the alleged victim," and Plaintiff found it "impossible . . . to begin to investigate the allegations and prepare a defense." Two months later, he received additional notice that "the complaint arises from an incident occurring on or about October 25, 2016 at approximately 1:00 a.m. when it is alleged you sexually assaulted a Syracuse University Student." He still received no notice of the location. Plaintiff contends that this notice was "vague and open ended" and prevented him from preparing a defense. Second, Plaintiff contends he was denied a "full and fair investigation." He points out that the Student Conduct Handbook provides that, when the Title IX Coordinator receives a complaint, the Coordinator "will designate an investigator who may conduct an investigation." Plaintiff argues that "[t]he obligation to conduct an investigation must be read in conjunctions [sic] with other guarantees that this be a 'full and fair' investigation; otherwise the contractual guarantee is meaningless." Third, Plaintiff points to a section of the Handbook that contains a "Bill of Rights" which states that students have a right "'to participate in a process that is fair, impartial, and provides

adequate notice and meaningful opportunity to be heard.'" To determine whether Defendant violated this provision, Plaintiff claims, the Court must evaluate the process as a whole. Defendant also violated this right, Plaitniff claims, by failing to require that the alleged victim appear at the hearing.

All these alleged breaches, however, are the types of general statements of policy which New York law dictates cannot form the basis of a viable contract claim. See Gally v. Columbia University, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998); *see also* Nungesser v. Columbia Univ., 244 F. Supp. 2d 345, 373 (S.D.N.Y. 2017).[4]  While Plaintiff claims he was not provided "adequate notice" of the complaint against him, he admits that he received notice of the nature of the complaint against him and complains only about the level of detail in the notice. He also admits he had a hearing, but complains about the hearing's outcome and the witnesses who testified.  The provision that students receive "written notice" or "adequate notice" of complaints is incorporated in the "Fundamental Fairness" section of the Statement of Student Rights and Responsibilities, and in the Bill of Rights found in the Syracuse University Policy on Sexual Assault, Sexual Harassment, Stalking or Relationship Violence.  See Student Conduct System Handbook, Exh. A to Complaint, at 4, 8.  In both those places, the University promises that a student has "the right to written notice and the opportunity for a hearing" and "adequate notice and [a] meaningful opportunity to be heard."  Id.  Provisions that students will be treated in a "fundamentally

_____

[4]("Nungesser alleges that Columbia breached six policies in its treatment of him [including its "policy concerning fair process to both complainants and respondents in disciplinary investigations and proceedings"]. He also alleges that Columbia violated the duty of good faith and fair dealing. None of these claims withstand scrutiny, however, because Nungesser has not identified the specific promises that Columbia has breached.")

36

fair" manner, or in a manner that is consistent with fundamental "student rights," are the

sorts of non-actionable statements of general policy that courts applying New York law have

held cannot support a breach of contract claim. See, e.g. Ward, 2000 WL 1448641, at *4.[5]

Moreover, Noakes' breach of contract claim with respect to "notice" fails because there is no

allegation that notice was not provided.  Allegations challenging the adequacy of the notice

do not establish a viable breach of contract  claim. See Routh, 981 F. Supp. 2d at 208-210.[6]

His remaining two breach of contract claims, focused on alleged guarantees of "fairness,"

are equally generalized complaints that attempt to transform dissatisfaction about the

outcome of the hearing into a breach-of-contract cause of action.  They are equally

unavailing. See Nungesser, 244 F. Supp. 2d at 373.   Accordingly, the breach of contract

claim is dismissed.

### iv.  Negligence

Plaintiff's fourth cause of action alleges that Syracuse was negligent.  Plaintiff

contends that "Syracuse owed a duty of care to [Plaintiff] and others to conduct that process

in a non-negligent manner and with due care."  Complt. at ¶ 123.  Those "who directed and

implemented that process owed" Plaintiff "the same duty of care."  Id.  The University's duty,

Plaintiff alleges, "included [an] obligation to conduct an investigation and adjudicatory

---

[5] ("Here, virtually all of the promised services that Ward cites, are broad
pronouncements of the University's compliance with existing anti-discrimination laws,
promising equitable treatment of all students.  As such, they cannot form the basis for a
breach of contract claim.")

[6] (Rejecting a breach of contract claim where plaintiff admitted receiving notice of
the complaint but contended that such notice was insufficient.  The Court noted that
plaintiff "has not indicated a particular policy or provision requiring the [University] to
provide him with any level of detail or explanation in its decision, nor does the Court find
any in the Standards of Student Conduct.")

process in a non-negligent manner." Id. at ¶ 125.  Plaintiff contends that Syracuse's duty is

"contractual, and/or quasi-contractual," "imposed by Federal law, including Title IX and the

Clery Act," and "further imposed by the role of Syracuse in providing an education

consistent with the liberal values of fairness and due process." Id.  Accreditation standards

set by the Middle States Commission on Higher Education that apply to Syracuse also

impose on the University a duty of "truthfulness, clarity, and fairness," Plaintiff contends. Id.

at ¶ 126.  As evidence of the University's negligence, Plaintiff points to alleged failings in the

investigation–such as the investigator's alleged assumption that Jane Roe told the truth, the

allegedly biased identification process, and the unwillingness of the University to permit

Plaintiff the advisor of his choice–as evidence of Syracuse's breach of the duty of care.

In New York, proof of negligence requires a showing that "(1) the defendant owed the

plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff

suffered damage as a proximate result." Williams v. Utica Coll. of Syracuse Univ., 453 F.3d

112,116 (2d Cir. 2006). Defendant argues that Plaintiff's negligence claim should be

dismissed because all of the duties he alleges are contractual duties, which cannot be the

subject of a negligence claim.  Moreover, Defendant argues, no tort for negligent

investigation or prosecution exists in New York.  Plaintiff responds that the accreditation

standards which apply to Syracuse create an independent legal duty.

Plaintiff's claim fails as a matter of New York law.  First, as the Court stated in

Prasad, "a claim of this nature 'fails . . . because '[t]here is no cause of action in the State of

New York sounding in negligent prosecution or investigation.'" Prasad, 2016 WL 3212079,

at *23 (quoting Xiaolu Peter Yu, 97 F. Supp. 3d at 484 (in turn quoting Coleman v. Corp.

Loss Prevention Assocs., 282 A.D.2d 703, 724 N.Y.S.2d 321, 322 (2d Dep't 2001) and

citing <u>Weitz v. State</u>, 182 Misc.2d 320, 696 N.Y.S.2d 656 (N.Y. Ct. Cl.1999) (applying this

rule to "administrative disciplinary charges brought against a college or university student")).

Beyond the impossibility of stating a claim for negligent investigation or prosecution, courts

have found that accreditation standards create no duty and thus no negligence claim.

Judge Wolford of the Western District of New York rejected an identical argument, finding:

> Plaintiff's opposition papers focus on accreditation standards—as opposed to
> a contract—as the source of HWS's alleged duty. (Dkt. 17 at 25–26). In
> support of his position, Plaintiff argues that courts have recognized that
> accreditation standards create an independent duty of care for schools and
> other entities, citing a number of out-of-state cases. (Dkt. 17 at 26–27 (citing
> <u>United States ex rel. Diop v. Wayne Cty. Cmty. Coll. Dist.</u>, 242 F.Supp.2d 497,
> 524–25 (E.D. Mich. 2003); <u>Gess v. United States</u>, 952 F. Supp. 1529, 1552
> (M.D. Ala. 1996); <u>A.W. v. Lancaster Cty. Sch. Dist. 0001</u>, 280 Neb. 205, 222,
> 784 N.W.2d 907 (2010); <u>Fletcher v. S. Peninsula Hosp.</u>, 71 P.3d 833, 837
> (Alaska 2003)). However, none of these cases support Plaintiff's position; in
> other words, none stand for the proposition that, under New York law,
> accreditation standards give rise to a duty of care for colleges or universities.
> Indeed, Plaintiff concedes that "New York does not appear to have addressed
> the issue." (Dkt. 17 at 26). Having failed to demonstrate that New York law
> recognizes a duty of care arising out of accreditation standards, Plaintiff's
> negligence claim is dismissed.

<u>Rolph</u>, 271 F. Supp. 3d at  409.

Because New York law does not recognize a claim for negligent prosecution or

investigation, or a duty of care arising out of accreditation standards, Plaintiff's fourth cause

of action is dismissed.

## V.    CONCLUSION

For the reasons discussed above, Syracuse's motion to dismiss Plaintiff's

Complaint, dkt. # 11, is **GRANTED in part** and **DENIED in part**.  Syracuse's motion is

denied with respect to Plaintiff's Title IX claim (Count I), granted with leave to re-plead with

respect to Plaintiff's Title VI claim (Count II), and granted with prejudice with respect to

Plaintiff's state law claims (Counts III and IV) which are **DISMISSED**.  If Plaintiff elects to re-plead his Title VI claim, he shall file an Amended Complaint within 21 days of the date of this Order.[7]  If Plaintiff fails to file an Amended Complaint within the time specified in this Order, the Court will deem Plaintiff's Title VI claim dismissed with prejudice.

**IT IS SO ORDERED.**

Dated:February 26, 2019

Thomas J. McAvoy
Senior, U.S. District Judge

---

[7]If Plaintiff elects to re-plead, he must assert sufficient factual allegations directed to the deficiencies addressed above.  See FED. R. CIV. P. 11(b)(3)("By presenting to the court a pleading, . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."),